# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

_____

| | |
|---|---|
| STATE OF NEW MEXICO,<br>on behalf of the NEW MEXICO<br>ENVIRONMENT DEPARTMENT,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY, et al.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   No. 1:16-cv-00465-MCA-LF<br>)<br>)<br>)<br>)<br>)<br>) |

_____

| | |
|---|---|
| NAVAJO NATION,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)   No. 1:16-cv-00931-MCA-LF<br>)<br>)<br>)<br>)<br>) |

_____


## DEFENDANT EPA'S MOTION TO DISMISS COMPLAINTS OF PLAINTIFFS STATE OF NEW MEXICO AND NAVAJO NATION AND INCORPORATED MEMORANDUM IN SUPPORT THEREOF

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT FOR DISMISSAL ...............................1

BACKGROUND ...................................................................................................................3

I.      Legal Background.........................................................................................................3

        A.      The Comprehensive Environmental Response, Compensation and Liability Act...3

        B.      The Clean Water Act ..................................................................................................4

II.     Factual Background ....................................................................................................5

STANDARD OF REVIEW .....................................................................................................8

ARGUMENT ...........................................................................................................................9

I.      EPA Retains Sovereign Immunity When Responding to a Release or Substantial
        Threat of Release of Hazardous Substances Caused by Others............................................9

II.     Plaintiffs' Allegations Fail to State a Claim for Relief Against EPA Under
        CERCLA.....................................................................................................................13

        A.      Plaintiffs Have Not Adequately Alleged That EPA Is Liable As an
                "Operator."................................................................................................................13

        B.      Plaintiffs Have Not Adequately Alleged That EPA Is Liable As an
                "Arranger" or As a "Transporter."...........................................................................16

III.    New Mexico's Clean Water Act Claim Is Barred ...........................................................18

        A.      CERCLA Section 9613(h) Divests This Court of Jurisdiction Over
                New Mexico's CWA Claim.....................................................................................19

        B.      New Mexico Lacks Standing to Bring Its CWA Claim.........................................22

        C.      Colorado's Alleged Failure to Issue Permits Is Not a "Violation of an
                Effluent Standard or Limitation" Under CWA Section 1365(h) ...........................24

CONCLUSION......................................................................................................................25

Defendants the United States of America and the United States Environmental Protection Agency ("EPA" or "the Agency") (collectively, "EPA") hereby move pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the First, Second and Fourth Causes of Action in the Complaint of the State of New Mexico, and the First and Second Claims for Relief in the Complaint of the Navajo Nation (New Mexico and the Navajo Nation are, collectively, the "Plaintiffs").[1]  The United States separately is filing an opposition to New Mexico's motion for leave to amend its complaint (ECF No. 86, filed Nov. 15, 2016), to the extent the proposed amended complaint reasserts the above-referenced First, Second and Fourth Causes of Action and also seeks to add new claims against the United States.  The memorandum of points and authorities supporting EPA's motion to dismiss is set forth below.

## INTRODUCTION AND SUMMARY OF ARGUMENT FOR DISMISSAL

Both Plaintiffs seek relief from this Court in connection with the August 5, 2015, release of contamination from an abandoned gold mine in Colorado known as the "Gold King Mine." Specifically, both Plaintiffs request that EPA be held jointly and severally responsible with the other Defendants under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9607(a), 9613(g)(2), for "response costs" that each Plaintiff allegedly has incurred or will incur as a result of this contamination.  These claims against EPA ignore well-settled law that CERCLA does not waive EPA's sovereign immunity to suit when its sole connection to the site at issue arises from exercising its authority under CERCLA to respond to other entities' legacy contamination.  That is plainly the case here, where Plaintiffs' own allegations acknowledge that EPA became involved at the Gold King Mine not because of any historic involvement in the operations that resulted in mining waste, but rather by

---

[1] The remaining counts in each complaint are pled against private parties, not EPA.

exercising its authority under CERCLA to assist in responding to environmental contamination caused by others.  Accordingly, in the absence of an express and unequivocal waiver of EPA's sovereign immunity, the Court lacks subject-matter jurisdiction over Plaintiffs' CERCLA claims against EPA.  *Infra* Argument I.  And, should the Court find that such jurisdiction exists, it still should dismiss these claims because Plaintiffs have not alleged facts showing that EPA fits the definition of a liable party under CERCLA.  *See* 42 U.S.C. § 9607(a)(1)-(4).  *Infra* Argument II.

New Mexico's Fourth Cause of Action requests that the Court issue an injunction requiring EPA to abate contamination from the Gold King Mine and other abandoned mines in Colorado that are adversely impacting New Mexico's waters, invoking a provision of the Clean Water Act ("CWA"), 33 U.S.C. § 1365(h).  But EPA already is responding to this contamination pursuant to its CERCLA authority; mostly recently, it has added the "Bonita Peak Mining District" (which encompasses releases from the Gold King Mine) to its National Priorities List for remediation (as determined necessary) pursuant to CERCLA, 81 Fed. Reg. 62,397, 62,400 (Sept. 9, 2016), and is actively assessing contamination throughout the listing area as part of its remedial process.  *Infra* at 6-7.  Therefore, under equally well-settled law including that of the Tenth Circuit, New Mexico's claim to compel "abate[ment]" by EPA must be dismissed because it invites premature judicial intervention into EPA's remedial process that is expressly barred by the "timing of review" provision in section 9613(h) of CERCLA.  42 U.S.C. § 9613(h); *see, e.g.*, *New Mexico v. General Elec. Co.*, 467 F.3d 1223, 1249 (10th Cir. 2006).  *Infra* Argument III.A.  In addition, the Court lacks jurisdiction over this claim because it fails to satisfy traditional standing considerations.  *Infra* Argument III.B.  Finally, New Mexico's allegations fail to state a claim for relief under CWA section 1365(h) because, as explained further below, those allegations do not conform to the plain language of the statute.  *Infra* Argument III.C.

# BACKGROUND

## I.       Legal Background

### A.       The Comprehensive Environmental Response, Compensation and Liability Act

In 1980 Congress enacted CERCLA, 42 U.S.C. §§ 9601-75, "to provide a mechanism for

the prompt and efficient cleanup of hazardous waste sites." *United States v. City & County of*

*Denver*, 100 F.3d 1509, 1511 (10th Cir. 1996).  Section 9604 authorizes the President to take

action to respond to a release or substantial threat of release of any hazardous substance.  42

U.S.C. § 9604.  The President has delegated some of that authority to EPA.  *See* 52 Fed. Reg.

