# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

THE STATE OF NEW MEXICO on behalf
of the NEW MEXICO ENVIRONMENT
DEPARTMENT,

      Plaintiff,

v.                                No. 16-CV-465 MCA/LF

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; GINA MCCARTHY
in her official capacity as Administrator,
United States Environmental Protection Agency;
ENVIRONMENTAL RESTORATION, LLC;
KINROSS GOLD CORPORATION; KINROSS
GOLD U.S.A., INC.; and SUNNYSIDE GOLD
CORPORATION,

      Defendants.

and

NAVAJO NATION, a federally recognized
Indian Tribe, on its own behalf, and as
*parens patriae* on behalf of the Navajo people,

      Plaintiff,

v.                                No. 16-CV-931 MCA/LF

U.S. ENVIRONMENTAL PROTECTION
AGENCY; ENVIRONMENTAL
RESTORATION, LLC; HARRISON
WESTERN CORPORATION; GOLD KING
MINES CORPORATION; SUNNYSIDE
GOLD CORPORATION; KINROSS GOLD
CORPORATION; KINROSS GOLD U.S.A.,
INC.; and DOES 1-10,
      Defendants.

1

# MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on *Defendant Environmental Restoration, LLC's Motion to Dismiss the Complaint [Doc. 1] and Motion to Strike* [Doc. 32], pertaining to the Complaint filed by the State of New Mexico; and *Defendant Environmental Restoration, LLC's Motion to Dismiss the Complaint [Doc. 1] and Motion to Strike* [Doc. 101], pertaining to the Complaint filed by the Navajo Nation. The Court has considered the submissions, the relevant law, and is otherwise fully advised in the premises. The Court grants-in-part, denies-in-part, and, in-part, holds in abeyance ER's *Motions*.

This opinion addresses all arguments raised by Defendant Environmental Restoration (hereafter, ER) with the exception of its arguments based on the jurisdictional bar set forth at 42 U.S.C. § 6972(b)(2)(B)(ii) and 42 U.S.C. § 9613(h). The Court has requested additional briefing and evidence with respect to whether certain of Plaintiffs' claims are barred by the above provisions, and the briefing, which remains in progress. Nonetheless, the Court herein addresses the remaining issues raised by ER.

## I.  BACKGROUND

### A. *Procedural Posture*

On May 23, 2016, New Mexico filed its *Complaint* stemming from the Gold King mine spill which occurred on August 5, 2015. [16-CV-465, Doc. 1][1] On August 16, 2016, the Navajo Nation filed its Complaint based on the Gold King mine spill. [16-CV-931, Doc. 1] On November 28, 2016, this Court consolidated the two cases. [Doc. 90] Both Plaintiffs filed motions for leave to amend their complaints. [Doc. 86; Doc. 141]

Generally, both Plaintiffs allege that, while conducting environmental remediation of the Gold King Mine in Colorado, the Environmental Protection Agency (hereafter, EPA), ER (a contractor for the EPA), and others "breached a collapsed portal" of the mine, "releasing over three million gallons of acid mine drainage and 880,000 pounds of heavy metals into the Animas River watershed." [Doc. 1, ¶ 1; accord. 16-CV-931, Doc. 1, ¶ 1] The acid mine drainage traveled down-river, into the San Juan River, into New Mexico, and into the Navajo Nation, causing extensive environmental and economic damage. [Doc. 1, ¶¶ 1-3; 16-CV-931, Doc. 1, ¶¶ 4, 24]

New Mexico brings six causes of action against ER: cost recovery and declaratory judgment under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA); injunctive relief under the Resource Conservation and Recovery Act (RCRA); public nuisance; trespass; and "negligence and gross negligence." [Doc. 1, pp. 32-48; Doc. 86-1, pp. 41-61] Navajo Nation brings seven causes of action against ER: cost recovery and declaratory judgment under CERCLA; negligence; gross

[1] Hereafter, all "Doc. #" references are to the lead case, number 16-CV-465, unless otherwise specified.

3

negligence; trespass; public nuisance; and private nuisance. [16-CV-931, Doc. 1, pp. 34-46; Doc. 141-1 pp. 46-58] ER challenges each cause of action by both Plaintiffs. [Doc. 32; Doc. 101]

While both Plaintiffs have moved for leave to amend their complaints [Doc. 86; Doc. 141], those motions are opposed and remain pending.[2] On January 23, 2017, this Court entered a *Memorandum Opinion and Order*[3] stating that this Court will consider whether dismissal of the proposed amended complaints would be appropriate in light of the various Defendants' *Motions to Dismiss*, thus analyzing whether the proposed amended complaints would be futile. [Doc. 118, p. 6] The Court further rejected ER's arguments that New Mexico's *Motion for Leave to File Amended Complaint* was untimely and that it prejudiced ER. [Doc. 118, pp. 6-7] Having addressed these issues, the only issue remaining to be considered in determining whether to grant New Mexico's (as well as Navajo Nation's) *Motion for Leave to File Amended Complaint* is whether amendment would be futile. Accordingly, for purposes of the *ER's Motions to Dismiss* Plaintiffs' claims, the Court considers the facts as alleged in the *Proposed Amended Complaints*, thereby conducting the futility analysis. [Doc. 86-1; Doc. 141-1] If

---

[2] The primary focus of both Motions to Amend is the addition of tort claims against the EPA. However, both Plaintiffs have also added certain factual allegations relevant to ER. [Doc. 86, pp. 3-5; Doc. 141, pp. 7-8]

[3] In this *Memorandum Opinion and Order*, the Court denied ER's request for the Court to expedite its decision on the present motion in light of the motion to amend the complaint. [Doc. 118]

dismissal is proper as against ER based on the facts alleged therein, then amendment of the claims as against ER would be futile and the claims against ER must be dismissed.

Finally, on December 11, 2017, ER filed a *Motion to Transfer for Coordinated or Consolidated Pretrial Proceedings Under 28 U.S.C. § 1407* with the United States Judicial Panel on Multidistrict Litigation. [Doc. 191-1] Thereafter, the United States filed a *Motion to Temporarily Stay Proceedings Pending Decision by the Judicial Panel on Multidistrict Litigation.* [Doc. 191] Some parties oppose the *Motion to Stay*, or oppose only a delay of the decision on their pending motions to dismiss. [Doc. 191, p. 2; Docs. 192, 195, 199] The Court does not address the *Motion to Stay* [Doc. 191] in this *Memorandum Opinion and Order.* The Court exercises its discretion to rule on the present motion only, concluding that no cause has been shown to stay the issuance of this decision, including the factors of judicial economy and avoiding hardships and inequities to the moving party. *See Pace v. Merk & Co., Inc.*, CIV 04-1356 MCA/ACT, 2005 WL 6125457, *1 (D.N.M. 2005) (recognizing the district court has the discretion to stay a case when a motion to transfer proceedings is pending and listing the factors the district court should consider).

**B. *Allegations***

New Mexico alleges:

On August 5, 2015, EPA, EPA's contractors, and the Colorado Division of Reclamation, Mining and Safety ("DRMS"), used an excavator to dig away tons of rock and debris that blocked the portal of the Gold King Mine. Water had been building in the mine and seeping out of the portal for years, and EPA, the contractors, and Colorado officials knew the water was highly

5

acidic and laced with heavy metals. Colorado's records and EPA's work plan not only recognized that the mine was filled with water, but also highlighted the risk of a significant blowout—especially if workers attempted to dig away the blockage. Yet, the work plan ignored this well-understood risk. In fact, EPA's lead official at the Gold King Mine—who was on vacation when the crew triggered the release—had ordered EPA and DRMS employees and EPA's contractor *not* to excavate the earthen debris blocking the portal and *not* to drain the mine without setting up equipment to handle the discharge. Further, the lead EPA official—recognizing the hazards at the site—told the crew to wait to excavate until after he returned from vacation and consulted with an engineer from the Department of Interior's Bureau of Reclamation about the risks of EPA's actions at the site. Despite the clear dangers and explicit directions of EPA's project leader, the on-site crew dug into the portal without verifying the hydraulic pressure or taking necessary precautions—with catastrophic consequences.

[Doc. 86-1, ¶ 4]

New Mexico alleges that mining operations at the Gold King Mine ceased in 1992 [Doc. 86-1, ¶ 30] and, in 2004, the Level 7 adit[4] collapsed. [Doc. 86-1, ¶ 63] The Colorado Division of Minerals and Geology inspected the Gold King mine in 1996 and found that it drained one to two gallons of acid mine drainage per minute. [Doc. 86-1, ¶ 53] In 1996 a neighboring mine, the Sunnyside Mine, was sealed using a bulkhead (and a second bulkhead was installed in 2001), causing acid mine drainage to travel through a connecting tunnel, the American Tunnel, to the Gold King Mine. [Doc. 86-1, ¶¶ 39-41] As a result of the collapsed adit and the acid mine drainage from the American Tunnel, Gold King Mine's discharge grew to between 150 and 200 gallons per minute, depending on the season, by 2007. [Doc. 86-1, ¶¶ 53, 63]

---

[4] "adit: a horizontal passage leading into a mine for the purposes of access or drainage." Oxford Living Dictionaries, British & World English. Retrieved from: https://en.oxforddictionaries.com/definition/adit.

In 2008 and 2009, in an attempt to address the acid mine drainage, the Colorado Division of Reclamation, Mining and Safety (DRMS) "secured" the Level 7 adit portal, installed a "grated closure . . . to facilitate drainage," diverted the drainage, and then backfilled the Level 7 adit. [Doc. 86-1, ¶¶ 67-68] DRMS planned to install a drainage pipe at the floor of the adit, however, when they attempted to install an observation pipe, the timbers supporting the portal collapsed, and DRMS was never able to complete installation of its originally planned drainage pipe. [Doc. 86-1, ¶¶ 68-72]

"In 2014, DRMS asked EPA to re-open the Gold King Mine Level 7 adit and investigate the drainage situation." [Doc. 86-1, ¶ 78] "EPA requested a work plan for the Gold King Mine investigation from Environmental Restoration and issued a 'Task Order Statement of Work' ('Statement of Work') on June 25, 2014." [Doc. 86-1, ¶ 79] ER submitted a RFP and EPA selected ER as a contractor, "task[ing] Environmental Restoration with 'procur[ing] and manag[ing] the reopening and ground support construction at the Upper Gold King Mine – 7 level adit.'" [Doc. 86-1, ¶ 80] EPA's Request for Proposal (RFP) also states that ER would select a subcontractor and "'conduct operations in oversight management of surface and underground work activities.'" [Doc. 86-1, ¶ 80] EPA, along with one of the sub-contractors, began work in September, 2014, however, after two hours of excavation the crew "abruptly stopped work" and EPA, ER and others determined "that the drainage would require larger settling ponds and additional treatment." [Doc. 86-1, ¶ 83] "[B]efore EPA left the site [in 2014], the construction crew pushed large quantities of earthen material and debris

7

in front of the DRMS-installed pipes, forming an earthen plug that prevented the mine from draining and caused a head of water to further build up behind the blockage." [Doc. 86-1, ¶ 88]

EPA asked employees of another contractor, Weston Solutions, to prepare a report, and EPA's on-scene coordinator[5] submitted the report to EPA Region 8. [Doc. 86-1, ¶¶ 84-85] This report stated that drainage pipe installed by DRMS were "adjacent to the adit roof," in contrast to earlier DRMS records which stated that the pipe was at the adit floor. [Doc. 86-1, ¶ 85] Based on the purportedly erroneous conclusion that the pipe was at the roof, EPA's report stated that the adit floor was six feet below the level of the waste dump surface, again contrary to DRMS's records. [Doc. 86-1, ¶ 86] Further, New Mexico alleges, the EPA "fail[ed] to test and confirm the amount of water behind the adit" despite successfully using this practice on two adjacent mines. [Doc. 86-1, ¶ 87]

In May and June, 2015, ER submitted draft work plans to EPA to continue work on the Gold King Mine. [Doc. 86-1, ¶ 90] EPA, ER, and other contractors visited the site several times "to assess site conditions and drainage flows[;]" collect water samples, grade the surface of the waste dump, and begin construction on a water management and treatment system. Nonetheless, no Defendant tested the "hydrostatic pressure behind the blocked portal." [Doc. 86-1, ¶¶ 90-92] On July 23, 2015, Steven Way, EPA's on-scene

---

[5] "On-scene coordinator (OSC) means the federal official predesignated by EPA . . . to coordinate and direct response[] [actions], or the government official designated by the lead agency to coordinate and direct removal actions." 40 C.F.R. § 300.5. An on-scene coordinator "directs response efforts and coordinates all other efforts at the scene of a discharge or release. 40 C.F.R. § 300.120(a).

coordinator, contacted a Bureau of Reclamation engineer to conduct an independent review of the excavation plans. Mr. Way arranged for the review to be conducted on August 14, 2015, after Mr. Way returned from vacation. [Doc. 86-1, ¶ 93] Mr. Way further arranged for another EPA employee, Mr. Griswold, to supervise the Gold King Mine site from August 3, 2015 until Mr. Way returned from vacation. [Doc. 86-1, ¶ 94]

> On July 29, 2015, Mr. Way emailed specific instructions about the scope and timing of work at the Gold King Mine site to Matt Francis (Environmental Restoration), Elliot Petri (Weston Solutions), and Allen Sorenson (DRMS). Later that day, Mr. Way forwarded these instructions to Mr. Griswold. Mr. Way's instructions set out the "priority and strategy" for on-site work during the week of August 3.