2923 (Exec. Order No. 12,580) (Jan. 23, 1987).  EPA can clean up releases under section 9604

by performing "removal" or "remedial actions," collectively termed "response" actions.  42

U.S.C. § 9601(23)-(25).  "Removal action" is defined to include, among other actions, "the

cleanup or removal of released hazardous substances from the environment," as well as actions

"necessary to monitor, assess, and evaluate the release" of hazardous substances.  *Id.* § 9601(23).

"Remedial action" is defined to include, *inter alia*, "actions consistent with permanent remedy

taken instead of or in addition to removal actions in the event of a release or threatened release of

a hazardous substance in the environment."  *Id.* § 9601(24).

Section 9613(h) of CERCLA addresses the timing of judicial review of response actions

taken pursuant to section 9604.  42 U.S.C. § 9613(h).  It provides that "[n]o Federal court shall

have jurisdiction . . . to review any challenges to removal or remedial action selected under

[section 9604]," except in limited circumstances not present in this case.  *See id.* § 9613(h)(1)-

(5).

CERCLA also assigns liability for cleanup costs to four categories of "covered persons":

(1) those who "own" or "operate" a facility at which hazardous substances are located; (2) those

who previously owned or operated such a facility "at the time of disposal of any hazardous substance"; (3) those who "arrange[] for disposal or treatment" of hazardous substances; and (4) those who "accept[] . . . any hazardous substance for transport to disposal or treatment facilities." 42 U.S.C. § 9607(a)(1)-(4).  This scheme of liability "ensure[s] that the costs of . . . cleanup efforts [are] borne by those responsible for the contamination."  *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009).  Section 9620(a)(1) provides that the federal government "shall be subject to, and comply with, this chapter in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section 9607."  *Id.* § 9620(a)(1).

B.      **The Clean Water Act**

The Clean Water Act was enacted to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. 1251(a).  Section 1365(h) of the CWA provides that state governors may bring suit under section 1365(a), the CWA citizen-suit provision,[2] "where there is alleged a failure of the [EPA] Administrator to enforce an effluent standard or limitation under this chapter the violation of which is occurring in another State and is causing an adverse effect on public health or welfare in [the plaintiff governor's] State, or is causing a violation of any water quality requirement in his State."  33 U.S.C. § 1365(h); *see also id.* § 1365(a).  To our knowledge, no state governor has ever before invoked section 1365(h).

---

[2] *See* 33 U.S.C. § 1365(a) (allowing citizen suits to be filed against "any person . . . alleged to be in violation" of "an effluent standard or limitation under this chapter" or an EPA or state order "with respect to such a standard or limitation," and "against the Administrator" for alleged "failure . . . to perform any act or duty under this chapter which is not discretionary with the Administrator").

## II.      Factual Background[3]

The present lawsuits stem in large part from the legacy of more than a century of mining activity and its associated impacts on the environment.  Mining companies descended on the area surrounding the headwaters of the Animas River to extract precious metals in the late 19th and early 20th centuries.  New Mexico Complaint ("NM Compl.") ¶¶ 19-20; New Mexico Amended Complaint ("NM Am. Compl.") ¶¶ 23-24, 26; Navajo Compl. ¶ 5.  The resulting contamination from those mining activities has endured to this day, though many of the mining companies have not, and some mines were abandoned altogether.  *See, e.g.,* NM Compl. ¶¶ 21, 27, 99; NM Am. Compl. ¶¶ 23, 27, 125; Navajo Compl. ¶ 5.  As their profits declined, mining companies in the area began shuttering their mining tunnels.  Navajo Compl. ¶ 6.  Because the mining district "consists of an interrelated maze of mining tunnels, fractures, and waterways," some of these mining closures caused water to shift through the watershed.  *Id*.  Mining contamination in this area has spread past the original mines and infiltrated groundwater, a problem often referred to as "acid mine drainage."  *Id*. ¶ 41.

In the 1990s, EPA and Colorado's Department of Public Health and the Environment determined that the watershed had been severely impacted by metals contamination.  Navajo Compl. ¶ 58.  Both EPA and Colorado thus undertook to clean up mines in the area.

---

[3] This statement of facts is drawn primarily from allegations in the operative complaints of New Mexico and Navajo Nation, but because this Court is simultaneously considering New Mexico's motion for leave to amend its complaint, we have included parallel citations to the relevant allegations in New Mexico's proposed amended complaint.  New Mexico's original and proposed amended factual allegations against the United States are not materially different in substance, and as noted above, the United States is separately filing an opposition to the motion for leave to amend on futility grounds.  This statement of facts is supplemented by reference to additional materials relevant to resolving whether this Court has jurisdiction.  *See Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995) (courts have "wide discretion" to consider materials outside the pleadings as appropriate to determine jurisdiction).

Specifically, New Mexico alleges that Colorado's Division of Reclamation, Mining and Safety ("DRMS") began reclamation work at the Gold King Mine in 2008, and that EPA began reclamation work at a mine known as "Red and Bonita" in 2011. NM Compl. ¶ 64, 70; NM Am. Compl. ¶ 67, 73. In 2014, DRMS asked EPA to investigate drainage issues at the Gold King Mine. NM Compl. ¶ 75; NM Am. Compl. ¶ 78. EPA, DRMS, and contractors Environmental Restoration, Weston Solutions and Harrison Western then began investigating the ongoing releases at the Gold King Mine. NM Compl. ¶ 76; NM Am. Compl. ¶ 79-83; Navajo Compl. ¶¶ 72-76.

New Mexico alleges that on August 4, 2015, the "EPA crew" began "digging at the adit" of the Gold King Mine. NM Compl. ¶ 84; *accord* NM Am. Compl. ¶ 96. The next day, as these personnel allegedly "resumed digging at the mouth of the adit," the operator of an excavator "reported hitting a 'spring.'" NM Compl. ¶¶ 4, 87; NM Am. Compl. ¶ 99 (backhoe operator hit a spring); *see also* Navajo Compl. ¶ 80. This breach caused the eventual release of three million gallons of acid mine drainage into the Animas River Watershed. NM Compl. ¶ 1; NM Am. Compl. ¶ 1; Navajo Compl. ¶ 83.