[Doc. 86-1, ¶ 95] Before excavation of the earthen debris blocking the adit was to start, Mr. Way instructed ER to "provide 'adit drainage control' and implement a 'water management system[,]'" including setting up a pipe and filter bags; putting a sump and sump-pump in place to "handle adit discharge"; putting piping or a hose in place to direct discharge to a treatment pond; and ensuring that a "stinger pipe" was prepared and available. [Doc. 86-1, ¶ 95]

On August 4, 2015, after Mr. Griswold arrived, "the EPA crew" began excavating the adit and drug out all but a small portion of the drainage pipe that DRMS installed in 2009. [Doc. 86-1, ¶ 96] New Mexico alleges this work was done "[w]ith an incomplete safety plan, an inadequate evaluation of the fluid hazard, and lacking any equipment to prevent or mitigate an uncontrolled release of water from the mine." [Doc. 86-1, ¶ 96] The next day, August 5, 2015, the "EPA crew" resumed excavating the Level 7 adit,

when a backhoe operator hit a "spring." [Doc. 86-1, ¶ 98-99] New Mexico alleges that because "the pipes were visibly well below the plug, the EPA crew knew or should have known they were removing material at least several feet below the roof of the adit." [Doc. 86-1, ¶ 98] No one present attempted to plug the spring or "blowout," and the blowout resulted in the release of over three million gallons of acid mine drainage and 880,000 pounds of heavy metals from the Gold King Mine into the Animas River. [Doc. 86-1, ¶¶ 1, 99] The Animas River joins the San Juan River and travels through portions of New Mexico and the Navajo Nation. [Doc. 86-1, ¶ 1]

In sum, New Mexico alleges:

> [T]he work conducted by EPA, DRMS, Environmental Restoration, Weston Solutions, and Harrison Western in connection with the Gold King Mine amounted to reckless, careless, and grossly negligent conduct that was not driven or supported by social, economic, or public policy considerations. Furthermore, their actions substantially deviated from their own work plans, the mandatory directions given by Mr. Way, established engineering standards of care, and applicable federal and state regulations.

[Doc. 86-1, ¶ 111]

The Navajo Nation's Complaint alleges similar allegations as a basis for relief. To the extent the allegations differ between the Navajo Nation and New Mexico, those differences are addressed below as pertinent to the analysis of the present motions.

## II.     ANALYSIS

### A. *Legal Standard Governing Motions To Dismiss*

ER brings its *Motions to Dismiss* under Federal Rule of Civil Procedure 12(b)(6). Fed. Civ. P. Rule 8(a)(2) requires a complaint to set out "a short and plain statement of

10

the claim showing that the pleader is entitled to relief." In *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), the Supreme Court held that: "to withstand a motion to dismiss, a complaint must have enough allegations of fact, taken as true, 'to state a claim to relief that is plausible on its face.'" *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Twombly*, 550 U.S. at 570). In applying this test, a court accepts as true all "plausible, non-conclusory, and non-speculative" facts alleged in the plaintiff's complaint, *Shrader v. Biddinger*, 633 F.3d 1235, 1242 (10th Cir. 2011); provided, that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In short, in ruling on a Rule 12(b)(6) motion, "a court should disregard all conclusory statements of law and consider whether the remaining specific factual allegations, if assumed to be true, plausibly suggest the defendant is liable." *Collins*, 656 F.3d at 1214.

### B. *CERCLA Cost Recovery and Declaratory Judgment*

Both New Mexico and the Navajo Nation bring claims pursuant to CERCLA against ER for cost recovery (42 U.S.C. § 9607(a)) and a declaratory judgment (42 U.S.C. § 9613((g)(2)). [Doc. 1, ¶¶ 96-115; 16-CV-931, Doc. 1, ¶¶ 117-141]

"Congress enacted CERCLA to facilitate the expeditious cleanup of environmental contamination caused by hazardous waste releases . . . and to establish a financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste disposal sites." *Young v. United States*, 394 F.3d 858, 862

11

(10th Cir. 2005) (internal quotation marks and citations omitted). "Thus, the twin aims of CERCLA are to [clean up] hazardous waste sites and impose the costs of such cleanup on parties responsible for the contamination." *Id.*

> The elements of a prima facie case of liability under § 9607(a) require a showing (1) that the defendant is a "covered person" under CERCLA; (2) that a "release" or "threatened release" of any "hazardous substance" at the site in question has occurred; (3) that the release or threatened release caused plaintiff to incur costs; (4) that plaintiff's costs are "necessary" costs of response; and (5) that plaintiff's response action or cleanup was consistent with the [National Contingency Plan].

*Morrison Enters. v. McShares, Inc.*, 302 F.3d 1127, 1135–36 (10th Cir. 2002).

ER disputes that it is a covered person under Section 9607(a). [Doc. 33, p. 7; Doc. 102, p. 6] Section 9607(a) imposes liability for the cleanup of facilities on four categories of persons:

> (1) the owner and operator of a vessel or a facility,

> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance[.]

42 U.S.C. § 9607(a).  Liability is imposed on such "covered persons" for:

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

(D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

Section 9607(a)(4).  "The term 'release' means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment."  42 U.S.C. § 9601(22).

Section 9613(g)(2) provides that:

In any such action described in this subsection, the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages. A subsequent action or actions under section 9607 of this title for further response costs at the vessel or facility may be maintained at any time during the response action, but must be commenced no later than 3 years after the date of completion of all response action. Except as otherwise provided in this paragraph, an action may be commenced under section 9607 of this title for recovery of costs at any time after such costs have been incurred.

42 U.S.C. § 9613(g)(2).

Both Plaintiffs allege that ER is liable under CERCLA as an operator of a facility at which hazardous substances were disposed, as an arranger for the disposal or treatment

of hazardous substances, and as a transporter of hazardous substances.  [Doc. 1, ¶¶ 102-104; Doc. 86-1, ¶¶ 128-130; 16-CV-931, Doc. 1, ¶¶ 123-126; Doc. 141-1, ¶¶ 153-155]

ER argues that it does not fit into any of these categories of persons.  [Doc. 33, p. 7; Doc. 102, p. 6]

### i.    CERCLA Operator Liability

CERCLA circuitously defines an "owner or operator" as "in the case of an onshore facility or an offshore facility, any person owning or operating such facility[.]" 42 U.S.C. § 9601(20)(A)(ii).

> The term "facility" means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9).

Given CERCLA's unhelpful definition of an operator, courts have come up with varying tests to determine operator liability.  Having reviewed several cases, the Court finds the following summary particularly clear and succinct, including its discussion of *United States v. Bestfoods*, 524 U.S. 51 (1998), the only Supreme Court case on the issue:

> In *United States v. Bestfoods*, 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998), the Supreme Court stated that "under CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility." *Id.* at 66, 118 S.Ct. 1876. To be held liable for remediation costs, "an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with

environmental regulations." *Id.* "For one to be considered an operator, then, there must be some nexus between that person's or entity's control and the hazardous waste contained in the facility." *Geraghty & Miller, Inc. v. Conoco Inc.*, 234 F.3d 917, 928 (5th Cir. 2000) (*quoting Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338, 1341 (9th Cir. 1992)), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 129 S.Ct. 1870, 173 L.Ed.2d 812 (2009). "A court must decide whether a contractor is an operator after considering the totality of the circumstances concerning its involvement at the site." *Id.*

*Exxon Mobil Corp. v. U.S.*, 108 F. Supp. 3d 486, 520 (S.D. Tex. 2015). Before *Bestfoods*,[6] a Circuit split developed between two tests: the "actual control" test and the "authority to control test." *See FMC Corp. v. Aero Indus., Inc.*, 998 F.2d 842, 846 (10th Cir. 1993) (discussing the Circuit split and declining to "decide which approach is best because it is undisputed on the record that [the defendant] exercised actual control and personally participated in any conduct that violated CERCLA"); *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1504-05 (11th Cir. 1996) (discussing the two tests and the Circuit split). *Bestfoods* criticized the "actual control" test[7] but did not address the "authority to control" test. *Bestfoods*, 524 U.S. at 67. Instead, the Court relied on

---

[6] The Court granted certiorari in *Bestfoods* to resolve an issue not present here: "to resolve a conflict among the Circuits over the extent to which parent corporations may be held liable under CERCLA for operating facilities ostensibly under the control of their subsidiaries." *Bestfoods*, 524 U.S. at 60. On this question, the Court stated: "The question is not whether the parent operates the subsidiary, but rather whether it operates the facility, and that operation is evidenced by participation in the activities of the facility, not the subsidiary. Control of the subsidiary, if extensive enough, gives rise to indirect liability under piercing doctrine, not direct liability under the statutory language." *Id.* at 68 (internal quotation marks and citation omitted).
[7] The Court stated that the "actual control" test incorrectly fused the issues of "direct and indirect liability" by considering the relationship between two corporations rather than the parent corporation's interaction with the facility. *Bestfoods*, 524 U.S. at 67.

CERCLA's statutory language to determine the meaning of the word "operate," ultimately instructing courts to evaluate each party's involvement with or at a facility to determine whether that party operated the facility. *Id.* at 71-73. The Court held that "an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.* at 66-67.

After *Bestfoods*, our Tenth Circuit decided the issue of whether a minority shareholder was liable as an operator under CERCLA, and, consistent with *Bestfoods*, did not apply either the "actual control" or "authority to control" test. *Raytheon Constructors, Inc. v. Asarco Inc.*, 368 F.3d 1214, 1217 (10th Cir. 2003). The Court focused on the "necessary connection between the potential 'operator' and the facility itself," stating that "operation is evidenced by participation in the activities of the facility." *Id.* (internal quotation marks and citation omitted).

Although the parties in this case spend some time briefing cases relying on both the actual control test and the authority to control test, in light of *Bestfoods* and *Raytheon Constructors* this Court is not persuaded that either test is appropriate. Instead, the Court must focus on the language of CERCLA itself and the principles set forth in *Bestfoods*. As set forth above, *Bestfoods* states: "an operator must manage, direct, or *conduct operations* specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Bestfoods*, 524 U.S. at 66 (emphasis added). Here, Plaintiffs

allege that ER was directly involved in conducting operations at the facility. Plaintiffs allege that ER was responsible for providing drainage control, implementing a water management system, and constructing and maintaining the retention pond. [Doc. 86-1, ¶ 79, 95; Doc. 141-1, ¶ 89] EPA selected ER to "procur[e] and manag[e] the reopening and ground support construction" of the Gold King Mine portal. [Doc. 86-1, ¶¶ 80; Doc. 141, ¶ 73] New Mexico alleges that ER was involved in the decision making concerning operation of the facility, including deciding in 2014 that larger settling ponds and additional treatment were necessary. [Doc. 86-1, ¶ 83] Navajo Nation quotes a May 2015 Action/Work Plan submitted by ER which lists the following tasks for ER and its subcontractor:

- Utilize ramp created in site set up to access slope above portal[.]
- Excavate loose material from the top of the high wall.
- Drill in wire mesh anchors.
- Hang wire mesh on the high wall as excavation to the sill of the portal proceeds.
- Excavate to the sill and into the competent rock face at the portal.
- Gradually lower the debris blockage with the appropriate pumping of the impounded water to water management/treatment system.

[Doc. 141-1, ¶ 89] Further and not least, ER was one of the parties present on August 4 and 5, 2015 and excavating at the time of the spill, contrary to the directions of Mr. Way. [Doc. 86-1, ¶¶ 96-100; Doc. 141-1, ¶¶ 101-104] These facts state a claim that ER "*conduct[ed] operations* specifically related to [the] pollution." *Bestfoods*, 524 U.S. at 66 (emphasis added). Contrary to ER's argument, these are not conclusory allegations. [Doc. 33, p. 8] Plaintiffs' allegations are sufficient to state a claim for operator liability.

ER points to other allegations in the Complaints which suggest EPA controlled the activities at the Gold King Mine. [Doc. 33, p. 8; Doc. 102, p. 8] ER argues that these allegations require dismissal based on the analysis employed in *Interstate Power Co. v. Kansas City Power and Light Co.*, 909 F. Supp. 1284, 1289 (N.D. Iowa 1994) (applying the authority to control test) and *Ryland Group, Inc. v. Payne Firm, Inc.*, 492 F. Supp. 2d 790, 793-94 (S.D. Ohio 2005). [Doc. 33, p. 10] In *Interstate Power*, the Court held that a contractor which performed demolition services was not liable as an operator because "[i]t is undisputed that all of [the contractor's] actions were taken at the direction of other parties." *Interstate Power*, 909 F. Supp. at 1289. In *Ryland Group*, the Court held that a subcontracted company that was hired to "rototill the soil" of a contaminated area, thereby causing the contamination to spread, was not an operator. *Ryland Group, Inc.*, 492 F.Supp. 2d at 793-94. The Court reached this decision in part because it was the contractor, not the subcontractor, which investigated the contamination of the soil, developed a plan to remediate the contamination, performed sampling, and directly supervised the subcontractor, thereby "direct[ing] and control[ing] all activities that took place in the contaminated areas of the site." *Id.* As this Court stated above, however, the Tenth Circuit applies neither the authority to control nor the actual control test, which are the basis for the decisions in *Interstate Power* and *Ryland Group*.[8] Further and

_____

[8] The *Ryland Group* Court characterized *Bestfoods* as "distinguish[ing] between an entity which exercised discretion and one which merely activate[s] valves and pumps." *Id.* at 794. Based on this distinction, the *Ryland Group* Court concluded that "[u]nder *Bestfoods*, hands-on activities alone are not sufficient to establish that a party is liable as

alternatively, even if the Court were to apply *Interstate Power* and *Ryland Group*, the Court would conclude that dismissal is not appropriate. Once the facts are developed, it may be that ER lacked any control of the facility. However, given Plaintiffs' specific allegations as to the contractual duties of ER and ER's actual operation of the facility, the Court concludes that, as pleaded, Plaintiffs may be able to prove facts establishing that ER meets the definition of an operator.