In the following days, EPA sent more than 200 employees and contractors to the areas affected by the Gold King Mine release, collected water samples, and held public meetings. "One Year After the Gold King Mine Incident: A Retrospective of EPA's Efforts to Restore and Protect Impacted Communities" (Aug. 1, 2016) ("One Year Report"), Ex. 1, at 9-10. Six days after the release, EPA finished constructing settling ponds to treat the water discharging from the mine. *Id.* By November 2015, EPA had installed an interim water treatment plant to treat the mining discharge. *Id.* EPA decided to undertake a removal action under CERCLA section 9604, as it explained in an action memorandum issued on January 15, 2016. NM Compl. ¶ 124; NM

Am. Compl. ¶ 150.  Two months later, EPA released its Conceptual Monitoring Plan to study the impact of the August 5 breach; since then, EPA has continued to investigate the impact of the release and has decided to continue operating the interim water treatment plant at Gold King Mine.  One Year Report, Ex. 1, at 10-11; EPA Action Memo., Jan. 12, 2017, Ex. 2 at 9.

On September 9, 2016, EPA added the Bonita Peak Mining District ("Mining District") to the National Priorities List ("NPL"). 81 Fed. Reg. 62,397, 62,400.  The NPL is a list of priority sites "among the known releases or threatened releases [of hazardous substances, pollutants, or contaminants] throughout the United States."  42 U.S.C. § 9605(a)(8)(B).  After EPA lists a site, EPA, or a responsible party under EPA's oversight, will undertake a remedial investigation and feasibility study to more precisely define the site, if necessary, and determine what cleanup is appropriate, if any.  *See* 42 U.S.C. § 9604; Bonita Peak Mining District NPL Listing Support Document ("NPL Support Document"), Ex. 3, at 10-11.

The Mining District consists of "a commingled release of metals from numerous mines and mine-related activities in the Animas River watershed," which includes the Mineral Creek, Cement Creek and Upper Animas drainages. NPL Support Document, Ex. 3, at 10.  The site is not limited to specific mines, but extends to the release of contamination from mines in the Animas River watershed, wherever that contamination "come[s] to be located."   NPL Support Document, Ex. 3, at 10, 13.  As EPA pursues further investigation, the Agency will be better able to characterize the full extent of the releases, and, thereby, the site.  *Id*. at 10.  Currently, EPA is assessing ecological risks of mining contamination in the Animas River to gather information necessary for the remedial investigation and feasibility study.  Bonita Peak Mining District 2016 Sampling Analysis Plan/Quality Assurance Project Plan, Ex. 4 at 1.

## STANDARD OF REVIEW

The federal courts are courts of limited jurisdiction and may exercise only that jurisdiction which has been granted to them by Congress. *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541 (1986). The plaintiff bears the burden of proving that subject-matter jurisdiction exists. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). A plaintiff must plead and, if challenged, prove the existence of the requisite jurisdictional facts. *Gibbs v. Buck*, 307 U.S. 66, 72 (1939). If the plaintiff cannot meet this burden, the case should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1).

Because subject-matter jurisdiction focuses on the court's power to hear the plaintiff's claim, a Rule 12(b)(1) motion imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority. *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974); *see Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94-95 (1998). In deciding a Rule 12(b)(1) motion, a court is not limited to the allegations in the complaint, and instead has "wide discretion" to consider materials outside the pleadings as it deems appropriate to resolve whether it has jurisdiction in the case. *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995).

The plaintiff must also plead sufficient facts to demonstrate an entitlement to relief. Fed. R. Civ. P. 12(b)(6). Though the plaintiff's factual allegations are presumed to be true in deciding a Rule 12(6)(6) motion, "a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, the complaint must plead sufficient facts, not mere conclusory allegations, to support a viable claim, *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991), and must be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic*, 550 U.S. at 570.

**ARGUMENT**

I.     **EPA Retains Sovereign Immunity When Responding to a Release or Substantial Threat of Release of Hazardous Substances Caused by Others.**

New Mexico's First and Second Causes of Action and the Navajo Nation's First and Second Claims for Relief are premised on the erroneous contention that Congress waived EPA's sovereign immunity for claims based on EPA's CERCLA response to a release or substantial threat of release of hazardous substances caused by others. Every reported district court case to address CERCLA's waiver of sovereign immunity, 42 U.S.C. § 9620(a)(1), under similar factual circumstances has held that EPA retains immunity when EPA's <u>sole</u> involvement at the site consists of actions taken under CERCLA section 9604 to respond to releases caused by others. The only court of appeals decision to discuss the issue agrees. This Court should likewise uphold EPA's sovereign immunity in this case.

A party seeking to sue the United States or one of its agencies bears the burden of demonstrating that a specific statutory provision waives the government's sovereign immunity. *Fostvedt v. United States,* 978 F.2d 1201, 1203-04 (10th Cir. 1992). Unless Congress has consented to a cause of action against the United States, there is no jurisdiction in any court to entertain such suits. *United States v. Mitchell*, 463 U.S. 206, 212 (1983). A waiver of immunity must be "unequivocally expressed" in the text of the statute and cannot be merely implied. *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33 (1992); *Sierra Club v. Lujan*, 972 F.2d 312, 314 (10th Cir. 1992). Furthermore, waivers of sovereign immunity are "construed strictly in favor of the sovereign." *United States Dep't of Energy v. Ohio*, 503 U.S. 607, 614 (1992); *Sierra Club*, 972 F.2d at 314.