Other courts have held contractors liable as CERCLA operators. While some of these cases predate *Bestfoods* and apply either the actual control or authority to control test, the analysis in each of these cases is consistent with *Bestfoods* determination that:

> [A]n operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. . . . [A]n operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

*Bestfoods*, 524 U.S. at 66-67. In *Kaiser Aluminum*, the Ninth Circuit relied on the rule that operator liability attaches "if the defendant had authority to control the cause of the contamination at the time the hazardous substances were released into the environment." *Kaiser Aluminum & Chem. Corp.*, 976 F.2d at 1341. In *Kaiser Aluminum,* the complaint alleged that the contractor excavated tainted soil, moved it, and "spread it over

---

an operator." *Id.* This Court does not read *Bestfoods* as stating that hands-on activities alone are insufficient to establish operator liability. Instead, *Bestfoods* considered both the definition of operate in the mechanical sense (i.e., conducting hands-on activities) and the organizational sense, and concluded that operator can include both, holding that "operator" includes those who "manage, direct, *or* conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste." *Bestfoods*, 524 U.S. at 66-67 (emphasis added).

uncontaminated portions of the property." *Kaiser Aluminum & Chem. Corp.*, 976 F.2d at 1342. The Court held that these allegations were sufficient to state a claim of operator liability against the contractor because the "activity which produced the contamination . . . occurred *during* . . . the construction process" performed by the contractor. *Id.* (emphasis in original). Further, the Fifth Circuit considered the operator provision in light of the definition of "disposal" in CERCLA, and concluded that a party that "moved, dispersed, or released [hazardous materials] during landfill excavations and fillings" could be liable as an operator. *Tanglewood East Homeowners v. Charles-Thomas, Inc.*, 849 F.2d 1568, 1573 (5th Cir. 1988).

Finally, a number of district courts have followed the analysis set forth in *Kaiser Aluminum. See KFD Enters., Inc. v. City of Eureka*, 2010 WL 4703887, *2-3 (N.D. Cal. 2010) (denying contractor's motion to dismiss where the plaintiff alleged that, during the course of drilling wells, the contractor "pierced aquitard, which caused release of contaminants into previously uncontaminated ground" and stating that operator liability merely requires the party to have control over the activity that causes the pollution); *City of North Miami, Fla. v. Berger*, 828 F. Supp. 401, 413-14 (E.D. Va. 1993) (stating "operator liability is clearly appropriate" for ABC, a landfill operation company, which "exercised actual physical control over the wastes" even though another party directed and controlled the work, because ABC "actually performed the construction and waste disposal work"); *Ganton Techs v. Quadion Corp.*, 834 F. Supp. 1018, 1021-22 (N.D. Ill. 1993) (applying *Kaiser* to hold that "pollution clean-up contractors" are operators under

CERCLA where the contractors dealt with the hazardous material and "controlled the activities in which the additional contamination took place—the clean up operations"). The Court finds the reasoning of these cases persuasive and holds that ER, as a contractor, may be liable as an operator.

In sum, as pleaded by both New Mexico and the Navajo Nation, either Plaintiff may be able to establish a set of fact demonstrating that ER is liable as an operator, and thus a conclusion that ER was not an operator is not appropriate at this juncture.

### ii.    CERCLA Arranger Liability

Arranger liability is "intended to deter and, if necessary, to sanction parties seeking to evade liability by 'contracting away' responsibility." *United States v. Gen. Elec. Co.*, 670 F.3d 377, 382 (1st Cir. 2012). Thus, liability for removal and remediation attaches to:

> any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances.

42 U.S.C. § 9607(a)(3).

ER argues that it was not an arranger for three reasons. First, ER argues that the discharge was accidental, relying on *Burlington Northern*, 556 U.S. at 612 and *Amcast Indus. Corp. v. Detrex Corp.*, 2 F.3d 746, 751 (7th Cir. 1993), and thus ER argues that it cannot be liable for the spill. [Doc. 33, p. 10; Doc. 102, p. 9] Second, ER argues that it

did not arrange for disposal "by any other party or entity," as required by Section 9607(a)(3). [Doc. 33, p. 10; Doc. 102, p. 9] Finally, ER argues that Plaintiffs failed to plead factual allegations that ER controlled the treatment or disposal process. [Doc. 33, p. 11; Doc. 102, p. 10]

First, the Court considers ER's argument that, based on the holding in *Burlington Northern*, it cannot be liable as an arranger because the spill was accidental. In *Burlington Northern*, the potentially responsible party, Shell, sold a pesticide, which the Court characterized as a new, useful product. *Burlington Northern*, 556 U.S. at 603, 612. Shell was aware that minor, accidental spills occurred during the transfer of the pesticide from a common carrier to the purchaser's bulk storage tanks, but the Court held that this knowledge was insufficient to make Shell liable as an arranger. *Id.* at 612-13. The Court stated:

> It is plain from the language of the statute that CERCLA liability would attach under § 9607(a)(3) if an entity were to enter into a transaction for the sole purpose of discarding a used and no longer useful hazardous substance. It is similarly clear that an entity could not be held liable as an arranger merely for selling a new and useful product if the purchaser of that product later, and unbeknownst to the seller, disposed of the product in a way that led to contamination. . . . Less clear is the liability attaching to the many permutations of "arrangements" that fall between these two extremes—cases in which the seller has some knowledge of the buyers' planned disposal or whose motives for the "sale" of a hazardous substance are less than clear.

*Id.* at 609-10. The Court held that "Shell's mere knowledge that spills and leaks . . . occur[ed] is insufficient grounds for concluding that Shell 'arranged for' the disposal of [the pesticide] within the meaning of § 9607(a)(3)." *Id.* at 613. The Court advised that

the ordinary meaning of "arrang[e] for" applies, and that "the word 'arrange' implies action directed to a specific purpose," and "'intentional action.'" *Id.* at 610-11 (internal citations omitted). Accordingly, the Court rejected the argument that, where a company sells a new, useful product, knowledge of some disposal of hazardous substances through a spill is sufficient to create liability as an arranger. *Id.* at 612. The Court acknowledged that the statute defines "dispose of" as including unintentional disposals such as spills and leaks, but, nonetheless the Court was not persuaded by the argument that Shell "entered into the sale of [the pesticide] with the intention that at least a portion of the product be disposed of during the transfer process by one or more of the methods described in § 6903(3)," and therefore the Court held that Shell was not liable. *Id.* at 612.

Here, the Court is not persuaded that *Burlington Northern* is applicable because *Burlington Northern* limited its holding to the context of the sale of a new, useful product. *Id.* at 612-13. *Burlington Northern* is explicitly not applicable to "a transaction for the sole purpose of discarding a used and no longer useful hazardous substance," a circumstance in which the Court stated that liability is "plain." *Id.* at 610-13. Plaintiffs' allegations in this case state a claim that the arrangement falls into this area of "plain" liability. Specifically, New Mexico alleges that the hazardous substance was "acid mine drainage and . . . heavy metals" including "arsenic, lead, mercury, cadmium, copper, and zinc," *i.e.*, a used and no longer useful substance. [Doc. 86-1, ¶¶ 1, 125] New Mexico further alleges ER arranged for the disposal and treatment of the waste water by alleging that the 2014 "Statement of Work" provided that ER was responsible for removing the

"blockage in the adit" to allow a controlled release of the mine waste water; providing

channels or other conveyances for the waste water; directing the flow of the waste water

to those channels and conveyances; and "construct[ing] & maint[aining] of repository,

retention pond & water treatment." [Doc. 86-1, ¶¶ 79, 129] Navajo Nation likewise

alleges that the disposed product was mine waste water, which contained hazardous

substances. [Doc. Doc. 141-1, ¶¶ 76, 151] Navajo Nation alleges that, in "May 2015,

Environmental Restoration submitted an 'Action/Work Plan,' which included sub-

contracting with Harrison Western to excavate the mine. . . . Under the plan, Harrison

Western would be 'mobilized to provide expertise in mine site related activities,' and

Environmental Restoration would only 'support' Harrison Western as necessary." [Doc.

141-1, ¶ 88]

> The Action/Work Plan also indicated that the work at Gold King would
> include "directing mine discharge [from Gold King] to the pond at the Red
> and Bonita work site" and "establishing a water treatment system." After
> portal reconstruction was complete, ER and other contractors would
> "[r]eturn [the] flow" of acid mine drainage to its "original path."

[Doc. 141-1, ¶ 89] In sum, Plaintiffs' allegations allow a reasonable inference that the

sole purpose of the agreement between the EPA and ER was for ER to participate in the

disposal and treatment of a no-longer-useful, hazardous substance. This is the

circumstance in which *Burlington Northern* concluded that CERCLA liability as an

arranger was "plain." *Burlington Northern*, 556 U.S. at 609-10.

Further, ER's reliance on *Amcast Industrial* for the proposition that arranger

liability "excludes accidental spillage" is not persuasive because ER ignores the bulk of

the analysis in *Amcast Industrial*. *Amcast Indus. Corp.*, 2 F.3d at 751. [Doc. 33, p. 10; Doc. 102, p. 9] The full sentence ER cites states: "In the context of the operator of a hazardous-waste dump, 'disposal' includes accidental spillage; in the context of the shipper who is arranging for the transportation of a *product*, 'disposal' excludes accidental spillage." *Id.* (Emphasis added). Moreover, the Court went on to state:

> The words "arranged with a transporter for transport for disposal or treatment" appear to contemplate a case in which a person or institution that wants to get rid of its hazardous wastes hires a transportation company to carry them to a disposal site. If the wastes spill en route, then since spillage is disposal and the shipper had arranged for disposal—though not in that form—the shipper is a responsible person and is therefore liable for clean-up costs. But when the shipper is not trying to arrange for the disposal of hazardous wastes, but is arranging for the delivery of a useful product, he is not a responsible person within the meaning of the statute and if a mishap occurs en route his liability is governed by other legal doctrines.

*Id.* As detailed above, here, Plaintiffs allege that ER arranged for the disposal of a hazardous substance, not a new, useful product. Thus, the exception for liability for spills carved out by *Burlington Northern* and *Amcast Industrial* does not apply in this case.

The Court is further not persuaded by ER's second argument that Plaintiffs failed to allege that ER arranged for the disposal of the hazardous substance by "any other party or entity." [Doc. 33, pp. 10-11; Doc. 102, pp. 9-10] ER states Tenth Circuit law correctly, *i.e.*, that the disposal or treatment must be performed by a party or entity other than ER. [Doc. 33, p. 11] *Chevron Mining Inc. v. United States*, 863 F.3d 1261, 1282-83 (10th Cir. 2017) (stating that "the clause 'by any other party or entity' does not apply to ownership of the hazardous substances but, as most courts have held, refers back to the

previous clause, 'for disposal or treatment' (*i.e.*, the phrase thus most naturally reads as the arrangement 'for disposal or treatment . . . by any other party or entity, at any facility or incineration vessel')").  The Court rejects Plaintiffs' argument to the contrary.  [Doc. 58, p. 8; Doc. 115, pp. 10-11]

ER argues that Plaintiffs failed to allege that another party participated in or conducted the disposal or treatment.  The Court does not agree.  The treatment or disposal of the hazardous materials within the mine waste water was to occur at a settling pond.  [Doc. 8601, ¶¶ 79, 129; Doc. 141-1 ¶ 91]  Navajo Nation quotes from the Action/Work Plan, which identified tasks jointly for ER and ER's "'underground subcontractor (Harrison Western, HW).'"  [Doc. 141-1, ¶ 89]  One such task was the "'pumping of the impounded water to water management/treatment system (at Red and Bonita and described in TO62 Work Plan), to prevent the uncontrolled release of mine water.'"  [Doc. 141-1, ¶ 89]  Thus, ER contracted with Harrison Western to assist with the disposal of the hazardous waste, and therefore ER "arrang[ed] 'for disposal or treatment . . . by any other party or entity [Harrison Western]."  *Chevron Mining Inc.*, 863 F.3d at 1282 (internal quotation marks omitted).  Similarly, New Mexico alleges that ER "submitted a draft work plan for the Gold King Mine operation, which included sub-contracting with Harrison Western to complete the project."  [Doc. 86-1, ¶ 90]  New Mexico also alleges that in June and July of 2015, "EPA, Environmental Restoration, Weston Solutions, and Harrison Western . . . discussed a plan to install a sump basin to treat water that would be pumped out of the mine during the adit excavation work."