CERCLA section 9620(a)(1) states that federal departments and agencies "shall be subject to, and comply with, this chapter in the same manner and to the same extent, both

9

procedurally and substantively, as any nongovernmental entity, including liability under [section 107]." 42 U.S.C. § 9620(a)(1). Section 9607(a)(1)-(4), in turn, establishes liability under CERCLA for four categories of persons, referred to as owners, operators, arrangers and transporters. *Id.* § 9607(a). Therefore, a federal agency may be liable if it, acting like a private party, falls within one of these four categories.[4]

When EPA undertakes actions pursuant to CERCLA section 9604(a)(1) in response to a release of hazardous substances caused by others, it "does not subject itself to liability under section [96]07(a)." *In re Paoli R.R. Yard PCB Litig.*, 790 F. Supp. 94, 97 (E.D. Pa. 1992), *aff'd*, 980 F.2d 724 (3d Cir. 1992); 42 U.S.C. § 9604(a)(1). Section 9620(a)(1) does not expressly and unequivocally waive EPA's immunity in situations where EPA does not, and never has had, any connection to the site but for EPA's section 9604 response actions. *See United States v. Atlas Minerals & Chemicals, Inc*., 797 F. Supp. 411, 421 (E.D. Pa. 1992) (finding that the waiver found in section 9620 does not extend to EPA response action because "when the EPA undertakes such actions, it is not acting like a private party"). Waivers of sovereign immunity must be strictly construed, and section 9620(a)(1) <u>cannot</u> be read as a more general waiver of sovereign immunity that would extend to EPA's actions at a site taken solely under section 9604(a)(1). *United States v. Western Processing Co.*, 761 F. Supp. 725, 729 (W.D. Wash. 1991) (holding that CERCLA does not waive sovereign immunity for claims based on EPA's cleanup activities because "a waiver of sovereign immunity cannot be based on such tenuous ground as an implication, especially one of such ghostly manifestation").

---

[4] For example, the United States may be liable under CERCLA section 9607(a) where a federal agency owns a hazardous waste facility, engages in the operation of a facility that releases hazardous substances, or arranges for the disposal of its hazardous waste. *See FMC Corp. v. U.S. Dep't of Commerce*, 29 F.3d 833, 835-41 (3d Cir. 1994). As discussed below, however, here EPA does not fit within any of the section 9607 categories. *Infra* Argument II.

The Third Circuit Court of Appeals confirmed that CERCLA section 9620(a)(1) does not waive EPA's immunity for response actions when such actions are EPA's sole connection to the site. *See FMC Corp. v. U.S. Dep't of Commerce*, 29 F.3d 833, 841-42 (3d Cir. 1994). Rather, a waiver of sovereign immunity exists where "the government's involvement . . . [is] not in response to a threatened release of hazardous materials." *Id.* (emphasis added). In *FMC*, the court of appeals reviewed claims against the U.S. Department of Commerce arising from its substantial involvement during World War II in the operational decision-making at a rayon plant from which hazardous substances were released. *Id.* at 843-46. The court found a waiver of sovereign immunity for such conduct, and noted that the Department of Commerce's conduct was unlike actions taken "solely with the purpose of cleaning up hazardous materials—activities undertaken to 'ameliorate a dangerous situation that, but for the prior action of the generators and transporters of the hazardous waste, would not exist.'" *Id.* at 841. The Third Circuit explained that Congress did not intend CERCLA to discourage the government from taking response actions by making the government liable for attempts to clean up waste created by others. *Id.*; *see also Coeur D'Alene Tribe v. Asarco, Inc.*, 280 F. Supp. 2d 1094, 1125 n.23 (D. Idaho 2003) (distinguishing government actions giving rise to waiver of sovereign immunity from government CERCLA cleanup actions at a site for which the government is immune from suit.)

For similar reasons, every reported federal district court decision to address EPA's sovereign immunity stemming solely from allegations associated with its cleanup activities has held that Congress did not waive EPA's immunity.[5] *See, e.g., United States v. Azrael*, 765 F.

_____

[5] The factual circumstances giving rise to *United States v. Iron Mountain Mines, Inc.*, 881 F. Supp. 1432, 1448-49 (E.D. Cal. 1995), in which the court found no "remedial" immunity under CERCLA, did not concern an EPA response action taken under CERCLA. Two court of appeals decisions that found a waiver of immunity arising from the United States' activities in World War II — *United States v. Shell Oil Co.*, 294 F.3d 1045 (9th Cir. 2002) and *East Bay Mun. Util.*

Supp. 1239, 1244 (D. Md. 1991); *United States v. Western Processing Co.*, 761 F. Supp. 725,

729 (W.D. Wash. 1991); *United States v. Am. Color & Chem. Corp.*, 858 F. Supp. 445, 449-50

(M.D. Pa. 1994); *Richland-Lexington Airport Dist. v. Atlas Properties*, 854 F. Supp. 400, 414 (D.

S.C. 1994); *United States v. Atlas Minerals & Chemicals, Inc*., 797 F. Supp. 411, 419-21 (E.D.

Pa. 1992); *In re Paoli R.R. Yard PCB Litig.*, 790 F. Supp. at 97; *B.R. MacKay & Sons v. United

States*, 633 F. Supp. 1290, 1296 n.9 (D. Utah 1986); *United States v. Hardage*, No. CIV-86-

1401-P, 1989 U.S. Dist. LEXIS 17236, at *3-5 (W.D. Okla. Nov. 22, 1989).

Plaintiffs' claims against EPA do not fall within the scope of Congress' waiver of

sovereign immunity in section 9620(a)(1). Plaintiffs do not allege that EPA's involvement at

Gold King was for any purpose other than to respond to releases from the mine as part of a site

investigation. *See* NM Compl., ¶ 75; *see also id.* ¶¶ 76-87; NM Am. Compl. ¶ 78-79; *see also id.*

¶¶ 80-99; Navajo Compl. ¶¶ 67, 78. This is not a case involving, for example, the alleged release

of hazardous substances from a federal installation, or from an industrial site formerly owned or

operated by a federal government agency. Thus, Plaintiffs' CERCLA claims against EPA

necessarily are based entirely on EPA's actions in its capacity as the agency charged with

responding to releases of hazardous substances. NM Compl. ¶¶ 102-04; NM Am. Compl. ¶¶

128-30; Navajo Compl. ¶¶ 123-25. Congress did not intend for EPA to be potentially liable

under section 9607(a) when its only nexus to the site arises from EPA's response to a release of

hazardous substances. *See Western Processing*, 761 F. Supp. at 729 (When EPA carries out

response actions at a site, "the EPA is not analogous to an agency of the Federal Government

that may have generated its own waste and transported it to the site.")

---

*Dist. v. United States*, 142 F.3d 479 (D.C. Cir. 1998) —similarly did not involve claims against
EPA arising from its CERCLA section 9604 activities in response to the release of hazardous
substances caused by others.

Plaintiffs have thus failed to carry their burden of identifying a waiver of sovereign immunity that would allow their claims based upon EPA's response actions at Gold King. Accordingly, those claims should be dismissed for lack of subject-matter jurisdiction.