[Doc. 86-1, ¶ 91]  Thus, New Mexico also alleges that ER arranged for at least one other party to aid in the disposal of the hazardous waste.  While there could certainly be more detail to these allegations, at this early stage, Plaintiffs' allegations are sufficient to plead that ER arranged with at least one other party for that other party to participate in the disposal of the hazardous waste.  *See Twombly*, 550 S.Ct. at 555 (to state a claim, factual allegations, taken as true, need not be detailed but "must be enough to raise a right to relief above the speculative level").

Third and finally, ER argues that both New Mexico and Navajo Nation failed to plead "sufficient factual allegations that ER controlled the alleged treatment or disposal process," citing *Interstate Power Co.*, 909 F. Supp. at 1288 [Doc. 33, p. 11]; *see also* Doc. 102, pp. 9-10] and *Shell Oil Co.*, 294 F.3d 1045, 1055 (9th Cir. 2002) [Doc. 102, p. 10].  ER argues that the New Mexico alleges that ER was "directly supervised" and "controlled and directed by" the EPA and the Colorado DRMS, and, thus, as a matter of law, ER cannot be liable as an arranger.  [Doc. 33, p. 11]  ER argues that Navajo Nation "alleges that the Substitute OSC was 'in charge' at Gold King at all relevant times," and, thus, that the Substitute OSC controlled the work and Plaintiffs failed to allege control by ER.  [Doc. 102, p. 10]

The Court is not persuaded that Plaintiffs must plead that ER controlled the alleged treatment or disposal process.  The elements of arranger liability as set forth by the Court in *Interstate Power Co*. and *Shell Oil Co.* are not consistent with the elements set forth by our Tenth Circuit.  In *Interstate Power Co.*, the Court stated that the elements

of arranger liability are: "(1) a 'disposal' of a hazardous substance; (2) an 'arrangement' contemplating disposal; and (3) a sufficient 'nexus' between the party and the hazardous substance." *Interstate Power Co.*, 909 F.Supp at 1287. In *Shell Oil Co.*, the Court held that "control is a crucial element of the determination of whether a party is an arranger under § 9607(a)(3)." *Shell Oil Co.*, 294 F.3d at 1055. By comparison, in *Chevron Mining, Inc.*, the Court held that the elements of arranger liability are: "(1) the party must be a 'person' as defined in CERCLA; (2) the party must 'own' or 'possess' the hazardous substance prior to the disposal; and (3) the party must, 'by contract, agreement or otherwise,' arrange for the transport or disposal of such hazardous substances." *Chevron Mining, Inc.*, 863 F.3d at 1279. Thus, neither control nor the "authority to control" the hazardous substance are elements of arranger liability as set forth in this Circuit.[9] *Chevron Mining, Inc.*, 863 F.3d at 1283. Accordingly, the Court will not grant ER's *Motions to Dismiss* based on this argument.

For the above reasons, the Court concludes that both Plaintiffs have sufficiently alleged that ER is liable as an arranger pursuant to Section 9607(a)(3), and the Court will not grant dismissal of their claims that ER is an arranger.

### iii.    CERCLA Transporter Liability

Section 9607(a)(4) holds liable as a transporter "any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities,

---

[9] Further, in *Chevron Mining*, the Court acknowledged that a party made an argument based on actual control, however, the Court did not adopt the test because the issue was not squarely before the Court. *Chevron Mining Inc.*, 863 F.3d at 1283.

incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance." "The terms 'transport' or 'transportation' means (*sic*) the movement of a hazardous substance by any mode, including a hazardous liquid pipeline facility." 42 U.S.C. § 9601(26). In *United States v. Hardage*, 985 F.2d 1427, 1435 (10th Cir. 1993), our Tenth Circuit held that, to be a transporter, the party must have selected the site of disposal or treatment. Other courts have reached the same conclusion. *See, e.g., B.F. Goodrich v. Betkoski,* 99 F.3d 505, 520-21 (2d Cir. 1996) (collecting cases), *abrogated on other grounds by United States v. Bestfoods*, 524 U.S. 51 (1998); *Tippins Inc. v. USX Corp.*, 37 F.3d 87, 93-94 (3d Cir. 1994); *United States v. W. Processing Co.,* 756 F. Supp. 1416, 1419-20 (W.D. Wash. 1991). In so concluding, the Court in *Western Processing* first reviewed CERCLA's legislative history and EPA's commentary, and, based on this review, explained the rationale for the site selection provision in Section 9607(a)(4):

> [T]ransporters have a limited role in the activity surrounding hazardous substances. They neither create nor treat the material, but are responsible for its safe carriage between the point where it is generated and where it is left for disposal or treatment. If the transporter does not select the delivery site, the transporter's connection with the material is the most attenuated among potentially responsible parties. If the transporter does select the delivery site, the transporter's role becomes a less passive one. As one who actively selected a disposal site, the transporter may more equitably be subject to liability.

*Id.* at 1420.

Our Tenth Circuit has not yet "define[d] the outer limits of transporter liability" or determined whether, as some other courts have considered, transporter "liability may be imposed if the transporter at least actively participates in or assists in the site selection." *See United States v. Hardage*, 750 F. Supp. 1444, 1458-59 (W.D. Okla 1990); *see Tippins, Inc.*, 37 F.3d at 94-95 (holding that "a person is liable as a transporter not only if it ultimately selects the disposal facility, but also when it actively participates in the disposal decision to the extent of having had substantial input into which facility was ultimately chosen").

ER argues that it is not liable as a transporter because Plaintiffs' allegations are conclusory and because "'transporter liability is predicated on site selection by the transporter,'" quoting *Hardage*.  [Doc. 33, p. 12; Doc. 102, p. 11]  ER argues that the selection of the Gold King Mine as a reclamation site occurred prior to ER's contract[10] and that Plaintiffs fail to make "any allegation that ER was involved in siting or selecting the ponds or treatment facilities."  [Doc. 33, p. 12; *accord* Doc. 102, p. 11]

Neither New Mexico nor Navajo Nation dispute ER's reading of *Hardage* as requiring the transporter to have selected the site for disposal.  [Doc. 58, pp. 11-12; Doc. 115, p. 11]  Instead, New Mexico argues that its allegations are sufficient to plead transporter liability.  Specifically, New Mexico refers to the following allegations (in the original complaint):  1) that "ER 'accepted hazardous substances from the mines for

_____

[10] It is not the selection of the reclamation site, but the selection of the treatment or disposal site that is relevant to the question of transporter liability.

transport and disposal, including to settling ponds and other facilities, and releases from those facilities occurred.' (Compl. § 103);" 2) "ER 'dug a channel on the right side of the berm and positioned planks so that water flowing from the adit could be directed to the drainage channel that DRMS had previously installed.' (Compl. ¶ 86);" and 3) that "ER participated in operations involving the treatment and disposal process, which included transporting mine water from Gold King to settling ponds and other facilities. (Compl. ¶ 81)." [Doc. 58, pp. 11-12] Navajo Nation, on the other hand, argues that: "ER 'knew that, in the event of a blowout, highly contaminated water . . . at the Gold King Mine would make its way from Cement Creek down to the Animas and San Juan Rivers, crossing through the Navajo Reservation.'" [Doc. 115, p. 11 (quoting its original Complaint)] These allegations do not identify the party or parties who selected the treatment site – the settlement pond – or who participated in the site selection.

However, Plaintiffs' *Proposed Amended Complaints* (submitted after briefing was completed on the *Motion to Dismiss*) contain additional allegations concerning whether ER selected the site of disposal or treatment of the waste water.[11] Navajo Nation's *Proposed Amended Complaint* discusses the 2014 Task Order which "sought a work plan from Environmental Restoration," and which:

---

[11] If the *Proposed Amended Complaints* correct the pleading deficiency in the original *Complaints*, then the amendments are not futile, which weighs in favor of granting Plaintiffs leave to amend their *Complaints*. *See Jefferson Cty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc.*, 175 F.3d 848, 859 (10th Cir. 1999). Such leave should be freely given. *Id.*; *cf. Iqbal*, 556 U.S. at 687 (remanding to the Court of Appeals to determine whether it was appropriate to remand to allow the respondent to seek leave to amend his deficient complaint).

required the construction of a "temporary water retention and sludge management pond" that would be used to "manage impounded mine water and base flows and metal precipitate sludge from the mine workings." It required Environmental Restoration to "[p]rovide for appropriate removal of contamination . . . in consultation with the OSC" and "appropriate disposal and transportation of all contaminated debris . . . ."

[Doc. 141-1, ¶¶ 67, 71] Navajo Nation also alleges that, after the failed attempt in 2014 to begin the excavation, EPA drafted a report acknowledging the need for larger settlement ponds and the preparation of additional water management and treatment mechanisms. [Doc. 141-1, ¶ 85] Thereafter, Harrison Western, a sub-contractor selected by ER, prepared a revised excavation plan, and, using this plan, ER submitted a new "Action/Work Plan," which was approved by the EPA. [Doc. 141-1, ¶ 88] The Navajo Nation alleges:

The Action/Work Plan also indicated that the work at Gold King would include "directing mine discharge [from Gold King] to the pond at the Red and Bonita work site" and "establishing a water treatment system." After portal reconstruction was complete, ER and other contractors would "[r]eturn [the] flow" of acid mine drainage to its "original path" and then construct a flume and measuring station, as directed by USEPA personnel.

[Doc. 141-1, ¶ 89]

Among its new allegations, New Mexico pleads: "EPA OSC Steve Way, Colorado DRMS officials, and employees of Environmental Restoration, Weston Solutions, and Harrison Western inspected the Level 7 adit and determined that the drainage would require larger settling ponds and additional treatment." [Doc. 86-1, ¶ 83] Subsequently, in May of 2015, ER submitted a new draft work plan. [Doc. 86-1, ¶ 90] Then, in June or July of 2015, "EPA, Environmental Restoration, Weston Solutions and

Harrison Western visited the Gold King Mine several times to assess site conditions and drainage flows [and] . . . discussed a plan to install a sump basin to treat water that would be pumped out of the mine during the adit excavation work." [Doc. 86-1, ¶ 91] Then the "EPA and its contractors . . . started constructing a water management and treatment system." [Doc. 86-1, ¶ 92]

Given that the Court must construe the allegations in the light most favorable to Plaintiffs, the Court concludes that, in their *Proposed Amended Complaints*, both New Mexico and the Navajo Nation have met *Twombly's* notice pleading requirement to allege more than "a formulaic recitation of the elements" with regard to ER's selection of the site, or participation in the selection of the site, for the treatment of the waste water. It is a reasonable inference that, by ER's participation in the meetings concerning the need for additional treatment and by ER's role in preparing reports and draft work plans, ER participated in the selection of the site of either the temporary water treatment site or the Red and Bonita treatment basin.

For the foregoing reasons, the Court denies ER's motions to dismiss the claims of New Mexico and the Navajo Nation for CERCLA liability based on ER's alleged transporter status.

### C.  Injunctive Relief

On July 28, 2017, this Court asked for additional briefing and evidence regarding "the scope of the EPA's removal action" in order for the Court to be able to determine whether the EPA's response action precludes some of Plaintiffs' claims or some of the

relief requested by Plaintiffs.  [Doc. 164, p. 3]  Based on the Court's order, the parties voluntarily exchanged some discovery.  [Doc. 177]  However, recently a discovery dispute arose between the parties [Doc. 187], and thus, at this time, briefing on the jurisdictional issue remains incomplete.

Accordingly, the Court does not address at this time the following arguments by ER which are related to the jurisdictional issue:  New Mexico's request for injunctive relief under RCRA is barred because the EPA has commenced a removal action under CERCLA § 104 [Doc. 33, pp. 12-14]; Navajo Nation's request for injunctive relief to "abate the nuisance and cure the trespass within the Nation" are barred because "the EPA has begun removal efforts at Gold King" [Doc. 102, pp. 11-13]; and New Mexico's "claim[] for an order requiring ER to 'abate the nuisance and cure the trespass' would interfere with the EPA's ongoing removal action and, therefore, is barred under CERCLA." [Doc. 33, p. 14]

**D.** *Preemption of State Tort Claims*

CERCLA contains two saving clauses.  The first states:  "Nothing in this chapter shall be construed or interpreted as preempting any State from imposing any additional liability or requirements with respect to the release of hazardous substances within such State." 42 U.S.C. § 9614(a).  The second states:

> Nothing in this chapter shall affect or modify in any way the obligations or liabilities of any person under other Federal or State law, including common law, with respect to releases of hazardous substances or other pollutants or contaminants. The provisions of this chapter shall not be considered, interpreted, or construed in any way as reflecting a

determination, in part or whole, of policy regarding the inapplicability of strict liability, or strict liability doctrines, to activities relating to hazardous substances, pollutants, or contaminants or other such activities.

42 U.S.C.A. § 9652(d).

In *New Mexico v. General Electric Company*, 467 F.3d 1223, 1247 (10th Cir. 2006), our Tenth Circuit held that:

CERCLA's comprehensive NRD [natural resource damage] scheme preempts any state remedy designed to achieve something other than the restoration, replacement, or acquisition of the equivalent of a contaminated natural resource. We reach this conclusion notwithstanding CERCLA's saving clauses because we do not believe Congress intended to undermine CERCLA's carefully crafted NRD scheme through these saving clauses.