## II. Plaintiffs' Allegations Fail to State a Claim for Relief Against EPA Under CERCLA.

Plaintiffs' CERCLA claims against EPA must be dismissed for a second, independent reason: their allegations fail to plausibly establish that EPA is a "covered person" with potential liability for response costs under CERCLA. Although CERCLA is a strict liability statute, *Matter of Bell Petroleum Servs., Inc.*, 3 F.3d 889, 897 (5th Cir. 1993), it does not "automatically assign liability to every party with any connection to a contaminated facility," *United States v. Qwest Corp.*, 353 F. Supp. 2d 1048, 1051 (D. Minn. 2005) (internal quotation marks omitted). Rather, as noted above, the statute specifies four categories of "covered persons" (colloquially known as "potentially responsible parties" or "PRPs") that may be liable: (1) "owner[s] and operator[s]" of facilities where hazardous substances are released; (2) owners and operators of such facilities "at the time of disposal of any hazardous substance"; (3) persons who "arranged for disposal or treatment" of hazardous substances; and (4) certain transporters of hazardous substances. 42 U.S.C. § 9607(a)(1)-(4); *supra* at 3-4. Plaintiffs contend that EPA is liable as an operator, an arranger, and a transporter, *see* NM Compl. ¶¶ 102-04, NM Am. Compl. ¶¶ 128-30; Navajo Compl. ¶¶ 123-25, but their allegations fail to plausibly establish a factual basis for liability under any of these three categories, and so the claims must be dismissed.

### A. Plaintiffs Have Not Adequately Alleged That EPA Is Liable As an "Operator."

The term "operator" under CERCLA section 9607(a) has its "ordinary [and] natural meaning"—an "operator" is generally "someone who directs the workings of, manages, or

conducts the affairs of a facility." *United States v. Bestfoods*, 524 U.S. 51, 66 (1998). The

Supreme Court explained in *Bestfoods* that given "CERCLA's concern with environmental

contamination," operator liability exists where the person "manage[s], direct[s], or conduct[s]

operations specifically related to pollution, that is, operations having to do with the leakage or

disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.*

at 66-67. To determine whether a defendant meets this definition, many courts have examined

whether the person was "actively involved in" the facility's "operations and decision-making."

*City of Wichita v. Trustees of the Apoco Oil Corp. Liquidating Trust*, 306 F. Supp. 2d 1040, 1054

(D. Kan. 2003). In other words, an operator is an entity that "'make[s] the relevant decisions'

regarding the disposal of hazardous wastes 'on a frequent . . . basis.'" *Lockheed Martin Corp. v.

United States*, 35 F. Supp. 3d 92, 121 (D.D.C. 2014) (quoting *City of Wichita*); *TDY Holdings,

LLC v. United States*, 122 F. Supp. 3d 998, 1017 (S.D. Cal. 2015) (same); *see also, e.g.*, *Miami-

Dade Cty. v. United States*, 345 F. Supp. 2d 1319, 1342 (S.D. Fla. 2004) (holding no liability

where "federal personnel did not . . . direct [the contractor's] employees in their daily work").

　　The same analysis applies where a plaintiff alleges that a governmental entity is an

"operator." *FMC Corp.*, 29 F.3d at 840. The government may be liable where it is "running the

facility" in a "hands-on" manner. *United States v. Township of Brighton*, 153 F.3d 307, 316 n.11

(6th Cir. 1998). By contrast, the court reasoned in *Township of Brighton*, a governmental entity

would <u>not</u> be liable as an operator where it is merely invoking its "conventional police power to

ensure that [hazardous substances] do[ ] not pose a threat to public health and safety." 153 F.3d

at 315.

　　Applying this rule, EPA is not an operator where its only involvement at a facility

consists of a response action to ensure that contamination created by others does not endanger

the public.  *See id.*; *see also Western Processing*, 761 F. Supp. at 731 (concluding that EPA was not acting as an operator when its response actions cleaning up hazardous substances were remedial in nature).[6]  This makes perfect sense.  EPA's response actions are not the "running" or "management" of a facility as those terms are commonly understood—no one would say that EPA is *running* a facility like a mine when EPA is merely cleaning up contamination created by others.  *See Bestfoods*, 524 U.S. at 66-67 (the plain meaning of "operator" is one who "conduct[s] the affairs of; manage[s]; [or] operate[s] a business").

Declining to hold EPA liable as an "operator" when it is cleaning up contamination created by others is consistent with CERCLA's broader statutory scheme.  As the court observed in *Western Processing*, CERCLA's "statutory scheme was designed to compel commercial concerns to internalize the costs of waste disposal," and the United States "is to contribute its share when it acts in a fashion analogous to that of a business concern."  761 F. Supp. at 730.  However, "[t]hat does not mean that Congress intended to shift liability back to the taxpayers" when EPA's "cleanup efforts at hazardous waste sites are less than successful."  *Id.*  Such a rule would expose EPA (and the taxpayers) to the risk of enormous liability every time EPA performs its statutory duty to respond to releases or threatened releases of hazardous substances.

Here, there are no allegations that EPA at any time "directed the workings [or] business" of the Gold King Mine, *Bestfoods*, 524 U.S. at 66-67, or otherwise directly managed the mine's business affairs in its efforts to safeguard public health and the environment, *Township of Brighton*, 153 F.3d at 315.  Rather, Plaintiffs' allegations confirm that EPA was conducting a response action at the time of the spill—it was seeking to clean up contamination created by

---

[6] Courts similarly have held that states and municipalities cannot be liable as CERCLA operators or arrangers as a result of their cleanup efforts at hazardous waste sites.  *See, e.g.*, *Stilloe v. Almy Bros., Inc.*, 782 F. Supp. 731, 736 (N.D.N.Y. 1992).

others.  New Mexico alleges that mining operations at Gold King ceased in the early 1990's.