*Id.* The Court went on:

This is not to say the State's public nuisance and negligence theories of recovery are completely preempted in view of the ongoing remediation. . . . We need not go that far. Rather the remedy the State seeks to obtain through such causes of action-an unrestricted award of money damages-cannot withstand CERCLA's comprehensive NRD scheme. *See Bedford Affiliates v. Sills*, 156 F.3d 416, 426-27 (2d Cir. 1998) (holding CERCLA's contribution scheme preempted state law remedies of restitution and indemnification); *In re Reading Co.*, 115 F.3d 1111, 1117-21 (3d Cir. 1997) (same). An interpretation of the saving clauses that preserved the State's NRD claim for money damages in its original form would seriously disrupt CERCLA's principle aim of cleaning up hazardous waste.

*Id.* at 1247-48 (footnote omitted).[12]

---

[12] The Court, quoting the district court, described the State's damage demand as follows:

As of January 2004, the Plaintiffs demand over $1.2 billion dollars in cash compensation, including $609,000,000 as the cost of water rights to nearly a quarter-million acre-feet of potable water that likely will never be purchased, and up to $609,000,000 for the construction of a 289,500 acre-foot "replacement" surface storage reservoir that likely will never be built.

Based on *General Electric Co.*, ER argues that Plaintiffs' state law claims for relief should be dismissed or the damages claims should be stricken. With regard to the Navajo Nation's state law tort causes of action:

> Contrary to the Tenth Circuit's express holding in *New Mexico* [*v. General Electric Co.*] . . . Plaintiff seeks compensation for a host of damages that it is not entitled to in the Tenth Circuit, such as stigma damages and loss of tax and business revenue. (Compl. ¶ 97) Thus, Plaintiff's state law Claims for Relief should be dismissed or, in the alternative, Plaintiff's claims for unrestricted monetary damages should be stricken.

[Doc. 102, pp. 13-14] Likewise, ER argues, with regard to New Mexico's state law tort causes of action:

> Plaintiff is not entitled to an unrestricted award of money for natural resource damages under state law, [*General Electric Co.*, 467 F.3d at 1257], and its state law Claims for Relief should be dismissed or, in the alternative, Plaintiff's claims for unrestricted "compensatory, consequential, and punitive damages" should be stricken.

 [Doc. 33, p. 14] Pursuant to its tort claims, New Mexico seeks against ER (and other Defendants) compensatory, restitutionary, and punitive damages, as well as attorneys' fees. [Doc. 86-1, ¶¶ 9, 199, 209, 210] In addition, specifically regarding its public nuisance claim, New Mexico alleges: "New Mexico has suffered special injuries, which the public as a whole does not share. New Mexico has and will continue to suffer lost economic activity, tax revenues, and stigmatic damages arising from these releases." [Doc. 86-1, ¶ 179] Navajo Nation seeks to recover compensatory, consequential, and punitive damages, as well as attorneys' fees, costs, and expenses. [Doc. 141-1, pp. 58-

_____

*Gen. Elec. Co.*, 467 F.3d at 1251 n.24 (internal quotation marks and citation omitted).

59]  Navajo Nation further refers to lost business revenues and stigma damages (pursuant to its public nuisance claim) [Doc. 141-1, ¶ 201], and damages based on the interference with Navajo Nation's use of the land for "water supply, irrigation needs, [and] recreational uses" (pursuant to its private nuisance claim) [Doc. 141-1, ¶ 207].

The Court in *General Electric Co.* refused to conclude that the State of New Mexico's "public nuisance and negligence theories of recovery are completely preempted." *Id.* at 1247-48.  Based on this holding, the Court concludes that dismissal of Plaintiffs' state law tort claims is not appropriate, as there is no authority for concluding that the *claims* are preempted.  *Id.*  Further, the Court denies the motion to strike the damages at this early stage in the proceeding.  *See Butler v. Pollard*, 482 F. Supp. 847, 852 (E.D. Okla. 1979) (overruling a motion to strike request for punitive damages; concluding that the defendant had "not convinced the Court that the material he wishes stricken is redundant, immaterial, impertinent or scandalous," and that the claim, if improper, would be "removed at the time of the pretrial conference or not admitted in evidence at the trial"); *see also Phillips Mach. Co. v. LeBlond, Inc.*, 494 F. Supp. 318, 321 (N.D. Okla. 1980) ("[I]f there is any question of fact or law raised by the defense, a motion to strike is improper and the issue must be decided later on the merits when more information is available.").  In *General Electric*, the district court's decision that the State's damages claims were preempted was made on summary judgment, after significant factual development (and narrowing of the damages requests by the Plaintiff), and after argument at an extended pretrial conference. *Gen. Elec. Co.*, 467 F.3d at 1236-

38. Evidence before the court included evidence pertaining to several bases for computing damages, as well as the remediation efforts which had occurred and were ongoing. *Id.* at 1237-38. The district court was able to compare the damage theories to the relief obtained through the remediation process. *Id.* Further, certain damages requests were dismissed for the failure of the Plaintiff to submit evidentiary support, rather than on the grounds that the relief was preempted. *Id.* at 1238. In this case, the Court is unable to conduct the same analysis without factual development and the development of the theories supporting the damages claims. Thus, the Court cannot determine that the requests are "redundant, immaterial, impertinent, or scandalous." Fed. R. Civ. P. 12(f). Accordingly, the Court exercises its discretion to deny the request without prejudice until the basis for the damages has been factual developed. *See Sterling Consulting Corp. v. Credit Managers Ass'n of Cal.*, 252 F. App'x 915, 917 (10th Cir. 2007) (unpublished decision) (reviewing motion to strike for an abuse of discretion).

### E. *Government Contractor Defense*

ER argues that it is shielded from liability from the Plaintiffs' state law claims[13] under the "government contractor defense." [Doc. 33, p. 14; Doc. 102, p. 14] The Court first considers whether the government contractor defense can be raised in a motion to

---

[13] New Mexico's state law claims are: public nuisance, trespass, and "negligence and gross negligence" (New Mexico's fifth, sixth, and seventh causes of action, respectively). [Doc. 1, ¶¶ 138-178; Doc. 86-1, ¶¶ 164-210] Navajo Nation's state law claims are: negligence, gross negligence, trespass, public nuisance, and private nuisance (Navajo Nation's third, fourth, fifth, sixth, and seventh claims, respectively). [16-CV-931, Doc. 1, ¶¶ 142-178; Doc. 141-1, ¶¶ 172- 210]

dismiss, and, if so, the Court then addresses the standard by which the Court must review the claim.

### i.     Standard of Review

New Mexico argues that the government contractor defense is an "affirmative defense that ER must assert and prove by a preponderance of the evidence." [Doc. 58, pp. 17-18] Navajo Nation argues that, because this is a motion to dismiss, grounds for dismissal based on the government contractor defense must appear plainly on the face of the complaint. [Doc. 115, p. 14] ER argues that "[a]s with any affirmative defense, the [government contractor defense] warrants dismissal if the factual prerequisites are set forth in the Complaint and matters subject to judicial notice, as they are in this case." [Doc. 120, p. 8]

The Court observes that the law is not particularly clear as to whether it is appropriate to grant dismissal, on a Rule 12(b)(6) motion, based on either the government contractor defense or the discretionary function exception to liability under the Federal Tort Claims Act (application of which is a predicate to application of the government contractor defense). *Compare Howard Routh & Sons v. United States*, 668 F.2d 454, 455-59 (10th Cir. 1981) (reversing dismissal on Rule 12(b)(6) motion of claims against United States and its contractors for damage to real property, concluding that "determination of whether or not a given act by the United States is discretionary, and so excluded from coverage under the Federal Tort Claims Act is very much a factual issue, depending upon evidentiary circumstances present in each individual case") *with Bell v.*

*United States*, 127 F.3d 1226, 1228-29 (10th Cir. 1997) (treating a Rule 12(b)(1) motion to dismiss for lack of jurisdiction based on application of the discretionary function exception to the waiver of immunity as a motion for summary judgment because the jurisdictional issues were intertwined with the merits of the case) *and with Ackerson v. Bean Dredging, LLC*, 589 F.3d 196, 204, 208 (5th Cir. 2009) (affirming grant of judgment on the pleadings under Rule 12(c) to contractors based on "government-contractor immunity" but concluding that application of the defense did not deny the court of subject-matter jurisdiction).

Nonetheless, both the Navajo Nation and ER suggest that the Court apply the following standard:

> Under Rule 12(b), F.R.Civ.P., a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim. If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule. But, if the affirmative defense is based upon matters outside the complaint, and is raised by a motion under Rule 12(b), then the court must consider the motion as one for summary judgment under Rule 56 in order to consider evidentiary matters outside the complaint. And, then, only if there is no genuine issue of fact as to the affirmative defense, can the court sustain the motion to dismiss.

*Miller v. Shell Oil Co.*, 345 F.2d 891, 893 (10th Cir. 1965). The Court notes that, when *Miller's* "plainly on the face of the complaint" test is applied, it is generally applied to the defense of the statute of limitations.[14] Nonetheless, even though it may oversimplify the

---

[14] "The defense of limitations is the affirmative defense that is most likely to be established by the uncontroverted facts in the complaint." *Serna v. Webster*, No. CV 17-0020 JB/WPL, 2017 WL 4386359, at *27 (D.N.M. Sept. 30, 2017), *appeal docketed*, No. 17-2177 (10th Cir. Oct. 10, 2017).

issue to simply hold that this standard can be applied to the government contractor defense, the Court will do so, in part because, even if it applies this standard, ER is not entitled to dismissal on the grounds of the government contractor defense based on the facts as alleged.

### ii.     Government Contractor Defense – *Boyle* and *Yearsley*

The government contractor defense was defined by the United States Supreme Court in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 509-12 (1988). The defense grew out of the holding in *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18 (1940), in which the petitioners, who owned land along the Missouri River, sued contractors for building dikes and who, "using large boats with paddles and pumps to produce artificial

---

The statute of limitations defense is unusual in that, as previously indicated, its effectiveness may well appear on the face of the complaint. Most of the affirmative defenses referred to in Rule 8(c) are less self-evident, however, and usually do not give rise to a motion addressed to the viability or sufficiency of the complaint. For example, the defense of laches, although similar to a limitations defense, involves more than the mere lapse of time and depends largely upon questions of fact. Thus, a complaint seldom will disclose undisputed facts clearly establishing the defense of laches and a motion to dismiss generally is not a useful vehicle for raising the issue, although some district courts have permitted a challenge to be made in this fashion. As is true of most of the Rule 8(c) affirmative defenses, the summary judgment motion or trial are better vehicles for determining the propriety of the defense.

5 Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, A. Benjamin Spencer, Richard L. Marcus & Adam N. Steinman, *Federal Practice & Procedure: Civil* § 1277, at 643 (3d ed. 2016) (footnotes omitted). This Court beliefs that, as with the defense of laches, a Rule 12(b)(6) motion is generally not the most "useful vehicle" for addressing the government contractor defense given the factual issues the defense presents.

erosion, had washed away a part of petitioners' land." *Id.* at 19. However, the contractors had done so "pursuant to a contract with the United States Government, and under the direction of the Secretary of War and the supervision of the Chief of Engineers of the United States." *Id.* Under those facts, the Supreme Court extended the immunity from suit which protects the United States Government to contractors performing work "authorized and directed by the Government of the United States." *Id.* However, *Yearsley* left the limits of the defense ill-defined. Forty-eight years later, in *Boyle*, the Court named the defense and added criteria for its application. *Boyle*, 487 U.S. at 504-513.[15]

In *Boyle*, the plaintiff asserted that a military contractor was liable for damages caused by an alleged design defect in a helicopter emergency escape system. *Id.* at 502-03. The Court began its analysis by considering whether federal law preempted state law, and, while recognizing that there was not express preemption, the Court nonetheless determined that the case presented an issue which involved "uniquely federal interests." *Id.* at 504. The uniquely federal interests presented by the case included contract obligations to the United States and "the civil liability of federal officials for actions taken in the course of their duty." *Id.* at 504-05. The Court stated that "the reasons for

---

[15] Some Courts have considered *Boyle* to be analytically distinct from *Yearsley*, thus concluding that each case considers a different defense, while other courts consider *Yearsley* to be "merely the progenitor of a government contractor defense." *Richland-Lexington Airport Dist. v. Atlas Props., Inc.*, 854 F. Supp. 400, 421 n.14 (D.S.C. 1994) (internal quotation marks and citations omitted) (collecting cases and discussing reasoning). This Court finds the latter view persuasive.

42

considering these closely related areas to be of 'uniquely federal' interest apply as well to the civil liabilities arising out of the performance of federal procurement contracts." *Id.* at 505-06. The Court noted that it had, in *Yearsley,* recognized a federal interest in governing civil liability for performance contracts, and the Court concluded that there was no basis for distinction in the case of procurement contracts. *Id.* at 506 (citing *Yearsley*, 309 U.S. 18).