NM Compl. ¶ 27, NM Am. Compl. ¶ 30.  EPA initially became involved at the mine many years

later to help "recla[im]" it after a historical adit collapsed and acid mine drainage began spilling

into a nearby creek.  NM. Am. Compl.  ¶¶ 63-65, 76; *see* NM Compl. ¶¶ 60-63 (similar). New

Mexico further alleges that, along with other efforts to clean up hazardous pollution, EPA

"collected water samples" and "started constructing a water management and treatment system to

handle an anticipated increase in discharges from the mine."   NM Am. Compl. ¶¶ 91-92; *see*

*also* NM Compl. ¶¶ 73-76 (similar).  The Navajo Nation makes similar contentions.  *See, e.g.*,

Navajo Compl. ¶ 65 (alleging that EPA was working at the mine site to "investigate[ ] the

potential blockages").  Nothing in these allegations suggests that EPA performed the type of

hands-on management of mine operations either at the time the mine was operating or during

cleanup efforts that plausibly could give EPA "operator" status under *Bestfoods* and its progeny.[7]

## B.  Plaintiffs Have Not Adequately Alleged That EPA Is Liable As an "Arranger" or As a "Transporter."

Section 9607(a)(3) of CERCLA provides that an arranger is one who "arrange[s] for

disposal . . . of a hazardous substance."  42 U.S.C. § 9607(a)(3).  The Supreme Court explained

that an entity "arranges for disposal" where it "takes intentional steps to dispose of a hazardous

substance."  *Burlington N.*, 556 U.S. at 611.  *See also Celanese Corp. v. Martin K. Eby Constr.*

*Co.*, *Inc.*, 620 F.3d 529 (5th Cir. 2010) (holding construction company was not liable as an

---

[7] EPA's involvement at the Gold King Mine is nothing like the government's involvement at the site at issue in *Nu-West Mining, Inc. v. United States*, 768 F. Supp. 2d 1082 (D. Idaho 2011).  In that case, the government entity owned the land where the mining was taking place, owned the hazardous substance at issue, approved the mining plans and regularly inspected the operations to ensure compliance with them, and directly "manag[ed]" the disposal of hazardous substances during the course of active mining operations by specifying the "design and location" of waste dumps.  *Id*. at 1085-86, 1089-91.  There are no similar allegations concerning EPA here.

arranger where it damaged a pipeline carrying methanol with its backhoe because it lacked the intent to dispose of hazardous substances). "Arranger liability is intended to deter and, if necessary, to sanction parties seeking to evade liability by contracting away responsibility." *Chevron Mining, Inc. v. United States*, 139 F. Supp. 3d 1261, 1276 (D.N.M. 2015) (internal quotation and citation omitted).

Plaintiffs have not plausibly alleged the requisite facts to establish EPA intended to dispose of a hazardous substance. *See Burlington N.*, 556 U.S. at 611. Neither New Mexico nor the Navajo Nation assert that the intent of EPA's actions was to dispose of acid mine drainage and heavy chemicals. *Burlington N.*, 556 U.S. at 612. Nor could they, as EPA's intent plainly was to investigate acid mine drainage. Thus, Plaintiffs' allegations are patently insufficient to demonstrate that their claim is "plausible on its face." *Toone v. Wells Fargo Bank, N.A.*, 716 F.3d 516, 520 (10th Cir. 2013) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In fact, Plaintiffs' allegations show the opposite: that EPA did not intend for the spill to take place. New Mexico's amended complaint states that the spill happened when a "backhoe operator reported hitting a 'spring,'" and "just moments after the blowout" asked "'What do we do now?'" NM Am. Compl. ¶ 99; *see also* NM Compl. ¶ 87 (similar). Likewise, the Navajo Nation's complaint recounts similar facts: that "pressurized water began spurting out" as workers excavated an adit and that the blowout caused "[p]ersonnel on site [to] evacuate[ ] the area." Navajo Compl. ¶¶ 80-81. Plaintiffs have thus failed to allege facts sufficient to state a claim that EPA is liable as an "arranger" under CERCLA.

Plaintiffs' allegations that EPA is liable as a "transporter" under section 9607(a)(4) similarly fail. 42 U.S.C. § 9607(a)(4). Transporter liability requires a showing that the defendant brought waste to a site, accepted waste for transport, or selected a disposal facility.

*Id.*; *see, e.g.*, *United States v. Hardage*, 761 F. Supp. 1501, 1511-12 (W.D. Okla. 1990). Neither Plaintiff even attempts to allege any such actions by EPA.

For the above reasons, if the Court does not dismiss New Mexico's First and Second Causes of Action against EPA, and all of the Navajo Nation's claims against EPA, under Rule 12(b)(1) for lack of jurisdiction, it should do so under Rule 12(b)(6) for failure to state a claim.

### III.    New Mexico's Clean Water Act Claim Is Barred.

This court lacks jurisdiction over New Mexico's Fourth Cause of Action under CWA section 1365(h), and, thus, this claim must be dismissed under Rule 12(b)(1). New Mexico brings this claim to "compel[]" EPA "to seek abatement of pollution" from Colorado mines discharging into the Animas River. NM Compl. ¶ 137; NM Am. Compl. ¶ 163. But, pursuant to its CERCLA authority, EPA has already begun assessing contamination from mines in the Animas River watershed and addressing pollution from the Gold King Mine. NPL Support Document, Ex. 3, at 10; One Year Report, Ex. 1, at 10-11. When, as here, EPA is conducting CERCLA response actions, CERCLA section 9613(h) bars New Mexico from litigating to impose its own preferred cleanup. *Cannon v. Gates*, 538 F.3d 1328, 1332-33 (10th Cir. 2008); *Gen. Elec. Co.*, 467 F.3d at 1249 (citing 42 U.S.C. § 9613(h)). Section 9613(h) operates as "'a blunt withdrawal of federal jurisdiction," intended to "ensure that the cleanup of contaminated sites will not be slowed or halted by litigation." *Razore v. Tulalip Tribes of Wash.*, 66 F.3d 236, 239 (9th Cir. 1995) (internal citation omitted). New Mexico cannot upset EPA's careful consideration of cleanup options by raising a CWA claim for court-ordered pollution abatement now. In addition, New Mexico does not have standing to bring its CWA claim because it has failed to establish two necessary elements of standing: redressability and traceability. Even if New Mexico could overcome these jurisdictional defects, its CWA claim must still be dismissed

under Rule 12(b)(6) because Colorado's alleged failure to issue permits is not a "violation of an effluent standard or limitation" within the meaning of CWA section 1365(h).