After concluding that the case involved matters of uniquely federal interests, the Court held that this conclusion did not "end the inquiry," and stated that, before the Court could find the displacement of state law, it must find that either "a significant conflict exists between an identifiable federal policy or interest and the operation of state law, . . . or the application of state law would frustrate specific objectives of federal legislation." *Id.* at 507 (internal brackets, quotation marks, and citations omitted). The Court stated that, in the case before it, the "state-imposed duty of care that is the asserted basis of the contractor's liability . . . is precisely contrary to the duty imposed by the Government contract." *Id.* at 509. Nonetheless, the Court stated that "[e]ven in this sort of situation, it would be unreasonable to say that there is always a significant conflict between the state law and a federal policy or interest." *Id.* (internal quotation marks omitted). Accordingly, the Court sought a basis for defining "the outlines of[] significant conflict between federal interests and state law in the context of Government procurement," and determined that a suitable test existed in the discretionary function test, which sets forth

43

an exception from liability under the Federal Tort Claims Act. *Id.* at 511 (citing 28 U.S.C.

§ 2680(a)).

The discretionary function exception to liability for tort claims applies to

[a]ny claim based upon an act or omission of an employee of the Government . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). Applying the discretionary function test in *Boyle*, the Court set

forth the analysis applicable to determining whether a contractor is liable for work done

for the federal government – specific to the context of liability for a design defect in

equipment built pursuant to a procurement contract for military equipment:

Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States. The first two of these conditions assure that the suit is within the area where the policy of the "discretionary function" would be frustrated— *i.e.*, they assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself. The third condition is necessary because, in its absence, the displacement of state tort law would create some incentive for the manufacturer to withhold knowledge of risks, since conveying that knowledge might disrupt the contract but withholding it would produce no liability.

*Id.* at 512.

### iii. Application of the Government Contractor Defense to EPA Contracts

Since *Boyle*, our Tenth Circuit has cited the case several times, but none of those cases address the applicability of the government contractor defense.[16] However, courts which have considered how broadly *Boyle* reaches have reached varying results. New Mexico argues that certain courts have refused to apply the government contractor defense beyond the context of military contracts.[17] [Doc. 58, p. 18]

This Court is persuade by the reasoning of courts which have held that the language of and principles behind *Boyle* itself suggest that it is not limited to military contracts. For example, in *Andrews*, the Court considered the split in authority and determined that "[t]he governmental interests identified in *Boyle* as the basis for the contractor defense are equally applicable to military and non-military contracts." *Andrews*, 936 F. Supp. at 829-30; *see also Carley v. Wheeled Coach*, 991 F.2d 1117, 1120 (3d Cir. 1993) (holding that *Boyle's* rationale "is equally applicable to military and nonmilitary contractors"); *Gadsden Indus. Park, LLC v. United States* [*Gadsden I*]*, 111 F. Supp. 3d 1218, 1227-28 (N.D. Ala. 2015) (analyzing whether the government contractor defense protected an EPA contractor from immunity for actions taken during

---

[16] *See, e.g.*, *United States v. Supreme Court of New Mexico*, 839 F.3d 888, 918 n.18 (10th Cir. 2016) (citing *Boyle* for the test governing whether federal common law preempts state law); *Helfrich v. Blue Cross & Blue Shield Ass'n*, 804 F.3d 1090, 1092, 1098 (10th Cir. 2015) (holding that federal health plan provision preempted state antisubrogation law); *Ayala v. United States*, 980 F.2d 1342, 1349 (10th Cir. 1992) (holding that decision by federal mine safety inspector was technical and not discretionary).

[17] New Mexico cites *Andrews v. Unisys Corp.*, 936 F.Supp. 821, 830 (W.D. Okla. 1996) as citing cases demonstrating the split of authority. *Andrews* does collect such cases, and, after considering them, the Court held: "This Court does not interpret that language from the *Boyle* opinion as limiting the defense to military contractors." *Id.* at 829.

CERCLA clean-up; surveying the authority; and concluding that "[m]ultiple courts have applied *Boyle's* reasoning outside the military context"); *Richland-Lexington Airport Dist.*, 854 F. Supp. at 421-22 (analyzing whether the government contractor defense protected EPA contractor for work done pursuant to performance contract under CERCLA).

A few courts have considered whether the government contractor defense applies to contractors performing environmental clean-up activities for various governmental entities. For example, in *Richland-Lexington Airport District*, the Court applied *Boyle* in granting summary judgment to an EPA contractor that conducted clean-up activities which allegedly contaminated the plaintiff's adjacent property. *Richland-Lexington Airport Dist.*, 854 F. Supp. at 419-24. The Court in *In re World Trade Center Disaster Site Litigation*, 456 F. Supp. 2d 520, 563-66 (S.D.N.Y. 2006), denied summary judgment based on the government contractor defense to contractors involved in the clean-up of the 2001 World Trade Center site. Therein, the Court described the origin of the government contract defense as follows:

> The practicalities of modern governance have led courts, over the past sixty years, to extend the immunity traditionally afforded to the federal government for actions taken in furtherance of its government functions to private entities hired to facilitate the government in the implementation of its programs and goals. *See Yearsley v. W.A. Ross Const. Co.,* 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940). The extension of such immunity stems from the premise that, "[t]o insulate the United States from its discretionary decisions, but not to do likewise when the United States enters into contracts with others to execute the will of the United States 'makes little sense.'" *Richland–Lexington Airport District v. Atlas Properties, Inc.*, 854 F.Supp. 400 (D.S.C.1994) (*quoting Boyle v. United Techs. Corp.*, 487 U.S.

> 500, 511–512, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988)). Indeed, the primary purpose of the defense "is to prevent the contractor from being held liable when the government is actually at fault" but is otherwise immune from liability. *Trevino v. General Dynamics Corp.*, 865 F.2d 1474, 1478 (5th Cir. 1989).

*Id.* at 560. Finally, in *Gadsden I*, the Court denied summary judgment to contractors employed by the EPA to remediate certain industrial property, where the contractors argued that they were entitled to the government contractor defense for allegedly burying and selling certain railroad track spur lines owned by the plaintiff. *Gadsden I*, 111 F. Supp. 3d at 1221-22, 1231.

*Gadsden I* outlined *Boyle's* test in the context of an EPA response action, as follows:

> To establish the government contractor defense, [contractors] must demonstrate that (1) EPA had a unique[ly] federal interest; (2) a significant conflict exists between the state law and that interest; and (3) their actions were within *Boyle's* "scope of displacement." *See Boyle*, 487 U.S. at 504–13, 108 S.Ct. 2510.

*Gadsden I*, 111 F. Supp. 3d at 1228. To determine whether a significant conflict exists between state law and the uniquely federal interests, the Court applies the discretionary function exception to the FTCA. *Id.* Thus, the Court first considers whether

> a federal statute, regulation, or policy specifically prescribes a course of action for [a government] employee to follow. . . . If no prescribed course of action exists, then the court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield *i.e.* those based on considerations of public policy.

*Id.* at 1229 (internal quotation marks omitted) (quoting *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988)). "The *government actor*, rather than . . . the

*contractors*, must have exercised the discretion." *Id.* Finally, to determine whether the action is within the scope of displaced action, the contractor "must show that (1) EPA approved reasonably precise clean-up procedures; (2) [the contractor] followed those procedures; and (3) [the contractor] revealed to EPA any dangers regarding the cleanup activity unknown to EPA." *Id.* at 1230.

### iv.     The Government Contractor Defense Applied to this Case

In this case, both Plaintiffs argue that the government contractor defense does not apply to protect ER. Both Plaintiffs argue that EPA has no uniquely federal interest and that no significant conflict exists between the state tort claims and EPA's interests. [Doc. 58, pp. 19-20; Doc. 115, pp. 15-16] Both Plaintiffs further argue that the elements of the discretionary function exception test are not met, though they rely on somewhat varying rationales. [Doc. 58, pp. 21-22; Doc. 115, pp. 16-20] Finally, both Plaintiffs argue that ER did not comply with the specifications given to it by the EPA. [Doc. 58, p. 20; Doc. 115, pp. 20-21] The Court addresses these arguments in turn.

### a.     Uniquely Federal Interest

First, the Court must consider whether the EPA has a uniquely federal interest in "the civil liabilities arising out of the performance of [its response action] contracts" for environmental response actions authorized by CERCLA. *Boyle*, 487 U.S. at 505-06. In *Gadsden I*, the Court concluded that "EPA's remediation of the . . . property involves a unique[ly] federal interest in cleanup of a Superfund site on the national priority list."

48

*Gadsden I*, 111 F. Supp. 3d at 1228.  The same conclusion is warranted here.[18]  Plaintiffs'

arguments to the contrary are not persuasive, in part because neither Plaintiff correctly

identifies the uniquely federal interest.  New Mexico argues that the EPA has no uniquely

federal interest in ER's negligent conduct.  [Doc. 58, p. 19]  Navajo Nation argues that its

Complaint did not allege any obligation by the EPA, and therefore "ER has not met its

burden to show how the Complaint pleads a uniquely federal interest on the EPA's part."

---

[18] Congress addressed response action contractor liability in 1986 when it enacted the Superfund Amendments and Reauthorization Act of 1986, commonly referred to as SARA, which included a provision titled "Response Action Contractors."  Pub. Law 99-499, § 119.  This provision, codified at 42 U.S.C. § 9619, addresses the "Liability of response action contractors."  Accordingly, Congress itself identified a uniquely federal interest in response action contractor liability (two years before the Supreme Court judicially created the government contractor defense in *Boyle*).

Section 9619 states that "a response action contractor with respect to any release or threatened release of a hazardous substance or pollutant or contaminant" is not liable under CERCLA "or under any other Federal law" for damages "which result[] from such release or threatened release," unless the release "is caused by conduct of the response action contractor which is negligent, grossly negligent, or which constitutes intentional misconduct."  Section 9619(a)(1), (2).  The provision also states:

> The President may agree to hold harmless and indemnify any response action contractor meeting the requirements of this subsection against any liability (including the expenses of litigation or settlement) for negligence arising out of the contractor's performance in carrying out response action activities under this subchapter, unless such liability was caused by conduct of the contractor which was grossly negligent or which constituted intentional misconduct.

Section 9619(c)(1).  The law spells out specific circumstances under which the President may indemnify a response action contractor and the requirements of an indemnification agreement, including that the "response action contractor has made diligent efforts to obtain insurance coverage from non-Federal sources to cover such liability."  Section 9619(c)(4)(b).

[Doc. 115, pp. 15-16]  The Court is not persuaded by Plaintiffs' characterization of the inquiry.  The EPA has a uniquely federal interest concerning the liability of its response action contractors that perform response actions pursuant to CERCLA, as occurred in this case.

### b.  Significant Conflict Between State Law and Uniquely Federal Interest

The Court must next consider whether a significant conflict exists between state law and the EPA's uniquely federal interest in response action contractor liability.  As set forth in footnote 18, Section 6919 specifically addresses the "[l]iability of response action contractors."  No party has analyzed whether this provision demonstrates that there is or is not a significant conflict between state tort law and the uniquely federal interest of the liability pursuant to the EPA's response action contracts.[19]  Without such briefing, the Court is not prepared, at this juncture, to hold that there is such a conflict.

It remains unclear whether the Supreme Court would conclude that Congress's express provisions governing response action contractor liability in Section 9619 obviates the need for application of the discretionary function test in order to decide whether or not a conflict exists between state law and a uniquely federal interest.  Because it is

---

[19] There is little authority on this issue, however, in *Amtreco, Inc. v. O.H. Materials, Inc.*, 802 F. Supp. 443, 446 (M.D. Ga. 1992), the Court relied on Section 9619 in determining that a contractor was not immune from liability for state and common law torts.  While the Court in *Amtreco* considered Section 9619 in applying *Yearsley* alone (having determined that *Boyle* only applied to product liability cases), the Court observed that, pursuant Section 9619, "the government, at its option, may indemnify a response action contractor against any liability for negligence arising out of the performance of the cleanup contract[, which] indicates that the relationship between the United States and [the contractor] is not one of principal/agent." *Id.* at 445-46.

50

unclear whether the test should be applied, and given that the parties focused on the discretionary function test, the Court will conduct the analysis.

1. *The Discretionary Function Test*

The first step in applying the discretionary function test is to ask whether "a federal statute, regulation, or policy specifically prescribes a course of action for [the government] employee to follow," and, if not, whether the act is discretionary. *Gadsden I*, 111 F. Supp. 3d at 1229 (internal quotation marks and citations omitted). "[T]he *government actor*, rather than . . . the *contractors*, must have exercised discretion." *Id.* Discretionary acts are those "'susceptible to policy analysis.'" *Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1538 (10th Cir. 1992) (quoting *United States v. Gaubert*, 499 U.S. 315, 325 (1991)). The purpose of the discretionary function exception is to "prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy" through tort suits. *Berkovitz*, 486 U.S. at 536–37 (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984)). Accordingly, where a governmental employee must use judgment to consider the best course of action, such acts are discretionary. *Dalehite v. United States*, 346 U.S. 15, 34 (1953) (defining discretion as "the discretion of the executive or the administrator to act according to one's judgment of the best course"); *Gaubert*, 499 U.S. at 325 (recognizing that even day-to-day management decisions "regularly require[] judgment as to which of a range of permissible courses is the wisest," and thus fall within the discretionary function exception to governmental liability).