### A. CERCLA Section 9613(h) Divests This Court of Jurisdiction Over New Mexico's CWA Claim.

Pursuant to CERCLA section 9613(h), "[n]o Federal court shall have jurisdiction under Federal law other than [diversity jurisdiction] or under state law . . . to review any challenges to removal or remedial action selected under section 9604." 42 U.S.C. § 9613(h).[8] Because New Mexico asserts jurisdiction against EPA under the CWA, a "Federal law," its CWA claim is subject to the jurisdictional bar of CERCLA section 9613(h). NM Compl. ¶ 10-11; NM Am. Compl. ¶ 10-11; *see McClellan Ecological Seepage Situation v. Perry*, 47 F.3d 325, 327 (9th Cir. 1995) (holding that section 9613(h) barred a CWA claim). CERCLA section 9613(h) "strip[s] federal jurisdiction from <u>any</u> <u>challenge</u> that would interfere" with CERCLA response actions. *Cannon*, 538 F.3d at 1332-33 (emphasis added); *United States v. City and County of Denver*, 100 F.3d 1509, 1514 (10th Cir. 1996). "Any challenge" includes lawsuits that seek to substitute a court-ordered remedy for EPA's "flexible and dynamic" process of evaluating contamination and choosing appropriate cleanup actions. *Gen. Elec. Co.*, 467 F.3d at 1249-50 (citing 42 U.S.C. § 9613(h)); *Cannon*, 538 F.3d at 1333-34.

EPA is evaluating and addressing mining contamination in the Animas River watershed pursuant to its CERCLA authority. In September 2016, EPA listed the Bonita Peak Mining District on the CERCLA National Priorities List ("NPL"). NPL Support Document, Ex. 3, at 10. This NPL site consists of "a commingled release of metals from numerous mines and mine-related activities in the Animas River watershed," which includes the Upper Animas, Cement

---

[8] Section 9613(h) includes limited exceptions, none of which applies to New Mexico's CWA claim. *See* 42 U.S.C. § 9613(h)(1)-(5).

Creek, and Mineral Creek drainages. *Id.* In the support document accompanying the listing, EPA clarified that the Mining District is not limited to particular mines, but extends to wherever contamination from mining activity in the Animas River watershed comes to be located. *See id.* at 10, 13. EPA had conducted a preliminary assessment of some, but not all, of the mines in this area before determining that the site posed sufficient hazards to justify placement on the NPL. *Id.* at 10. Now that the Mining District has been listed, EPA is working through a carefully-structured process, based on the National Contingency Plan (40 C.F.R. Part 300), to further investigate pollution from mines in the Animas River watershed and pursue an appropriate cleanup. *See id.*; 40 C.F.R. § 300.430. As EPA gathers more information about the extent of contamination from mines in the Animas River watershed, the Agency will be better able to define the extent of the NPL site, and later, determine how to appropriately address this contamination. NPL Support Document, Ex. 3, at 10. Meanwhile, EPA continues to operate a water treatment plant at the Gold King Mine to treat ongoing releases at that location. EPA Action Memo., Jan. 12, 2017, Ex. 2 at 9.

Even at this early stage of EPA's activities in the Animas River watershed, section 9613(h) prohibits interference with EPA's cleanup process. As the Tenth Circuit observed in *Cannon*, section 9613(h) bars challenges to CERCLA "removal or remedial action," both of which are defined terms. 538 F.3d at 1333 (citing 42 U.S.C. § 9613(h)). A "removal action" includes not only "the cleanup or removal of released hazardous substances from the environment," but also "such actions as may be necessary to monitor, assess, and evaluate the release," and "action taken under section 9604(b) of this title." 42 U.S.C. § 9601(23). Section 9604(b) in turn authorizes "investigations," "planning," "information gathering," and other actions "necessary or appropriate" for cleanup. *Id.* § 9604(b). Thus, CERCLA section 9613(h)'s

jurisdictional bar applies "even if the Government has only begun to 'monitor, assess, and evaluate the release or threat of release of hazardous substances.'" *Cannon*, 538 F.3d at 1334 (quoting *Razore*, 66 F.3d at 239).

New Mexico acknowledges that EPA has already commenced a removal action to clean up releases at one of the mines within the NPL site, the Gold King Mine. *See* NM Compl. ¶ 124. More specifically, EPA is "monitor[ing], assess[ing], and evaluat[ing]" the release of hazardous substances from mines in the Animas River watershed as part of its investigation of the Mining District. 42 U.S.C. § 9601(23). For example, EPA is collecting samples and reviewing data to evaluate ecological risk throughout a long stretch of the Animas River, including near the mines in the Upper Animas and 50 miles downstream of the Mining District. Bonita Peak Mining District 2016 Sampling Analysis Plan/Quality Assurance Project Plan, Ex. 4 at 1.

New Mexico's CWA claim is a prohibited "challenge" to these response actions. New Mexico seeks to use federal litigation to upend the "method and order" prescribed by regulation for investigating and remediating sites on the NPL. *Razore*, 66 F.3d at 239 (internal citation omitted). Multiple appellate courts have rejected plaintiffs' claims for court-ordered remediation when EPA has begun assessing a site, but has not finished cleanup, recognizing that preemptive judicial intervention would freeze EPA's cleanup options before its careful investigative and decision-making process is complete. *See, e.g., Cannon*, 538 F.3d at 1335 (deciding that claim for "injunctive relief ordering . . . remediation . . . would undoubtedly interfere with the Government's ongoing" site assessment); *Boarhead Corp. v. Erickson*, 923 F.2d 1011 (3d Cir. 1991) (deciding that section 9613(h) barred a claim when EPA had decided to initiate the remedial investigation and feasibility study process); *El Paso Natural Gas Co. v. United States*,

750 F.3d 863, 875 (D.C. Cir. 2014) (deciding that section 9613(h) barred claims when EPA entered into an administrative settlement requiring a remedial investigation and feasibility study).

The Ninth Circuit's opinion in *Razore* is particularly instructive. In that case, EPA had listed a site on the NPL and was evaluating the appropriate cleanup options when plaintiffs sought a court-ordered remediation of the site. *Razore*, 66 F.3d at 239. The Ninth Circuit decided that section 9613(h) barred jurisdiction because the court could not order specific remediation while EPA was still studying how to clean up the pollution without infringing on EPA's process. *Id*. Similarly here, court-ordered remediation would infringe on EPA's ongoing cleanup process with respect to the NPL site.

Although section 9613(h) prohibits judicial intervention at this time, New Mexico is not without recourse. The NCP process offers New Mexico multiple avenues of participation. New Mexico can submit comments on EPA's proposed remedy. 40 C.F.R. § 300.430(f)(3). New Mexico can also enter into a cooperative agreement with EPA to receive funding to undertake response actions itself. *Id*. § 300.515(a)(1). New Mexico cannot, however, sue to "substitute a federal court's judgment" for EPA's judgment regarding the appropriate remedial alternative until the cleanup process is complete. *Gen. Elec. Co.*, 467 F.3d at 1249.