51

## A. *Whether Statutes Specifically Prescribed a Course of Action*

First, the Court considers whether CERCLA prescribed a specific course of action for EPA employees to follow. Section 9604 gives the President[20] the authority to respond to any release or substantial threat of a release of a hazardous substance into the environment. In relevant part, it states that, whenever there is a release or threatened release:

> [T]he President is authorized to act, consistent with the national contingency plan, to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance, pollutant, or contaminant at any time (including its removal from any contaminated natural resource), or take any other response measure consistent with the national contingency plan which the President deems necessary to protect the public health or welfare or the environment.

42 U.S.C. § 9604(a)(1). This section also gives the President the authority to determine whether a responsible party is qualified to conduct a remedial investigation and/or feasibility study, and if so, to allow such party to do so with government oversight. *Id.* The statute further provides that:

> Any removal action undertaken by the President under this subsection (or by any other person referred to in section 9622 of this title) should, to the extent the President deems practicable, contribute to the efficient performance of any long term remedial action with respect to the release or threatened release concerned.

Section 9604(b). Congress specifically vested in the President the authority to take such action "as he may deem necessary or appropriate" in investigating, monitoring, and

---

[20] As relevant to this case, the President delegated his authority to the EPA by Executive Orders. 40 C.F.R. § 300.100; 40 C.F.R. § 300.2.

gathering information "[w]henever the President is authorized to act pursuant to subsection (a) of this section." Section 9604(b)(1). Further, although the President must "consult with the affected State or States before determining any appropriate remedial action," Congress declared that "[t]he President shall select remedial actions to carry out this section in accordance with section 9621 of this title (relating to cleanup standards)." Section 9604(c)(2), (4). Section 9621 identifies considerations the President shall take into account when selecting appropriate remedial actions, including, *inter alia*, "the persistence, toxicity, mobility, and propensity to bioaccumulate of such hazardous substances and their constituents," the "potential for adverse health effects from human exposure," and "long-term maintenance costs." Section 9621(b)(1)(C), (D), (E). However, the President is not required to consider particular factors with more weight or given a formula for application of the factors. Section 9621(b)(1). Furthermore, the President may select a remedy "not appropriate for a preference under this subsection" and publish an explanation for such decision. Section 9621(b)(1).

In *Daigle*, Our Tenth Circuit considered whether actions taken by the Army while conducting a response action under § 9621 fell within the discretionary function exception to the FTCA. *Daigle*, 972 F.2d at 1540-41. The Court held that they did, reasoning:

> How [the Army and other agencies] were to go about containing the spread of contamination before further damage could occur while still protecting public health touched on policy choices, not the least of which involved the "translation" of CERCLA's general health and safety provisions into "concrete plans." *Allen*, 816 F.2d at 1427 (McKay, J., concurring). This

53

type of "translation involve[s] the very essence of social, economic, and political decisionmaking—the precise policy choices protected by the discretionary function exception." *Id*. The administrator must balance overall priorities—in this case the need for a prompt cleanup and the mandate of safety—with the realities of finite resources and funding considerations. *Id*. (citing *Varig Airlines*, 467 U.S. at 820, 104 S.Ct. at 2767). *See also* The Law of Hazardous Waste § 12.03[4][a] (discussing general principles underlying CERCLA, including prompt cleanup of waste sites, protection of human health and the environment). We are not permitted to "second-guess" that policy determination.

*Id*. at 1541–42. Other Courts that have considered this issue have reached the same ruling. *U.S. Fid. & Guar. Co. v. U.S.*, 837 F.2d 116, 123 (3d Cir. 1988); *Gadsden Industrial Park, LLC v. United States*, 2017 WL 4387217, *18 (N.D. Ala. 2017), *appeal docketed* No. 17-15325 (11th Cir. Nov. 30, 2017); *United States v. Green*, 33 F. Supp. 2d 203, 222-23 (W.D.N.Y. 1998).

For the reasons set forth in *Daigle*, the Court concludes that CERCLA did not prescribe a specific course of action for government employees to follow in conducting the response action at the Gold King Mine.

> B.  *Whether Regulations Specifically Prescribed a Course of Action*

[T]he discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive. And if the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect.

*Berkovitz*, 486 U.S. at 536. If such a regulation or policy mandates a specific course of action, then the discretionary function exception to liability does not apply, and, ergo, ER cannot demonstrate that the government contract defense plainly applies based on the

face of the *Proposed Amended Complaints*. Both Plaintiffs cite to several regulations as well as instructions by Mr. Way as prescribing a course of action for the federal employee to follow.

The Court notes that whether or not these regulations subscribe a course of action for EPA employees to follow is also the subject of EPA's responses in opposition to New Mexico and Navajo Nation's motions for leave to amend their complaint. [Doc. 125, pp. 12-18; Doc. 155, pp. 10-24] The Court declines to address those issues in this *Memorandum Opinion and Order*. For purposes of this *Memorandum Opinion and Order*, the Court assumes without deciding that ER can establish that at least some of the regulations or policies do not specifically prescribe a course of action for EPA employees. Thus, without deciding as much, the Court proceeds under the assumption that a significant conflict exists between state tort law and the uniquely federal interest in liability of the response action contractors conducting the response action at the Gold King Mine.

c.      Whether ER's Actions Fit Within the Scope of Displaced State Law

Next, the Court must determine whether the immunity from suit which the Court is assuming protects the EPA employees also extends to the EPA's contractor, ER. In other words, ER must show that the EPA "made [ER] do it" in order for ER to be protected from liability. *Gadsden I*, 111 F. Supp. 3d at 1230 (internal quotation marks and citation omitted). *Boyle* enunciated a three-part test to consider this issue, however, that test was worded specifically regarding the product liability issue before the Court in *Boyle*. *Boyle*,

55

487 U.S. at 512. *Gadsden I* reworded the test to apply to response action contractors performing under a contract with the EPA, restating the test as follows: the contractor "must show that (1) EPA approved reasonably precise clean-up procedures; (2) [the contractor] followed those procedures; and (3) [the contractor] revealed to EPA any dangers regarding the cleanup activity unknown to EPA." *Gadsden I*, 111 F. Supp. 3d at 1230. Again, because the government contractor defense is an affirmative defense, and because the court is considering ER's *Motions to Dismiss*, ER must demonstrate that the defense plainly applies based on the facts alleged in the *Proposed Amended Complaints*.

### 1. *Reasonably Precise Clean-up Procedures*

As pleaded, the Court cannot conclude that the EPA approved reasonably precise clean-up procedures, the first requirement for establishing that the actions fit within the scope of displaced state law. Plaintiffs allege that in late July 2015, EPA's on-site coordinator, Mr. Way, planned an on-site review of the plans by a Bureau of Reclamation engineer, which was scheduled to occur on August 14, 2015. [Doc. 86-1, ¶ 93; Doc. 141-1, ¶ 95] In the interim, Mr. Way went on vacation, but he arranged for another EPA employee, Mr. Griswold, to supervise the site while he was away. [Doc. 86-1, ¶ 94; Doc. 141, ¶¶ 96-97] Mr. Way sent "specific instructions about the scope and timing of work at the Gold King Mine" to Mr. Griswold and employees of ER, Weston Solutions, and DRMS. [Doc. 86-1, ¶ 95; Doc. 141-1, ¶ 97]

Without alleging that they were instructed to do so by Mr. Griswold, Plaintiffs allege that the crew at the Gold King Mine did not follow the work plan or the

instructions given by Mr. Way in his email.  [Doc. 86-1, ¶ 97; accord. Doc. 141-1, ¶ 98]

The *Proposed Amended Complaints* do not allege that Mr. Griswold gave any instructions, let alone the substance of the instructions.  Thus, it is impossible to determine whether Mr. Griswold gave "reasonably precise" instructions to the crew.[21]

[Doc. 86-1, ¶ 97]  Instead, New Mexico points to several inconsistent reports, by various parties, concerning the cause of the Gold King Mine spill.  [Doc. 86-1, ¶¶ 102-110]  One peer reviewer stated that the

> actual cause of failure was some combination of issues related to EPA internal communications, administrative authorities, and/or a break in the decision path. The [Bureau of Reclamation] report… did not describe why a change in EPA field coordinators caused the urgency to start digging out the plug rather than wait for BOR technical input as prescribed the EPA project leader.

[Doc. 86-1, ¶ 106]  New Mexico further alleges:

> The federal government's investigations over the past year have failed to explain the critical decisions and actions that caused the Gold King Mine release. Despite EPA's repeated admissions of responsibility, EPA has not been forthcoming with information about the circumstances leading to the spill and its documentation of those efforts. EPA has also ignored congressional requests and subpoenas for documents and information.

[Doc. 86-1, ¶ 106; accord Doc. 141-1, ¶¶ 130-131]

---

[21] According to New Mexico's original *Complaint*, the Gold King Mine crew's actions on August 4 and 5 were "under Mr. Griswold's direction."  [Doc. 1, ¶ 83]  Further, New Mexico alleged that "Mr. Griswold's failure to follow Mr. Way's directive[] was a recipe for disaster."  [Doc. 1, ¶ 83]  Even so, these allegations do not address the substance of Mr. Griswold's directions, which would be necessary to determine whether the instructions were reasonably precise.  Further, these allegations, or anything similar suggesting that Mr. Griswold gave directions contrary to Mr. Way's, are absent from New Mexico's *Proposed Amended Complaint*.

The *Proposed Amended Complaints* contain no allegations as to whether Mr. Griswold gave any directions to the crew working at the Gold King Mine, let alone the substance of such direction (if any). Accordingly, the Court cannot determine that Mr. Griswold gave reasonably precise directions. Thus, at this stage in the proceedings, the Court cannot determine that the government contractor defense protects ER. However, the *Proposed Amended Complaints* allow an inference that Mr. Way gave reasonably precise instructions, and, arguably, that the work plan contained reasonably precise instructions. However, without either allegations that Mr. Griswold gave no instructions or allegations that Mr. Griswold gave instructions and the substance of those instructions, the Court cannot, on the face of the complaints, determine whether the EPA gave reasonably precise instructions to ER.

### 2. *ER's Compliance with EPA's Procedures*

Further, for the government contractor defense to apply, the Court must be able to conclude that ER followed EPA's reasonably precise instructions. If, for the sake of analysis, the Court were to assume that Mr. Griswold gave no instructions to ER, the Court cannot conclude that ER followed EPA's instructions. Plaintiffs allege that the crew at the Gold King Mine site "substantially deviated from Mr. Way's written instructions, as well as the June 11 work plan." [Doc. 86-1, ¶ 97; accord. Doc. 141-1, ¶ 98] Such deviations included digging without a pump, hose, stinger, sump or sump pump to treat discharged water. [Doc. 86-1, ¶ 97; Doc. 141-1, ¶ 98] Alternatively, if the Court were to assume that the EPA, through Mr. Griswold, approved reasonably precise

clean-up procedures, the *Proposed Amended Complaints* contain no allegations that ER followed Mr. Griswold's instructions. Thus, looking only at the *Proposed Amended Complaints*, the Court cannot determine that ER followed EPA's reasonably precise instructions.

### 3. *Whether ER Revealed Dangers to the EPA*

Finally, for the Court to conclude that the government contractor defense applies, the *Proposed Amended Complaints* would have to plainly establish that ER revealed to EPA any dangers regarding the cleanup activity unknown to EPA. However, the *Proposed Amended Complaints* contain no allegations which would allow the Court to make such a determination. The *Proposed Amended Complaints* simply do not speak to this element of the government contractor defense.

### 4. *Summary*

In conclusion, ER has not established that its actions fall within the scope of action displaced by federal law, as enunciated by *Boyle* and reformulated to the context of environmental response actions in *Gadsden I*. The facts alleged in the proposed amended complaints to do not plainly demonstrate that "(1) EPA approved reasonably precise clean-up procedures," that "(2) [ER] followed those procedures," or that (3) ER "revealed to EPA any dangers regarding the cleanup activity unknown to EPA." *Gadsden I*, 111 F. Supp. 3d at 1230. Thus, ER has not persuaded the Court that it is plainly entitled to application of the government contractor defense based on the allegations in the proposed

amended complaints.  However, this conclusion does not prejudice ER's ability to plead and prove the defense during the course of the proceedings in this case.

### F.  Motions to Strike Joint and Several Liability

"[W]hen a court considers a state-law claim concerning interstate water pollution that is subject to the [Clean Water Act (CWA)] the court must apply the law of the State in which the point source is located."  *International Paper Co. v. Ouellette*, 479 U.S. 481, 487 (1987).  Citing *Ouellette* and similar authority, ER argues that "Supreme Court precedent establishes that Colorado state law applies to [Plaintiffs'] state tort causes of action as the law of the 'source' state."  [Doc. 33, pp. 23-24; accord. Doc. 102, p. 23]  ER further argues that Colorado has abolished joint and several liability, and thus, Plaintiffs' "claims that ER is 'jointly and severally liable' for damages under state tort law . . . should be stricken as immaterial under Fed. R. Civ. P. 12(f) because they have 'no possible bearing on the controversy.'"  [Doc. 102, p. 23 (citations omitted); accord. Doc. 33, p. 24]

New Mexico responds to this argument by first challenging ER's procedural use of a motion to strike because such relief is drastic and disfavored and, because, in its *Motion* as to New Mexico, ER does not argue that New Mexico's allegations are "redundant, immaterial, impertinent, or scandalous."  Fed. R. Civ. P. 12(f); *Lane v. Page*, 272 F.R.D. 581, 587, (D.N.M. 2011) ("Striking a pleading or part of a pleading is a drastic remedy and because a motion to strike may often be made as a dilatory tactic, motions to strike under Rule 12(f) generally are disfavored." (Internal quotation marks and citations

omitted)). [Doc. 58, p. 23] The Court does not believe that ER's argument as to the grounds for striking the allegations was unclear – citing Rule 12(f), ER argued that it could not be held jointly or severally liable based on controlling law, and thus the allegation should be stricken. [Doc. 33, pp. 23-24] Further, while striking the allegation is drastic, if the law is clear that joint and several liability cannot apply regardless of how the facts develop, it is appropriate to strike the allegation. *Cf. Norman's Heritage Real Estate Co. v. Aetna Cas. & Sur. Co.*, 727 F.2d 911, 915 (10th Cir. 1984) (favorably citing case which sustained a "defendant's motion to strike from plaintiff's pleadings his allegations relating to punitive damages" because punitive damages were not available for a breach of contract (internal quotation marks and citation omitted)).