## B. New Mexico Lacks Standing to Bring Its CWA Claim.

New Mexico's CWA claim also fails because it does not present a justiciable "case or controversy." New Mexico bears the burden of demonstrating that it meets the "irreducible constitutional minimum of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). This is a basic Article III requirement that cannot be erased by Congress. *See Raines v. Byrd*, 521 U.S. 811, 819 (1997). At a minimum, a plaintiff must show that it has (1) suffered concrete

and particularized injury; (2) which is fairly traceable to the challenged action; and that (3) the relief the plaintiff seeks is likely to redress its injury. *Lujan*, 504 U.S. at 560.

New Mexico has not fulfilled the third prong because it has not shown that this court can redress its alleged injury. New Mexico seeks to compel EPA to "seek abatement of pollution" from "numerous inactive and abandoned mines" in Colorado that "adversely affect the public health and environment in New Mexico." NM Compl. ¶ 137; NM Am. Compl. ¶ 214. Though New Mexico has alleged that there are "hundreds" of such mines in the Upper Animas region, it has named only two: Gold King Mine and Sunnyside Mine. NM Compl. ¶ 19; NM Am. Compl. ¶ 22. New Mexico is thus attempting to compel EPA to generally reduce water pollution from an uncertain number of unspecified Colorado mines. Identifying and remediating hundreds of sources of pollution across an entire watershed is a vast and technically complex undertaking— one in which EPA, as discussed above, is already engaged pursuant to the CERCLA process. The Supreme Court has made it clear that such sweeping programmatic challenges are not justiciable, and that lawsuits should instead challenge "specifically identifiable Government violations of law," *Lujan*, 504 U.S. at 568; *see also Allen v. Wright*, 468 U.S. 737, 761 (1984) (court orders must be tailored to "specific legal obligations whose violation works a direct harm"), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014). Here, New Mexico has failed to allege "specifically identifiable" violations of law, but instead has pointed generally to EPA's supposed failure to adequately enforce unspecified permitting requirements at hundreds of unidentified mines. New Mexico has thus failed to satisfy its burden of demonstrating redressability, and hence, its Article III burden of stating a justiciable claim.

New Mexico also has not shown that its injury is "traceable to the challenged action." *Lujan*, 504 U.S. at 560. To have standing to sue EPA, New Mexico must demonstrate that its injury is traceable to an "action <u>of the defendant</u> . . . and not . . . the result of the independent action of some third party not before the court." *Id.* at 560 (emphasis added) (internal punctuation marks omitted). New Mexico's vague allegations are insufficient to make this showing for two reasons. First, New Mexico alleges that "hundreds" of mines have harmed New Mexico by discharging into the Animas River without identifying the vast majority of those mines or any action EPA has taken concerning those mines leading to New Mexico's injury. Second, New Mexico alleges that Colorado has failed to issue permits for these discharges, and then insists that *EPA* be required to redress the injury caused by Colorado's inaction. NM Compl. ¶ 137; NM Am. Compl. ¶ 163. But New Mexico cannot sue EPA to resolve an issue that "depends on the unfettered choices" of Colorado (or the mine operators), "independent actor[s] not before the court[]." *Lujan*, 504 U.S. at 562. Thus, New Mexico's allegations fail to identify harm caused by EPA's own action or inaction, as required to support standing.

**C.      Colorado's Alleged Failure to Issue Permits Is Not a "Violation of an Effluent Standard or Limitation" Under CWA Section 1365(h).**

Finally, the CWA does not authorize New Mexico to sue EPA for Colorado's alleged failure to issue permits because a failure to issue permits is not a violation of an "effluent standard or limitation." Section 1365(h) states that state governors may bring suit under the CWA citizen-suit provision "where there is alleged a failure of the Administrator to enforce an effluent standard or limitation under this chapter," provided other requirements are met. 33 U.S.C. § 1365(h). "Effluent standard or limitation under this chapter" is defined to include standards and limitations, as well as "an unlawful act under subsection (a) of section 1311 of this

title." *Id*. § 1365(f)(1). New Mexico claims that Colorado's failure to issue permits is such an "unlawful act." NM Compl. ¶ 137; NM Am. Compl. ¶ 163.

But a plain reading of subsection 1311(a) dispels that claim. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432 (1999) (statutory interpretation begins and ends with clear language). That section deems the "discharge of any pollutant by any person" except in compliance with certain statutory requirements to be "unlawful." 33 U.S.C. § 1311(a). Colorado's alleged failure to issue permits is not an unauthorized "discharge" of pollutants and, thus, is not an "unlawful act" under section 1311(a). Because Colorado's alleged failure to issue permits is not an "unlawful action under subsection (a) of section 1311," it is also not an "effluent standard or limitation" under section 1365(f), and, therefore, New Mexico has not adequately alleged any "failure of the Administrator to enforce an effluent standard or limitation" under section 1365(h). Accordingly, New Mexico's 1365(h) claim must be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should grant this motion and enter the United States' proposed order dismissing New Mexico's First, Second and Fourth Causes of Action against EPA and the Navajo Nation's First and Second Claims for Relief against the United States.

Respectfully submitted,

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment & Natural Resources Division

DATED: February 13, 2017          By:     /s/ Brian H. Lynk
                                            BRIAN H. LYNK, DC Bar No. 459525
                                            SIMI BHAT
                                            United States Department of Justice
                                            Environmental Defense Section
                                            P.O. Box 7611
                                            Washington, D.C. 20044
                                            Phone: (202) 514-6187

Fax: (202) 514-8865
brian.lynk@usdoj.gov

DAMON P. MARTINEZ
United States Attorney
ROBERTO D. ORTEGA
Assistant United States Attorney
P.O. Box 607
Albuquerque, New Mexico  87103
(505) 346-7274

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of February, 2017, I electronically filed the foregoing Defendant EPA's Motion to Dismiss Complaints of Plaintiffs State of New Mexico and Navajo Nation and Incorporated Memorandum in Support using the Electronic Case Filing ("ECF") system of this Court.  The ECF system will send a "Notice of Electronic Filing" to the attorneys of record.

/s/ Simi Bhat
Simi Bhat