Next, New Mexico argues that the issue of law, whether the Court must apply Colorado law, is disputed and unclear, and that the court should not decide the issue, as the facts necessary to allow the court to decide the issue have not been established. [Doc. 58, pp. 23-24] New Mexico, however, does not identify any facts upon which this issue depends, and none are apparent to the Court.

Both Plaintiffs respond that the Court must apply traditional choice-of-law rules in determining whether to apply New Mexico or Colorado law. [Doc. 58, pp. 22-23; Doc. 115, p. 22] However, this argument is foreclosed by *Ouellette*, wherein the majority rejected the same argument, which was made by the Justices who concurred in part and dissented in part. *See Ouellette*, 479 U.S. at 501-02 (Brennan, J., concurring in part and dissenting in part) (stating that the Court should apply the usual two-part analysis of 1)

61

applying the conflict-of-law rules of the state in which the court sits, and 2) under such rules, determining whether the law of the source state or the affected state applies); *id.* at 509 (Stevens, J., concurring in part and dissenting in part) (disagreeing with the majority's decision on preemption without first letting the district court conduct a choice-of-law determination). The majority stated:

> [T]he application of affected-state law would frustrate the carefully prescribed CWA regulatory system. This interference would occur, of course, whether affected-state law applies as an original matter, or whether it applies pursuant to the source State's choice-of-law principles. Therefore if, and to the extent, the law of a source State requires the application of affected-state substantive law on this particular issue, it would be pre-empted as well.

*Id.* at 499 n.20.

New Mexico raises a few additional arguments which the Court concludes that *Ouellette* and similar cases address and foreclose. However, to address these arguments, the Court first finds it necessary to discuss the multi-faceted reasoning in *Ouellette.*

In *Ouellette*, International Paper Company (IPC), located in New York, discharged "a variety of effluents" into Lake Champlain, which forms part of the border between New York and Vermont. *Id.* at 483-84. The plaintiffs, who owned property in Vermont on the shore of Lake Champlain, sued IPC for common law nuisance under Vermont law. *Id.* at 484. The Court concluded that the CWA, which allows states to permit certain discharges into waters within their own borders, preempts tort claims under state law when the source of the alleged injury is located in another state. *Id.* at 497.

To reach its holding, the *Ouellette* Court stated that, from at least 1906 (when the Court decided *Missouri v. Illinois,* 200 U.S. 496 (1906)) until 1981 (when the Court decided *Milwaukee v. Illinois (Milwaukee II)*, 451 U.S. 304 (1981)), federal common law, rather than state law, governed issues of water pollution.  *Ouellette*, 479 U.S. at 487-89. In *Milwaukee II*, the Court held that the 1972 amendments to the Federal Water Pollution Control Act (i.e., the Clean Water Act) were so far reaching and comprehensive that the federal legislation preempted the federal common law, however, the Court did not address whether state law was preempted.  *Ouellette*, 479 U.S. at 488-89.  The Court next discussed the permit program designed by the CWA, which "generally prohibits the discharge of any effluent into a navigable body of water unless the point source has obtained [a] . . . permit" from either the EPA or the state within whose borders the point source sits.  *Id.* at 489-90.  Whether a state or the EPA issues a permit, an affected state, that is, a state which shares an interstate waterway with the source state, has the right to notice and the opportunity to object to the proposed standards.  *Id.* at 490.  "[H]owever, an affected State does not have the authority to block the issuance of the permit if it is dissatisfied with the proposed standards." *Id.*

Keeping in mind the regulatory permit framework, the Court turned to the issue at hand, whether the CWA preempted an affected state's ability to enforce its common law on an out-of-state point source.  The Court first stated that "Congress intended the 1972 amendments to establish an all-encompassing program of water pollution regulation." *Id.*

at 492 (internal quotation marks and citation omitted). The Court further observed that, in addition to the permitting system,

> [t]he CWA also provides its own remedies, including civil and criminal fines for permit violations, and "citizen suits" that allow individuals (including those from affected States) to sue for injunction to enforce the statute. In light of this pervasive regulation and the fact that the control of interstate pollution is primarily a matter of federal law . . . it is clear that the only state suits that remain available are those specifically preserved by the Act.

*Id.* The Court next considered the following saving clauses within the CWA:

> "Except as expressly provided . . . , nothing in this chapter shall . . . be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States." 33 U. S. C. § 1370.
>
> . . .
>
> "Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief . . . ." 33 U. S. C. § 1365(e).

*Id.* at 485, 492-93. The Court stated that the language at Section 1370 only preserves the authority of a state to regulate waters within its boundaries. *Id.* at 493. As to Section 1365(e), the Court noted that it applied only to "this section," namely, the section that allows citizen suits. *Id.* at 493. The Court stated that Section 1365(e), therefore, did "not purport to preclude pre-emption of state law by other provisions of the Act." *Id.* The Court then stated:

> After examining the CWA as a whole, its purposes and its history, we are convinced that if affected States were allowed to impose separate discharge standards on a single point source, the inevitable result would be a serious

> interference with the achievement of the full purposes and objectives of Congress. . . . Because we do not believe Congress intended to undermine this carefully drawn statute through a general saving clause, we conclude that the CWA precludes a court from applying the law of an affected State against an out-of-state source.

*Id.* at 493-94 (internal quotation marks and citation omitted).  After *Ouellette*, the Court reiterated that federal law controls water pollution in *Arkansas v. Oklahoma*, 503 U.S. 91, 110 (1992), repeating much of the history of the regulation of water law which was laid out in *Ouellette*.  *Id.* at 98-103.

Having set forth the controlling Supreme Court precedent, the Court turns to New Mexico's arguments.  First, New Mexico argues that whether *Ouellette* applies "is questionable at best" because "ER's three million gallon release was certainly not permitted under the CWA."  [Doc. 58, p. 24 n.18]  However, regardless of whether there was a permit for a particular discharge, allowing affected state tort law to apply to non-permitted discharges in source states would conflict with the CWA's citizen suit provisions.  *Ouellette*, 479 U.S. at 497-98 & n.18 (recognizing that plaintiffs alleged that IPC was violating the terms of its permit); *cf. In re: Deep Water Horizon*, 745 F.3d 157, 170-71 (5th Cir. 2014) (rejecting argument that affected state law does not conflict with the CWA regarding non-permitted discharges; concluding that "*Ouellette* forms a controlling backdrop for resolving claims caused by the blowout.  Federal law, the law of the point source, exclusively applies to the claims generated by the oil spill in any affected state or locality").  Thus, the lack of a permit for the August 5, 2015 release does

not alter the conclusion that the CWA preempts application of New Mexico law to a discharge with a point source in Colorado.

New Mexico also argues that it is "unclear if *Ouellette's* holding applies to sovereign entities such as New Mexico." [Doc. 58, p. 24 n.18] However, as discussed above, in both *Ouellette* and *Arkansas* the Court recounted the historical development of the rule that federal law (first federal common law and later federal statutes) preempts state common law with regard to interstate water-related disputes. *Ouellette,* 479 U.S. at 487-89; *Arkansas*, 503 U.S. at 98-100. Many of the cases establishing that state law is preempted involved state plaintiffs. *See, e.g.*, *Milwaukee II,* 451 U.S. at 317 (holding that the CWA displaced federal common law in case originally brought by Illinois against the City of Milwaukee). Thus, it is well established that such preemption applies to states as well as individuals.

New Mexico next argues: "As the CWA's savings clause applies on its face only to 'state actions,' it is unclear whether the limited holding in *Ouellette* extends to issues of apportionment of liability, as ER contends." [Doc. 58, p. 24 n.18] Finally, New Mexico argues that "given that liability under the CWA is joint and several, application of Colorado's comparative fault regime would arguably conflict with the Act's regulatory scheme, and thus thwart the objectives that the Court in *Ouellette* sought to avoid." [Doc. 58, p. 24 n.18] First, the Court notes that the actual language of the pertinent saving clause does not discuss "state actions," but rather, preserves source state law. 33 U.S.C. § 1365(e) ("Nothing in this section shall restrict any right which any person (or class of

persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief."). Second, New Mexico's arguments ignore the holdings of *Arkansas* and *Ouellette*, that the "Clean Water Act taken 'as a whole, its purposes and its history' pre-empted an action based on the law of the affected State and that the only state law applicable to an interstate discharge is 'the law of the State in which the point source is located.'" *Arkansas*, 503 U.S. at 100 (quoting *Ouellette*, 479 U.S. at 487). Thus, the source state law is not preempted – and that law includes both the causes of action available and the remedies available. Finally, regardless of whether the CWA applies joint and several liability and Colorado tort law applies comparative fault, Congress intended for the Colorado state law to be preserved.[22]

ER also moves to strike Navajo Nation's punitive damages claim for a reason distinct from the CWA. ER argues: "Plaintiff's punitive damages claim . . . should also be stricken because Colorado <u>prohibits</u> punitive damage claims in initial pleadings under Colo. Rev. Stat. § 13-12-102(1.5)(a), which is a substantive law that applies in federal court." [Doc. 102, p. 24] However, while ER characterizes the Colorado statute as substantive, the authority cited by ER indicates that the statute is a procedural statute, not a substantive statute. *Am. Econ. Ins. Co. v. William Schoolcraft,* 05-CV-1870 LTB-BNB,

---

[22] ER argues that Colorado has abolished joint and several liability, citing Colo. Rev. Stat.§ 13-21-111.5(1) ("In an action brought as a result of a death or an injury to person or property, no defendant shall be liable for an amount greater than that represented by the degree or percentage of the negligence or fault attributable to such defendant that produced the claimed injury, death, damage."), *Barton v. Adams Rental, Inc*., 938 P.2d 532, 536 (Colo. 1997) (*en banc*), and *In re Air Crash Disaster at Stapleton Int'l Airport*, 720 F. Supp. 1465, 1467 (D. Colo. 1989). Plaintiffs do not dispute this law.

2007 WL 160951, * 2 (D. Colo. 2007). Moreover, without any discussion or analysis, ER asks this Court to apply a Colorado state procedural rule in the federal District Court of New Mexico. The Court will not do so absent argument or analysis.

In sum, the Court grants ER's *Motions to Strike* [Doc. 32; Doc. 101] as to Plaintiffs' allegations of joint and several liability for their state tort law claims. The Court denies the ER's *Motion to Strike* [Doc. 101] as to Navajo Nation's punitive damages claims.

### G. *Motions to Amend Complaints*

As noted above, both Plaintiffs have moved for leave to amend their complaints [Doc. 86; Doc. 141]. As to Plaintiffs' new allegations against ER, the Court does not find the allegations futile. And, as noted above, the Court already concluded that there is no prejudice to ER based on the date the motions for leave to amend were filed. [Doc. 118] The Court therefore concludes that the motions for leave to amend should be granted as to the new allegations relating to ER. The Court nonetheless continues to hold the *Motions for Leave to Amend* in abeyance pending decision on the remaining pending motions to dismiss. Nonetheless, all allegations as to joint and several liability for Plaintiffs' tort claims will be stricken.

## III. CONCLUSION

The Court hereby **DENIES-IN-PART, GRANTS-IN-PART,** and **HOLDS-IN-ABEYANCE-IN-PART** *Defendant Environmental Restoration, LLC's Motion to Dismiss the Complaint [Doc. 1] and Motion to Strike* [Docs. 32,33] and *Defendant*

68

*Environmental Restoration, LLC's Motion to Dismiss the Complaint [Doc. 1] and Motion to Strike* [Docs. 101,102].

The Court **DENIES** both *Motions* [Doc. 32; Doc. 101] as follows: Plaintiffs' Claims for cost recovery and declaratory judgment under CERCLA; CERCLA preemption of Plaintiffs' state tort claims; dismissal of the state tort claims pursuant to the government contractor defense; and ER's motion to strike Navajo Nation's request for punitive damages.

The Court **HOLDS-IN-ABEYANCE** both *Motions* [Doc. 32; Doc. 101] with regard to ER's arguments that Plaintiffs' requests for injunctive relief are barred.

The Court **GRANTS** both *Motions* [Doc. 32; Doc. 101] solely with respect to striking Plaintiffs' claims for joint and several liability as to their state law tort claims.

**SO ORDERED** this 12th day of February, 2018 in Albuquerque, New Mexico.

M. CHRISTINA ARMIJO
United States District Court Judge