IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| THE STATE OF NEW MEXICO | § | |
| on behalf of the NEW MEXICO | § | |
| ENVIRONMENT DEPARTMENT, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civ. Action No. 1:16-cv-00465-WJ-LF |
| | § | Consolidated with |
| UNITED STATES OF AMERICA, | § | 16-cv-00931-WJ-LF |
| | § | |
| UNITED STATES ENVIRONMENTAL | § | No. 18-md-02824-WJ |
| PROTECTION AGENCY; | § | |
| | § | Hon. William P. Johnson, U.S.D.J. |
| GINA MCCARTHY, in her official capacity | § | |
| as Administrator, United States Environmental | § | |
| Protection Agency; | § | |
| | § | |
| ENVIRONMENTAL RESTORATION, LLC; | § | |
| | § | |
| WESTON SOLUTIONS, INC.; | § | |
| | § | |
| KINROSS GOLD CORPORATION; | § | |
| | § | |
| KINROSS GOLD U.S.A., INC.; and | § | |
| | § | |
| SUNNYSIDE GOLD CORPORATION, | § | |
| | § | |
| *Defendants.* | § | |

**FIRST AMENDED COMPLAINT**

**INTRODUCTION AND STATEMENT OF THE CASE**

1.      On August 5, 2015, the United States Environmental Protection Agency ("EPA")

and its contractors breached a collapsed portal of the Gold King Mine, releasing over three million

gallons of acid mine drainage and 880,000 pounds of heavy metals into the Animas River

watershed in southwestern Colorado. This massive release quickly overwhelmed Cement Creek,

a tributary of the Animas River, and then snaked down the Animas through Colorado and into New Mexico, where the Animas joins the San Juan River.  The sickly yellow plume of contamination then coursed through the San Juan River in New Mexico, the Navajo Nation, and into Utah.  One week later, the plume reached Lake Powell.

2.      The plume of contamination from the Gold King Mine release carried toxic heavy metals like lead, cadmium, copper, mercury, and zinc.  When the plume passed through downstream communities in three states and two sovereign tribes, heavy metal concentrations in the Animas and San Juan Rivers exceeded federal and state standards for public drinking water.  Along the way, a substantial amount of these heavy metals fell out of the water column and settled in the riverbeds of the Animas and San Juan.  Many reaches of the Animas—on both sides of the Colorado-New Mexico state line—are now "sinks," which have temporarily captured heavy metals from the release.  Rainfall, snowmelt, and other high flow events will re-suspend these pollutants and carry them further downstream into and through New Mexico.  These sources of ongoing and future discharges pose imminent and long-term health risks to the New Mexican people—particularly residents, farmers, ranchers, and recreational users of the Animas and San Juan Rivers.  They also threaten fish, invertebrates, plants, and the environment in New Mexico.

3.      In response to the Gold King Mine release, the State of New Mexico, joined by two other states and two sovereign tribes, declared states of emergency.  The garish yellow cloud of contamination wrought environmental and economic damage throughout the Animas and San Juan Rivers and severely strained New Mexico's already stressed water resources.  The release eroded the public's confidence in these waters: many businesses along the riverfront lost customers; others were forced to close.  Agricultural uses ground to a halt.  Potable water was

hauled in by truck for human and livestock consumption.  Tens of thousands of local residents, farmers, anglers, and tourists could not access or enjoy the rivers.  The reputation of New Mexico's prized sports fishing waters—some of the world's finest—was tarnished.

4.  The immediate cause and culprits of the Gold King Mine blowout are clear. *See* Exhibits A and B.  On August 5, 2015, EPA, EPA's contractors, and the Colorado Division of Reclamation, Mining and Safety ("DRMS"), used an excavator to dig away tons of rock and debris that blocked the portal of the Gold King Mine.  Water had been building in the mine and seeping out of the portal for years, and EPA, the contractors, and Colorado officials knew the water was highly acidic and laced with heavy metals.  Colorado's records and EPA's work plan not only recognized that the mine was filled with water, but also highlighted the risk of a significant blowout—especially if workers attempted to dig away the blockage.  Yet, the work plan ignored this well-understood risk.  In fact, EPA's lead official at the Gold King Mine—who was on vacation when the crew triggered the release—had ordered EPA and DRMS employees and EPA's contractors *not* to excavate the earthen debris blocking the portal and *not* to drain the mine without setting up equipment to handle the discharge.  Further, the lead EPA official— recognizing the hazards at the site—told the crew to wait to excavate until after he returned from vacation and consulted with an engineer from the Department of Interior's Bureau of Reclamation about the risks of EPA's actions at the site.  Despite the clear dangers and explicit directions of EPA's project leader, the on-site crew dug into the portal without verifying the hydraulic pressure or taking necessary precautions—with catastrophic consequences.

5.  Although the immediate cause of the August 5 release is clear, the root cause of the hazardous condition that culminated in the disaster is more complex, dating back more than two decades.  In 1996, Sunnyside Gold Corporation ("Sunnyside Gold"), the owner of the vast

Sunnyside Mine network, persuaded the State of Colorado to let it install bulkheads in two drainage tunnels below the Sunnyside Mine.  These bulkheads impounded possibly billions of gallons of acid mine drainage and waste water in Bonita Peak Mountain and caused the water to flood several adjacent mines.  Sunnyside Gold had been spending up to a million dollars annually to operate a water treatment facility in Gladstone that processed acid mine drainage and waste from the Sunnyside Mine and its other legacy mining sites in the Animas River watershed. Sunnyside Gold wanted to stop treating the acid mine drainage, use the mountain to essentially store its waste, and abandon its lingering environmental liabilities inside Bonita Peak.  Despite understanding the inevitable consequences of plugging the Sunnyside Mine and closing the Gladstone water treatment plant, Sunnyside Gold ultimately convinced Colorado that its plan was feasible, culminating in a consent decree in 1996.

6.     When Sunnyside Gold installed the bulkheads, a vast pool of acidic and toxic water rapidly built up within the Sunnyside Mine.  But the bulkheads also caused water from the Sunnyside Mine to enter the workings of other mines on Bonita Peak, like the Gold King and the Mogul.  Suddenly, these mines, which had been virtually dry for decades, were discharging hundreds of gallons of acid mine drainage every minute.  Even worse, the Gladstone water treatment plant, which Sunnyside Gold transferred to a cash-strapped operator in 2003, was shut down in 2005, leaving these new discharges untreated.  Water quality in the Animas River declined precipitously.  For more than a decade, the volume of water and hydraulic pressure within these mines continued to build, while regulators and Sunnyside's parent, Kinross Gold Corporation, dismissed the problem or publically denied its existence.

7.     The intentional decision to plug the Sunnyside Mine and fill Bonita Peak and numerous neighboring mines with Sunnyside Gold's acidic wastewater has damaged New

Mexico's waters, environment, people, and economy.  Sunnyside Gold and its Kinross parent companies profited from their hard rock mining properties, then knowingly created and maintained an immense environmental and human health hazard to cut their water treatment costs.  Then, government entities and officials entrusted to protect the environment violated mandatory safety regulations, established mine engineering standards, and deviated from their own directives, protocols, and procedures, triggering a massive release of pollutants into a river that provides drinking water to thousands of people in three states and two sovereign tribes. Downstream communities are still paying the price.

8.     The State of New Mexico, on behalf of the New Mexico Environment Department ("NMED" or "New Mexico"), accordingly demands that the Defendants abate the imminent and substantial threats emanating from the mines in Colorado, and remediate residual contamination from the Gold King Mine releases in New Mexico's surface waters and sediments.  Contamination from the Gold King Mine releases has combined and mingled with previous and ongoing discharges of hazardous substances, heavy metals, and acid mine waste. The Defendants are jointly and severally liable for this indivisible harm.

9.     New Mexico also demands full and just compensation for its environmental and economic damages caused by the Gold King Mine release.  Despite repeated requests by NMED and others, Defendants have not stepped forward to take responsibility for New Mexico's environmental and economic injuries.  Therefore, New Mexico brings this lawsuit based on Defendants' violations of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a), the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a), the Federal Clean Water Act ("CWA"), 33 U.S.C. § 1365(h),

and claims of negligence, gross negligence, public nuisance, and trespass.  New Mexico seeks cost recovery, damages, injunctive relief, and attorney's fees.

## JURISDICTION

10.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (civil action arising under the laws of the United States), 28 U.S.C. § 1367 (supplemental jurisdiction), 28 U.S.C. § 2201 (declaratory relief), and 28 U.S.C. § 2202 (injunctive relief).

11.     Jurisdiction is also proper in this Court under 42 U.S.C. §§ 9613(b) and 9613(g)(2) (CERCLA), 42 U.S.C. § 6972(a) (RCRA), and 33 U.S.C. § 1365(a) (CWA).

## VENUE

12.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) and 1391(e)(1)(B) and 42 U.S.C. § 9613(b) (CERLCA), 42 U.S.C. § 6972(a) (RCRA), and 33 U.S.C. § 1365(a) (CWA).

## PARTIES

13.     Plaintiff, the State of New Mexico, on behalf of NMED, has authority to bring this lawsuit.  NMSA 1978, § 74-6-1(A); NMSA 1978, § 8-5-2 (B); NMSA 1978, § 36-1-19(A).

14.     Defendant EPA is an agency within the executive branch of the federal government.  Its principal office is at 1200 Pennsylvania Avenue, N.W., Washington, DC 20460.  Defendant Gina McCarthy is named in her official capacity as the Administrator of EPA.  EPA has been properly served and has appeared in this matter.

15.     Defendant United States includes all agencies of the federal government, including EPA.  New Mexico submitted a claim to EPA on May 13, 2016 pursuant to the Federal Tort Claims Act ("FTCA").  28 U.S.C. § 2871-80.  EPA did not make a final determination of the claim within the six-month time period prescribed in 28 U.S.C. § 2675(a).  Accordingly, EPA denied New Mexico's claim.

16.     Defendant Environmental Restoration is a Missouri limited liability company with its principal office at 1666 Fabrick Drive, St. Louis, Missouri 63026.  Environmental Restoration has been and still is EPA's primary contractor for emergency and rapid response services at the Gold King Mine.  Environmental Restoration has been properly served and has appeared in this matter.

17.     Defendant Weston Solutions, Inc. ("Weston Solutions") is a Pennsylvania corporation with headquarters at 1400 Weston Way, P.O. Box 2653, West Chester, Pennsylvania 19380.  At all times relevant to this suit, Weston Solutions was the Superfund Technical Assessment and Response Team ("START") contractor for EPA at the Gold King and Red and Bonita Mines.  Weston Solutions is registered in Colorado as a foreign corporation.  Its principal place of business in New Mexico is located at 3840 Commons Avenue NE, Albuquerque, New Mexico, 87109-5831.  It may be served through its registered agent: Corporation Service Company, located at 123 East Marcy Street, Suite 101, Santa Fe, New Mexico 87501.  At the time of the Gold King Mine release, Weston Solutions was conducting business in New Mexico under contract to provide investigation, remediation, and restoration of abandoned oil and gas well sites and production facilities in New Mexico.

18.     Defendant Kinross Gold Corporation ("Kinross") is a Canadian corporation with its principal office at 25 York Street, 17th Floor, Toronto, Ontario, M5J 2V5, Canada.  Kinross currently owns the Sunnyside Mine and neighboring properties near Silverton, Colorado, through its subsidiaries Kinross Gold U.S.A., Inc. and Sunnyside Gold.  Kinross has been properly served and has appeared in this matter.

19.     Defendant Kinross Gold U.S.A., Inc. ("Kinross Gold U.S.A.") is a Nevada corporation with a principal office registered with the Colorado Secretary of State at 5075 S.

Syracuse Street, 8th Floor, Denver, Colorado 80237.  Kinross Gold U.S.A. is a wholly-owned subsidiary of Defendant Kinross and has transacted business in Colorado since 2003.  On information and belief, during times relevant to this action, Kinross Gold U.S.A. conducted business and had a registered agent for service of process in New Mexico.  Kinross Gold U.S.A., Inc. has been properly served and has appeared in this matter.

20.     Defendant Sunnyside Gold Corporation is a Delaware corporation with a principal office registered with the Colorado Secretary of State at 5075 S. Syracuse Street, 8th Floor, Denver, Colorado 80237.  It currently owns the Sunnyside Mine and other properties near Silverton.  Sunnyside Gold has been properly served and has appeared in this matter.

## FACTUAL BACKGROUND

### *The Gold King Mine and Sunnyside Mine*

21.     The headwaters of the Animas River begin in the San Juan Mountains of southwestern Colorado.  The confluence of three streams—Mineral Creek, Cement Creek, and the upper Animas—define the Upper Animas River Basin.  The river basin contains hundreds of inactive or abandoned mines, among them the Gold King Mine, on the slopes of Bonita Peak, and the much larger Sunnyside Mine, two miles west in Eureka Gulch.  Bonita Peak and the surrounding topography is a maze of faults, fissures, and fractures—both natural and manmade. *See* Exhibit C.

22.     The Upper Animas River Basin lies within a heavily mineralized area that was mined extensively for metals, mainly gold and silver, from the 1870s to the mid-1990s.  Historic mining activities significantly increased the exposure of the mineralized rock to atmospheric conditions.  This exposure increased the amount of heavy metals and acidity, known as acid

mine drainage, which reaches surface water and sediments.[1]  The most common heavy metals associated with acid mine drainage in the river basin are zinc, copper, lead, aluminum, iron, and manganese, with lesser amounts of other metals.

23.     Discovered in 1873, the Sunnyside Mine soon emerged as one of the most prolific and profitable mines in Colorado.  At the height of mining activities in the 19th and early 20th centuries, the Sunnyside mine complex was a self-contained community, complete with offices, boarding houses, a hospital, and a commissary.  In 1927, the Sunnyside became the first Colorado mine to produce 1,000 tons of ore per day and had a payroll of over 500 people.  The mine opened and closed many times during its life, eventually producing more than seven million short tons of ore before its final closure in 1991.

24.     The Sunnyside Mine contains myriad underground workings on seven levels ranging from 10,660 feet to over 13,000 feet above sea level.  The Sunnyside also includes parts of two haulage and drainage tunnels: the Terry Tunnel and the American Tunnel.  The latter tunnel is actually part of the lower level of the Gold King Mine, but was renamed "the American Tunnel" in 1959.  In 1960 and 1961, Standard Metals Corporation extended the American Tunnel more than a mile to intersect Sunnyside mine orebodies 600 feet below the Sunnyside mine workings.  Thus, the American Tunnel is not a mine but the lowest transportation and ore-haulage level of the Sunnyside Mine. *See* Exhibit D.

25.     The Gold King Mine was discovered in 1887, and ore production began in 1896. Like the Sunnyside, the Gold King contains numerous workings on seven levels ranging from

---

[1] Acid mine drainage is caused by a chemical reaction when oxygen and water flow over or through rock containing metallic minerals.  The reaction causes the release of hydrogen atoms, which lowers the pH of water—making it more acidic—and dissolves metals from rock into the water.  Dissolved metals can remain in the water, or eventually settle as sediment when the pH of the water rebounds.  This natural reaction generally occurs when oxygen from the air is introduced into areas where it normally would not be found (*e.g.*, through drilling, excavating, or mining tunnels).

11,440 feet to 12,300 feet above sea level.  At first, operations occurred at the "Upper Gold King" portal at Level 1 (12,160 feet above sea level).  Later, miners developed the "Lower Gold King" tunnel at Level 7 (portal elevation 10,617 feet above sea level) to further explore the mine's vein system.

26.     In 1985, Standard Metals Corporation went bankrupt.  Echo Bay Mines Inc. ("Echo Bay"), a Canadian corporation, purchased the Sunnyside Mine, operating and doing business as Sunnyside Gold.

27.     In 1986, Gerber Minerals Corporation, a subsidiary of Gerber Energy Internationals Inc., acquired control of the Gold King Mine, leasing it from Pitchfork "M" Corp.  Gerber Minerals Corp. also entered into an agreement with Echo Bay to develop the Gold King claims together.  According to a 1986 Sunnyside Gold-Gerber Minerals Corporation venture agreement, Gerber Minerals Corporation changed its name to Gold King Mines Corporation ("Gold King Mines Corp.")

28.     In 1988, Sunnyside Gold overhauled an old water treatment facility at the historic town of Gladstone, which received acid mine drainage from the American Tunnel.  Sunnyside Gold used one ton of lime per day to raise pH levels, causing toxic metals to precipitate out of solution and settle into ponds, and cleaning 1,600 gallons per minute of discharge to a level that could support sensitive aquatic life.  This process cost hundreds of thousands of dollars per year to operate.

29.     The main Gold King Mine claims saw little development after 1910.  But in 1989, the mine's owner, Gold King Mines Corporation ("Gold King Mines Corp."), entered an operating agreement with San Juan County Mining Venture (whose members included Echo Bay, Sunnyside Gold, and several other corporations), to further explore the Gold King Mine.

These companies attempted to revive mining operations at the Sunnyside and parts of the Gold King.  Sunnyside Gold developed the "Gold King Extension" and the Gold King Extensions 1 – 5, pushing the mine works of the Sunnyside to within a few hundred feet of the Gold King workings.  But faced with decreasing ore reserves and depressed gold and base metal prices, Sunnyside Gold decided to decommission the Sunnyside Mine in 1991.  Gold King Mines Corp. stopped mining the Gold King in 1992, but kept its state mining and reclamation permits active.

*Closing of the Sunnyside Mine (1991 to 2003)*

30.     When Sunnyside Gold decided to close the Sunnyside Mine, the American Tunnel was discharging about 1,700 gallons of acidic water with high concentrations of metals, particularly zinc and iron, each minute.  The American Tunnel was several hundred feet below the Sunnyside Mine and served as a huge drainage feature for the Sunnyside.  Sunnyside Gold captured and treated the discharges at the Gladstone treatment facility to comply with federal Clean Water Act regulations and Colorado-issued discharge permits.

31.     Because the treatment facility was expensive to maintain and operate, Sunnyside Gold searched for ways to end perpetual treatment of the American Tunnel's discharges.  To do so, Sunnyside Gold needed to terminate the discharge permit for the facility issued by the Colorado Department of Public Health and Environment Water Quality Control Division ("WQCD").

32.     Sunnyside Gold could not shut down the treatment facility without addressing the discharges from the American Tunnel.  Therefore, Sunnyside Gold developed a plan to install underground hydraulic seals—called "bulkheads"—in the American Tunnel and several other mine workings to block the drainage through the workings.  Sunnyside Gold submitted this plan

to the Colorado Division of Minerals and Geology[2] and told the Division that installing the first bulkhead would create a vast pool of impounded water.  Sunnyside Gold claimed that the Sunnyside Mine would continue to fill with water until the pool reached a "physical equilibrium"—the point when the amount of water flowing into the mine workings would equal the amount leaving the workings through natural fracture and fissures in the mountain.  If all went according to Sunnyside Gold's plan, the discharges from the American Tunnel would cease, while any new springs or seeps that emerged after Sunnyside Gold installed the bulkheads would have the same acidity and metal loading as background groundwater.

33.    WQCD raised several objections to Sunnyside Gold's plan.  First, WQCD noted that the treatment facility had significantly improved water quality in Cement Creek and believed that the plan would reverse this progress and degrade the watershed.  Second, WQCD doubted Sunnyside Gold's prediction that the mine pool behind the American Tunnel bulkhead would return to natural background pH and metal loading.  Third, and most importantly, WQCD issued a finding that any new or increased flows to the surface caused by flooding the Sunnyside Mine would be "point sources" requiring discharge permits.

34.    Because Sunnyside Gold's goal was to eliminate its discharge permit obligations, it pushed back against the agency.  When the two sides could not agree on the permitting issue, Sunnyside Gold filed a lawsuit against WQCD in Colorado district court and sought a declaratory judgment on whether future seeps and springs would require permits from WQCD. Before the court could rule, however, Sunnyside Gold and WQCD settled the lawsuit and signed a consent decree in May 1996.

35.    The consent decree divided Sunnyside Gold's work obligations in three parts:

---

[2] The Colorado Division of Minerals and Geology is the predecessor to DRMS.

i.      By the end of 1996, Sunnyside Gold would install bulkheads in the American and Terry Tunnels.  Then, Sunnyside Gold would monitor the rising mine pool until it reached "physical equilibrium" (determined by Sunnyside Gold and the Division of Minerals and Geology according to terms in Sunnyside Gold's mining and reclamation permit).  Sunnyside Gold had to monitor the height of pool for two more years and then grout the valves and pipes in the bulkheads.  Then, Sunnyside Gold could install more bulkheads in the American Tunnel.  If the bulkheads eliminated the discharges from the American Tunnel (and other conditions in the consent decree were met), then WQCD would agree to terminate Sunnyside Gold's discharge permit for the treatment facility.  However, Sunnyside Gold was given the option to transfer its permit to a third party who would assume responsibility for operating the facility and treating any lingering discharges from the American Tunnel.

ii.     Besides installing the bulkheads, Sunnyside Gold was required to remediate an "A" list of legacy mining and milling sites in the area.  Sunnyside Gold would remove sources of zinc and iron loading at these sites in an amount roughly equal to what was discharging from the American Tunnel before treatment.  Sunnyside Gold had to monitor dissolved zinc concentrations at a station known as A-72 on the Animas River about 1.6 miles downstream from Silverton, in an attempt to ensure that the water quality of the watershed would be protected.  If water quality did not improve, Sunnyside Gold would commence additional mitigation projects on a "B" list.  Ultimately, Sunnyside had to demonstrate to WQCD that zinc levels would remain below a baseline for five consecutive years.

iii.    While carrying out the off-site mitigation projects, Sunnyside Gold would divert the main stem of Cement Creek to the treatment facility.  After completing all the mitigation projects on the "A" list, Sunnyside Gold could reduce or eliminate the treatment of Cement Creek.

36.     The consent decree also contained a financial surety provision.  Within 30 days after entry of the decree, Sunnyside Gold was required to provide a financial surety for $5,000,000 in the form of an irrevocable letter of credit.  WQCD could draw on the letter of credit if Sunnyside Gold filed for bankruptcy and discontinued treatment necessary to maintain water quality in the Animas River.  In that event, WQCD could enter and operate the treatment facility itself and dispose of treatment residues at Sunnyside Gold's tailings pond.

37.     WQCD agreed to terminate Sunnyside Gold's discharge permit for the American Tunnel if all these criteria were achieved:

- Five years elapsed from the date of the valve closure at the first American Tunnel bulkhead.

- Two years elapsed since Sunnyside gave WQCD notice that the mine pool had reached equilibrium.

- Valves and pipes in the seals in the American and Terry Tunnels had been grouted.

- Hydrological controls and seals eliminating flows from the lower American Tunnel had been completed, or another party or parties had accepted the permit for water treatment at the American Tunnel.

- All of the "A" list mitigation projects were completed.

- Treatment of Cement Creek had ended.

- Sunnyside Gold demonstrated that water quality at the A-72 reference point could be maintained without the need for active treatment.

38.     In the summer of 1996, Sunnyside Gold started work on the "A" list mitigation projects.  By September, it had installed first bulkhead in the American Tunnel and closed the valve.  Sunnyside Gold diverted the stream flow of Cement Creek into the treatment facility and began monitoring zinc levels at A-72.  It also injected an alkaline solution into the mine pool to reduce its acidity.

39.     In 1999, Sunnyside Gold told WQCD that the mine pool behind the American Tunnel bulkhead had reached physical equilibrium.  However, by this time, the pool within the Sunnyside Mine was filling Bonita Peak and flooding into adjacent mine works, including the Mogul Mine.  Sunnyside Gold knew that the mine pool was not stable: millions of gallons of water were filling miles of workings and forming acid mine drainage.

40.     In May 2001, Sunnyside Gold took a final sample of the water behind the bulkhead and then installed more bulkheads downstream in the American Tunnel.  By the end of August 2001, Sunnyside Gold installed a second bulkhead and closed its valve.  By this point, the acidic drainage from the Sunnyside Mine had already made its way to the Mogul Mine.

Moreover, the water quality at A-72 did not improve, so Sunnyside Gold undertook more mitigation projects at the "B" list sites.

41.     In 2003, WQCD and Sunnyside Gold notified the Colorado court overseeing the consent decree that Sunnyside Gold had purportedly satisfied all of the consent decree's conditions.   Meanwhile, Sunnyside Gold was quietly settling litigation alleging that the Sunnyside Mine was flooding the Mogul Mine.

42.     Based on Sunnyside Gold's representations, the court terminated the consent decree.   The termination of the consent decree released Sunnyside Gold from its discharge permit for the American Tunnel and from the $5,000,000 financial surety.

43.     Water quality in the Animas River was improving when the treatment facility at Gladstone was in operation.   But, as we explain below, the treatment facility shut down in 2005 and water quality in the Animas River dropped dramatically.   Fish population surveys conducted by Colorado Parks and Wildlife observed sharp declines in trout and other species for many miles below the confluence of Cement Creek and the Animas.   Sunnyside Gold and the regulators witnessed the decline in water quality and aquatic life in the Animas for more than a decade, but did nothing to alert downstream communities in New Mexico that pollutants from the Sunnyside Mine pool were flowing into their waters.

*Kinross Acquires Sunnyside Gold and Strands its Lingering Environmental Liabilities*

44.     In June 2002, Kinross, Echo Bay, and TVX Gold Inc. entered into a "combination agreement" under the Canada Business Corporations Act.   This agreement, effective January 31, 2003, consolidated ownership of the businesses.   Through this merger, Kinross acquired all of Echo Bay's subsidiaries (*e.g.*, Sunnyside Gold) and its assets (*e.g.*, the Sunnyside Mine).

45.     On March 21, 2003, Kinross Gold U.S.A., Inc. filed an Application for Authority to Transact Business in Colorado.   In its application, Kinross Gold U.S.A. stated that it began

transacting business in Colorado on January 31, 2003.  Kinross Gold U.S.A. was and continues to be a wholly-owned subsidiary of Kinross.  Thereafter, Kinross Gold U.S.A. directed or controlled the conduct of Sunnyside Gold and operations at the Sunnyside Mine.

46.     Despite its incorporation in Nevada and its business activities in Colorado, both directors and all five officers of Kinross Gold U.S.A. had a listed address at 52nd Floor, 40 King Street West, Scotia Plaza, Toronto, Ontario, M5H 3Y2 Canada, which was the address of Kinross' corporate headquarters at that time.  Directors and officers of Kinross Gold U.S.A. are Kinross employees and received direction from Kinross.  Kinross Gold U.S.A. acted as the agent or alter ego of Kinross.[3]

47.     Kinross owned 100 percent of Sunnyside Gold's shares.  Since January 31, 2003, Kinross, directly and by and through its agents and alter egos, has controlled and directed its agent and alter-ego Sunnyside Gold's activities in Colorado, including but not limited to all of Sunnyside Gold's activities affecting the Sunnyside Mine.  At all relevant times, Sunnyside Gold's corporate management consisted of Kinross and Kinross Gold U.S.A. executives and employees, including members of Kinross Gold Corporation's Reclamation Operation Business Unit, who managed Sunnyside Gold's business and directed environmental affairs at the Sunnyside Mine in their capacities as Kinross and Kinross Gold U.S.A. employees.  This included sampling activities at the Sunnyside Mine, for which Kinross and Kinross Gold U.S.A. retained and managed contractors.  Kinross and Kinross Gold U.S.A. personnel also directed Sunnyside's formal legal interactions with EPA and the State of Colorado, as well as Sunnyside's relationship with the Animas River Stakeholders Group and other stakeholders in

---

[3] Kinross files consolidated financial reports and annual reports.  In those reports, Kinross states that the use of the term "Kinross" throughout includes all of its subsidiaries.  Unless otherwise specified, this Complaint uses "Kinross" when referring to Kinross Gold Corporation and its subsidiaries, including Kinross Gold U.S.A., and Sunnyside Gold Corp.

the Silverton historic mining region.  And Kinross and Kinross Gold U.S.A. took responsibility (and credit) for cleanup and reclamation work related to the Sunnyside Mine, identifying it "Kinross' former Sunnyside mine."  Upon information and belief, Sunnyside Gold could not meet its financial obligations without capital contributions or direct payments of creditors by Kinross.

48.     On multiple occasions, Kinross directly contracted for and provided financial assurance and support for the benefit of its subsidiaries' activities in Colorado concerning the Sunnyside Mine.  On May 1, 2003, Kinross provided a $1,250,000 irrevocable letter of credit for the benefit of the Colorado Division of Minerals and Geology related to the Sunnyside Mine through Kinross's bank, The Bank of Nova Scotia.  This financial assurance supported Sunnyside Gold's plans to reclaim lands around the American Tunnel, but it was patently insufficient to cover the costs of a catastrophic release from the Sunnyside Mine or other hydraulically connected mine workings.

49.     Kinross swiftly reduced the amount of financial assurance provided for the Sunnyside Mine.  In 2004, Kinross, by and through its agent and alter ego Kinross Gold U.S.A., reduced the amount of the surety to $500,000 and directed The Bank of Nova Scotia to revise the irrevocable letter of credit to reflect that amount.  Ultimately, Kinross eliminated the surety, leaving no financial assurance in place to cover the costs of remediating new discharges from surrounding mine portals or to prevent a blowout of water from the Sunnyside mine pool.  To wit, Kinross stranded the lingering environmental liabilities of its mining properties in Colorado. Sunnyside Gold's lack of independent capital and revenue, combined with Kinross's exit strategy from the Upper Animas Mining District, left the Sunnyside Mine financially abandoned.

50.     Kinross directed and controlled Sunnyside Gold's remediation activities near Silverton. As further alleged in this Complaint, shortly after acquiring Sunnyside Gold, Kinross transferred ownership and operational responsibility for the treatment facility to Gold King Mines Corp. and its President, Mr. Stephen Fearn, an inexperienced operator who quickly proved incapable of managing the facility. Kinross knew or should have known that divesting itself and its subsidiaries from the treatment facility and transferring operations to Mr. Fearn would impair the water quality of the Animas River, injure the riverine ecosystem, and imperil the health and livelihood of downstream communities in Colorado and New Mexico.

51.     Kinross also knew or should have known that the plan to bulkhead the Sunnyside Mine and allow acid mine drainage from the Sunnyside Mine to build within Bonita Peak had created a real and substantial danger of a future blowout. Given Kinross' international presence, and the many instances of past mine adit plug and bulkhead failures in Colorado and elsewhere, Kinross either knew or should have known that the decision to plug the American Tunnel was far from fail-safe. Indeed, increased discharges of acid mine waste water from other hydraulically connected mine portals, including the Mogul Mine and the Gold King Mine, were evident as early as 2001—a clear sign that the plan was failing. Rather than confront the issue, however, Kinross publically denied any connection between the Sunnyside mine pool and increased discharges from other mines. Kinross also denied that plugging the American Tunnel could cause hydraulic pressure within Gold King Mine Level 7 portal to increase—the root cause of the catastrophic release on August 5, 2015.

*Discharges from Gold King Mine and Neighboring Mines Increase and the Wastewater Treatment Facility Is Shut Down (1999 to 2005)*

52.     Before Sunnyside Gold plugged the Sunnyside Mine, the Gold King Mine was virtually dry. In 1996, the Division of Minerals and Geology inspected the Gold King and found

that it drained just one or two gallons of acidic, metal-laden water per minute—a mere trickle. Conditions changed significantly soon after Sunnyside Gold installed the first bulkhead in the American Tunnel. In late 1999, Colorado officials received reports of new discharges from the Gold King, and increased discharges from the neighboring Mogul Mine. Between 1999 and 2001, the discharge rate from the Mogul Mine increased from roughly 30 to 165 gallons per minute; between 1999 and 2005, the Gold King Mine's discharge rate rose from seven to 40 gallons per minute. As a result, officials declared that the Gold King and Mogul had become two of the worst polluting mines in Colorado.

53.    In 2000, Steven Fearn, the President of Gold King Mines Corp. bought the Gold King Mine from the trustee for Pitchfork "M" Corporation. In May 2001, WQCD issued a discharge permit to Gold King Mines Corp. for the Level 7 portal. In a 2002 letter to the state, Mr. Fearn noted that discharges from the Level 7 portal had increased to about 60 gallons per minute, corresponding to the installation of a second bulkhead in the American Tunnel.

54.    When the discharges from the Mogul Mine surged after the sealing of the American Tunnel, its owner, Mr. Todd Hennis, sued Sunnyside Gold in 2002. Mr. Hennis alleged that water from the Sunnyside Mine pool had found a pathway into the Mogul Mine workings and was trespassing on his property. Mr. Hennis ultimately dropped the lawsuit, and was included in a byzantine agreement with Mr. Fearn and Sunnyside Gold. The heart of the agreement was the transfer of Sunnyside Gold's water treatment plant and its permit to Mr. Fearn. Mr. Hennis received title to most of the land at Gladstone, which contained buildings, equipment, and settling ponds associated with the treatment facility. Sunnyside Gold also agreed to bulkhead the Mogul and the neighboring Koehler Mine as part of the deal.

55.     By agreeing to bulkhead the Mogul Mine, Sunnyside Gold seemed to recognize a pathway that allowed water to migrate from the Sunnyside mine pool into the Mogul's workings. In fact, a consultant hired by Sunnyside Gold a decade earlier had analyzed possible consequences of plugging the American Tunnel.  The consultant predicted that within months of installing the bulkhead in the American Tunnel, water from the mine pool could travel through the "Brenneman Vein"—a direct path between the Sunnyside and Mogul—at a rate of 160 gallons each minute.  That analysis was remarkably prescient: discharges out of the Mogul Mine increased rom 35 to 65 gallons per minute in 1995 to 165 gallons per minute six years later.

56.     In autumn 2002, Gold King Mines Corp. and Mr. Fearn purchased the Mogul Mine from San Juan Corporation ("San Juan Corp.") and its President, Mr. Hennis, for a note. As additional surety to secure the note, Gold King Mines Corp. gave San Juan Corp. a second mortgage on the Anglo Saxon and Harrison Mill Site claims, which included the water treatment facilities and settling ponds respectively at Gladstone.  San Juan Corp. also leased another property, the Herbert Placer, to Gold King Mines Corporation, which contained settling ponds that Mr. Fearn intended to use for water treatment.

57.     In January 2003, with full knowledge of the rising water level in Bonita Peak, Sunnyside Gold formally transferred ownership of its treatment facility and its discharge permit for the American Tunnel to Gold King Mines Corp.  As a result, Mr. Fearn became the operator responsible for the facility.  WQCD required Mr. Fearn to obtain certification to operate the facility by June 30, 2004.   Until that time, Larry Perino, Sunnyside Gold's manager of reclamation activities at the Sunnyside Mine, was supposed to supervise Mr. Fearn.  Notably, Mr. Fearn never obtained certification.

58.     Less than a year into the lease, the relationship between Mr. Hennis and Mr. Fearn broke down.  In the fall of 2003, Mr. Hennis sought to evict Mr. Fearn from the Herbert Placer for failing to maintain adequate liability insurance and neglecting to remove sludge from the settling ponds.  Eventually, Mr. Hennis and Mr. Fearn reached a compromise giving Mr. Fearn more time to remove the sludge and devise an alternative method to treat mine drainage.

59.     Over the next year, Gold King Mines Corp. and Mr. Fearn suffered a series of setbacks, culminating in the closure of the treatment facility.  First, in March 2004, one of the surety bonds covering the Gold King Mine was canceled.  The Division of Minerals and Geology ordered Mr. Fearn to replace the canceled bond, though he never did.  Then, in September, WQCD issued a notice of violation to Gold King Mines Corp. for exceeding the Gold King Mine Level 7 portal's permitted discharge limits for zinc, copper, and pH.  Finally, in October, Mr. Hennis returned to court, again complaining that Mr. Fearn was in breach of the lease.

60.     The court ruled in favor of San Juan Corp. and Mr. Hennis, and ordered Mr. Fearn to cease discharging wastewater into the Herbert Placer settling ponds and to remove residual sludge.  Now evicted, and without a way to treat the acidic discharges from the American Tunnel and the Gold King Level 7 portal, Mr. Fearn diverted the untreated discharges into Cement Creek and, ultimately, the Animas River.

61.     Gold King Mines Corp. filed for bankruptcy the next year.  Colorado's Mined Land Reclamation Board ordered the forfeiture of Gold King Mines Corp.'s reclamation bonds for the Gold King Mine.  As the second mortgage holder, San Juan Corp. and Mr. Hennis acquired the Gold King Mine through a foreclosure action.  They have owned the Gold King ever since.

*Reclamation of the Gold King Mine (2005 to 2011)*

62.     Acid mine drainage from the Gold King Mine Level 7 adit continued to grow after San Juan Corp. and Mr. Hennis acquired the Gold King Mine.  The adit had collapsed during the winter of 2004, which accelerated the drainage and saturated part of the waste rock dump in front of the adit.  By 2007, the discharges had surged to between 150 to 200 gallons per minute, based on the season.  In response, DRMS prepared to re-direct the discharges away from the slope of the waste rock dump and re-rout the water into Cement Creek.

63.     When DRMS notified Mr. Hennis of the situation and its plan, Mr. Hennis installed a lined channel on top of the waste rock dump to redirect the mine drainage from the Gold King into Cement Creek.  Later, on August 28, 2007, Mr. Hennis met with DRMS officials and an EPA official named Steve Way to discuss his own plan to address the Level 7 adit discharges.

64.     At the 2007 meeting, Mr. Hennis voiced his concerns about a potential blowout of the portal at Level 7.  In fact, Mr. Hennis requested EPA's help in entering the mine to investigate potential blockages of the portal that could cause a hazardous blowout.  Public documents show that Mr. Hennis told EPA that the investigation would confirm that the Sunnyside mine pool was the source of the Gold King's discharges.

65.     In public interviews, Mr. Hennis repeatedly stated that he presented water quality data to EPA, Colorado, Kinross, and Sunnyside Gold, which demonstrated that water from the Sunnyside mine pool had flooded the Gold King Mine.   On information and belief, representatives and employees of Kinross, Kinross Gold U.S.A., and Sunnyside Gold were told many times over many years to re-open the bulkheads in the American Tunnel, lower the mine pool to prevent further flooding of the Gold King Mine and neighboring mines, and restore the

water table within Bonita Peak to the level that existed before the plugging of the American Tunnel.

66.     In 2008, DRMS started partial reclamation work at the Gold King Mine site using Gold King Mine Corp.'s forfeited reclamation bonds.  That year, DRMS secured all four portals and installed a grated closure at the Level 7 adit to facilitate drainage.  DRMS also redirected the flow into a "diversion structure"—essentially a half pipe set into a graded ditch—that conveyed drainage away from the front portal and the waste rock dump.  Notably, in DRMS's project summary describing these actions, DRMS admits that it closed the Level 7 adit in a way that increased the potential for a blowout.

67.     In September 2009, DRMS returned to the Gold King Mine site and backfilled the Level 7 adit.  DRMS planned to install a drainage pipe (24-inch diameter, 30 feet long) at the floor of the adit to drain the mine and prevent an increase in hydraulic pressure.  DRMS's plans emphasized that the pipe should be set at a slight slope to the outside to facilitate drainage.

68.     When DRMS started work, its employees observed a collapse about 30 feet inside the adit.  To view the collapse and monitor the unstable conditions, DRMS decided to insert an observation pipe (30-inch diameter, 20 feet long) about 12 inches above the top of the drainage pipe.  When DRMS began inserting the pipes and backfilling around them, timbers that supported the portal collapsed and loose material completely covered the observation and drainage pipes.

69.     DRMS was concerned that this collapse would raise the water pressure within the Gold King Mine workings, making a blowout even more likely than before.  To relieve this concern, DRMS drove a steel pipe "stinger" through the drainage pipe and into the collapsed material.  The stinger was six inches in diameter and 44 feet long.

70.     DRMS records are unclear about precisely how far the stinger extended into the mine.  A contemporaneous DRMS record said the stinger extended 14 feet past the end of the 30-foot drainage pipe, while the 2009 DRMS project summary said it penetrated at least some of the 12 feet of collapsed material.  The 2009 DRMS project summary also observed that the stinger "was unable to penetrate through any of the original collapse in the tunnel" and stated that the adit continued to drain about 200 gallons per minute, similar to the rate before DRMS backfilled the adit and installed the two pipes and stinger.

71.     Besides backfilling the adit, DRMS constructed a concrete channel and installed a flume on the surface of the waste dump.  The flume and channel were located in front of the adit and connected to the drainage ditch that DRMS had installed in 2008.

*EPA's Activities at the Red and Bonita Mine (2011 to 2015)*

72.     In 2010, EPA began to investigate the Red and Bonita Mine, where debris covered a collapsed historical adit.  Since 2009, acid mine drainage had been discharging through the debris and entering Cement Creek at rates from 181 to 336 gallons per minute, apparently also impacted by the Sunnyside mine pool.

73.     Steve Way was EPA's On Scene Coordinator ("OSC") during the investigations and assessments at the Red and Bonita Mine.

74.     During its investigation, EPA removed debris blocking the Red and Bonita adit and built a temporary portal.  EPA intended to capture the discharge in a treatment pond below the mine's waste rock dump.  Before proceeding, however, EPA asked Department of Interior Bureau of Reclamation ("BOR") to review its plan to open the mine.  BOR warned EPA that a blowout could occur if EPA tried to remove the blockage under its proposed plan.  BOR also told EPA to review maps of the mine workings and reconsider its plan under the assumption that the mine was full of water.  BOR also asked EPA how it would respond to a sudden release of that

much water (*i.e.*, potentially millions of gallons).   After this discussion, EPA apparently understood these risks and changed its approach.  EPA's contractors drilled a well about 30 feet upslope from the mine opening to determine the volume and pressure of water inside the mine.

*EPA's Activities at the Gold King Mine in 2014*

75.     EPA first obtained access to the Gold King Mine in 2008 through an agreement with San Juan Corp. and Mr. Hennis.  The agreement allowed EPA, the U.S. Bureau of Land Management ("BLM"), and DRMS to enter the Gold King and Mogul Mine sites and other properties owned by San Juan Corp. and Mr. Hennis.

76.     When EPA sought to renew the agreement in late 2010, Mr. Hennis refused to grant EPA access to the mine and surrounding properties based on his stated concerns that EPA would create a "pollution disaster."  When EPA served Mr. Hennis with a compliance order and threatened fines upwards of $35,000 per day, Mr. Hennis signed the renewed agreement.  They renewed the access agreement several more times, including a renewal on August 8, 2014, which lasted through the end of 2015.

77.     In 2014, DRMS asked EPA to re-open the Gold King Mine Level 7 adit and investigate the drainage situation.  Because of the proximity of the Red and Bonita to the Gold King (about 500 feet), EPA and DRMS decided to assess the conditions at the Gold King Mine to determine if there would be any impacts (*i.e.*, increased adit flow) before DRMS and EPA shut the valve on the Red and Bonita bulkhead.

78.     EPA requested a work plan for the Gold King Mine investigation from Environmental Restoration and issued a "Task Order Statement of Work" ("Statement of Work") on June 25, 2014.  The Statement of Work outlined a plan for the investigation and described

precautionary measures to prevent a blowout of impounded water from the adit.  Section 2.0 of

the Statement of Work, titled "Description of Work" stated:

- The blockage in the adit *must* be removed in a manner to prevent a surge of impounded mine water from being released.  Specifically, water impounded behind the blockage *must* be drawn down in a controlled manner as the blockage is removed.  In addition, the flow from the adit *must* be directed into the existing channel or other conveyance provided by [Environmental Restoration]. (emphasis added)

- "[Environmental Restoration] will conduct operations in management of surface and underground work activities to include construction & maintenance of repository, retention pond & water treatment, access road maintenance…."

- "The work will be conducted by qualified contractors with the assistance and cooperation of the landowner, San Juan Corp.  In addition to compliance with applicable OSHA standards, the work is to be conducted in compliance with appropriate Mine Safety and Health Administration (MSHA) regulations inclusive of establishing a safe underground working environment for personnel and the rehabilitation of underground workings and escape ways.  (Note: MSHA regulations are not applicable to inactive mines; however, certain standards are relevant to the propose[d] work.)  All work will be performed under the conditions as described in an approved Work Plan to be submitted to the OSC for approval that will be prepared by the Contractor and submitted to the Agency before mine rehabilitation work begins."

- "Personnel on site will follow all pertaining [Applicable or Relevant and Appropriate Requirements] in reference to MSHA and OSHA in performing work on this site."

The Statement of Work also made clear that those conducting the work were required to

follow best management practices and engineering specifications.

79.     After receiving EPA's Statement of Work, Environmental Restoration issued a

Request for Proposal ("RFP"), dated July 29, 2014, and solicited bids from sub-contractors.  The

RFP states that EPA tasked Environmental Restoration with "procur[ing] and manag[ing] the

reopening and ground support construction at the Upper Gold King Mine – 7 level adit."  The

RFP also describes the scope of the proposed work in technical detail:   Environmental

Restoration would select a subcontractor to "mobilize all labor, material, equipment, and

supplies necessary to perform as directed by" Environmental Restoration and EPA.

Environmental Restoration would then "conduct operations in oversight management of surface and underground work activities."

80.     The RFP also makes clear that the work was required to "meet all requirements of the State of Colorado as to design and construction laws," and its workers were required to "fully investigate[] and comply with the need/potential need for a Professional Engineer's review and stamp for project plans."   The RFP also said, "personnel and equipment *shall* comply with all safety requirements set forth in applicable State, Federal and local laws and regulations including the requirements in MSHA and OSHA.   The Subcontractor *shall* ensure that its employees perform the work in a safe manner…." (emphasis added).

81.     EPA began work at the Gold King Mine in September 2014 under the direction of OSC Steven Way, who had met with Mr. Hennis and DRMS six years earlier when Mr. Hennis warned that plugging the American Tunnel had flooded the Gold King and surrounding mines.

82.     On September 11, 2014, EPA's sub-contractor, Harrison Western, started excavating and removing the metal grating and portions of the two pipes that DRMS had installed in 2009 at the Level 7 adit.   After just two hours of excavation on the blockage, the crew abruptly stopped work.   EPA OSC Steve Way, Colorado DRMS officials, and employees of Environmental Restoration, Weston Solutions, and Harrison Western inspected the Level 7 adit and determined that the drainage would require larger settling ponds and additional treatment.   EPA postponed the remaining work until 2015.

83.     After EPA abruptly halted work at the Gold King Mine, Mr. Way told two Weston employees named Jan Christner and Jeff Bryniarski to prepare a pollution report on the Gold King Mine operation.   Mr. Way also instructed them to include information about the discharge from the Level 7 adit, using DRMS's records and documents as a reference.

84.     Mr. Way submitted the report to his EPA Region 8 superiors on or about September 26, 2014.  In the final report, Way explained and documented the EPA crew's conclusions about the location of the pipes installed by DRMS and the elevation of the adit floor – specifically, that the pipes were adjacent to the adit roof.  Inexplicably, those conclusions directly conflicted with DRMS records available at the time.  DRMS's records of its 2009 reclamation work indicate that the drainage pipe was installed on the *floor* of the adit at a slight slope to encourage drainage from the mine.  Further, the observation pipe was installed just above the drainage pipe.

85.     In the report to Region 8, however, Mr. Way wrote that shortly after excavation began, "the work on [the] blockage was stopped when it was determined the elevation of the adit floor was estimated to be 6 feet below the waste-dump surface elevation."  EPA apparently assumed that the floor was six feet below the level of the waste dump surface because it concluded—contrary to DRMS's own records—that DRMS had installed the two drainage pipes immediately *below* the roof of the adit.  When EPA was at the site in 2014, the two pipes were stacked on top of each other (together about 48 inches tall) and the bottom of the lower pipe was nearly level with the waste rock dump.  Because the original height of the adit was 10 feet, EPA concluded that the adit floor was actually 6 feet beneath the surface of the waste dump.

86.     EPA compounded this error by failing to test and confirm the amount of water behind the adit by using a drill rig to bore into the mine from above and inserting a stinger pipe, just as it had done at the Red and Bonita Mine in 2011.  As further explained below, MSHA regulations require operators to drill bore holes before excavating in areas adjacent to flooded mine workings.  Had EPA followed this common practice—and its own precedent—it would have discovered that the Level 7 adit contained a vast quantity of highly pressurized water.  A

hydraulic pressure test would have left no doubt that it was unsafe to remove the backfill and that EPA needed to take additional precautions to prevent an "excavation-induced failure."

87.     On information and belief, before EPA left the site that year, the construction crew pushed large quantities of earthen material and debris in front of the DRMS-installed pipes, forming an earthen plug that prevented the mine from draining and caused a head of water to further build up behind the blockage.

*The Last Events Before the Blowout of the Gold King Mine*

88.     In March 2015, Mr. Way discussed the planned Red and Bonita and Gold King operations with Weston Solutions employees.  On March 23, Mr. Way sent an email to Mr. David Robinson, Weston Solution's Senior Project Manager and Safety Officer, and told him to "[p]repare water treatment plans for managing water impounded behind the adit portal" and to "[d]ocument activities during the portal opening and construction."

89.     In May 2015, Environmental Restoration submitted a draft work plan for the Gold King Mine operation, which included sub-contracting with Harrison Western to complete the project.  On June 11, Environmental Restoration emailed Mr. Way a second draft work plan for Mr. Way to review and approve.  On information and belief, the June 11 work plan was the last version created before the August 5 blowout, and neither Mr. Way nor any EPA official formally approved the June 11 work plan before the August 5 blowout.

90.     In or around June and July 2015, EPA, Environmental Restoration, Weston Solutions, and Harrison Western visited the Gold King Mine several times to assess site conditions and drainage flows.  They collected water samples and measured the flow from the adit.  They also discussed a plan to install a sump basin to treat water that would be pumped out of the mine during the adit excavation work.

91.     To prepare for the adit excavation, EPA and its contractors graded the surface of the waste dump, and started constructing a water management and treatment system to handle an anticipated increase in discharges from the mine.  During three months of site preparation, however, EPA and its contractors never attempted to test the hydrostatic pressure behind the blocked portal, or take any steps beyond visual observations to determine the volume of water inside the adit.

92.     According to BOR's technical evaluation of the blowout, Mr. Way called a BOR engineer named Michael J. Gobla "[o]n or about July 23" to discuss the situation at the Gold King Mine site.  Mr. Way was about to leave for vacation and would return to the site on August 14.  During the conversation, Mr. Way asked Mr. Gobla to visit the site and evaluate EPA's excavation plans.  Because Mr. Way was "'unsure about the plans for the Gold King Mine and wanted an outside independent review of the [] plans by BOR," they agreed that Mr. Gobla would conduct an on-site review of the plans on August 14—after Mr. Way returned.

93.     Sometime in late July or early August, Mr. Way left for vacation.  Mr. Way arranged for a DRMS official named Kristen Brown to supervise activities at the Gold King Mine during the week of July 27.  Mr. Way asked another EPA employee, Mr. Hays Griswold, to supervise the site from August 3 until Mr. Way returned from vacation.

94.     On July 29, 2015, Mr. Way emailed specific instructions about the scope and timing of work at the Gold King Mine site to Matt Francis (Environmental Restoration), Elliot Petri (Weston Solutions), and Allen Sorenson (DRMS).  Later that day, Mr. Way forwarded these instructions to Mr. Griswold.  Mr. Way's instructions set out the "priority and strategy" for on-site work during the week of August 3.  Mr. Way directed Environmental Restoration to provide "adit drainage control" and implement a "water management system" *before* the on-site

crew would begin digging out the earthen debris that blocked the adit. To that end, Mr. Way told the crew to "set up the pipe and filter bags towards the outlet end of the discharge pipe/[waste rock] dump." He also specified "[b]efore any excavation towards the adit floor between the concrete flume channel and adit, the sump, and sump-pump set up to handle adit discharge must be in place." Furthermore, he told the crew that "the piping / hose must be in place to allow flow to be directed to the [Red and Bonita treatment pond] before removing any adit blockage at or below 24" pipe in the adit debris. And, the stinger steel pipe, 4" threaded well casing pipe, must be prepared and available." Finally, Mr. Way made it clear that "[a]dit face excavation… will occur only when either the OSC or DRMS (Allen [Sorensen]) or [Harrison Western] mine crew Superintendent and the ERRS RM [Matt Francis] are present. In addition the ability to treat water must be set up with START [Weston Solutions] present."

95.     On August 4, at about 8:45 am, Mr. Griswold arrived at the site. An unknown DRMS employee arrived an hour later.[4] With an incomplete safety plan, an inadequate evaluation of the fluid hazard, and lacking any equipment to prevent or mitigate an uncontrolled release of water from the mine, the EPA crew began burrowing into the adit with a backhoe around 10:30 a.m. By the end of the day, the crew had dug out all but a small portion of the drainage pipe that DRMS installed in 2009. Contemporaneous photographs of the excavated adit show what appears to be wooden debris from the portal structure embedded in the earthen plug that held back the water within the mine.[5]

---

[4] Neither EPA nor DRMS has revealed the name of the DRMS employee who visited the site on August 4. Based on documents produced by EPA pursuant to New Mexico's Freedom of Information Act request, New Mexico believes that the DRMS individuals present at the site on August 4 and 5 were Bruce Stover and Allen Sorensen.

[5] This "plug" (*i.e.*, blockage) was a combination of collapsed debris within the mine, backfill placed by dumping from the bucket of an excavator, and material from the surficial slope failure at the mine portal.

96.     Photographs of EPA's work at the Gold King Mine site on August 4 and 5 reveal that the crew substantially deviated from Mr. Way's written instructions, as well as the June 11 work plan.  These photographs confirm that the crew was excavating at the level of the drainage pipes, toward the adit floor, without a pump, hose, stinger, or sump and sump-pump in place.  In short, the crew was digging deep into the face of the adit, at the level of the impounded water, without equipment necessary to control the anticipated release of highly pressurized acid mine drainage.

97.     The following day, August 5, 2015, more personnel from DRMS joined the EPA crew at the Level 7 adit to continue excavating.  That morning, the EPA crew dug out and removed the last remnants of the DRMS-installed pipes.  Because, at this point, the pipes were visibly well below the plug, the EPA crew knew or should have known they were removing material at least several feet below the roof of the adit.

98.     Soon after the EPA crew resumed digging into the adit, the backhoe operator reported hitting a "spring."  Inexplicably, the crew did not attempt to backfill the adit or plug the "spring."  Further illustrating the poor preparation on the part of the crew, a video recording, taken just moments after the blowout, shows an on-scene worker asking, "What do we do now?"

*Federal "Investigations" of the Blowout Have Been Rife with Conflict and Shortcomings*

99.     On August 5, 2015, EPA, Environmental Restoration, Weston Solutions, DRMS, and all other parties on site were not prepared to respond to an uncontrolled release of acidic mine water from the Gold King Level 7 adit, even though they were aware of this risk for more than a year.

100.    Just days after the spill, Mr. Griswold told the Denver Post in an interview that "[n]obody expected (the acid water backed up in the mine) to be that high."  Months later, Mr.

Griswold contradicted this statement.  In an email sent to other EPA officials on October 28, Mr. Griswold wrote he personally knew the blockage "could be holding back a lot of water and I believe the others in the group knew as well."

101.    On August 24, 2015, EPA released a summary of its "internal investigation" of the August 5 blowout.  EPA acknowledged that the July 2014 RFP and June 11 work plan identified the potential for pressurized mine water conditions and prescribed specific measures to control drainage during blockage removal, which the parties on site did not follow.  EPA admitted that the work plan did not include emergency procedures or contingency plans to protect public health and the environment from a catastrophic blowout.  EPA also said it "was not able to identify any calculations made on the possible volume of water that could be held behind the portal plug."

102.    On December 8, 2015, EPA issued an "addendum" to its internal investigation, which contained contradictory and misleading information about the on-site crew's actions at the Gold King Mine.  For example, EPA's addendum included an undated drawing, titled "Attachment D."  EPA's use of this drawing in the addendum leads the reader to believe that EPA and the crew used it as a guide during on-site operations.  However, Weston Solutions employee Elliot Petri later told congressional investigators that the undated drawing was actually created 6 days after the release, on August 11.

103.    On October 22, 2015, the BOR released a "Technical Evaluation of the Gold King Mine Incident."  Despite repeated assurances from EPA Administrator Gina McCarthy that the BOR's report would help identify those responsible for the blowout, the BOR's report made no findings of fault or wrongdoing on the part of EPA or any other party.  In fact, the report expressly disavowed any obligation to determine wrongdoing.  On information and belief, the

BOR was ordered to "stay clear" of addressing EPA and the crew's negligence and responsibility for the blowout.

104.    Even though BOR avoided determining who was at fault, its report confirmed that the Gold King Mine blowout was the result of multiple grossly negligent and reckless actions and omissions, including the lack of:

- An understanding that water impounded behind a blocked mine opening can cause hydraulic forces similar to those in a dam;

- Analysis of potential failure modes;

- Analysis of downstream consequences if a failure were to occur;

- Analysis of the geologic and hydrologic conditions of the general area;

- Monitoring to ensure that the structure constructed to close the mine portal continues to perform as intended; and

- An understanding of how the groundwater system can affect mines in the area and how work at one mine can affect conditions at another mine.

105.    A U.S. Army Corps of Engineer peer reviewer expressed "serious reservations" about the actual cause of the blowout.  In fact, the peer reviewer refused to provide his signature unless the BOR report expressly included his reservations.  The peer reviewer found that the "actual cause of failure was some combination of issues related to EPA internal communications, administrative authorities, and/or a break in the decision path.  The report… did not describe why a change in EPA field coordinators caused the urgency to start digging out the plug rather than wait for BOR technical input as prescribed the EPA project leader."  In other words, the peer reviewer believed that the blowout was the result of the negligent implementation and deviation from the work plan and Mr. Way's instructions.

106.    The federal government's investigations over the past year have failed to explain the critical decisions and actions that caused the Gold King Mine release.  Despite EPA's repeated admissions of responsibility, EPA has not been forthcoming with information about the circumstances leading to the spill and its documentation of those efforts.  EPA has also ignored congressional requests and subpoenas for documents and information.

107.    Congressional hearings in the fall of 2015 noted that EPA turned over documents with substantial redactions, making it impossible to determine which individuals and entities were responsible for preparing parts of the Gold King Mine work plan and which individuals and entities were actually present at the Gold King Mine site on August 5.  In addition, a video from the Gold King Mine on the day of the spill was edited to remove the statements of an on-scene worker moments after the blowout.

108.    On August 12, 2015, the House Oversight and Government Reform Committee requested that the EPA Office of Inspector General (OIG) investigate the Gold King Mine blowout.  Shortly after that request, the OIG announced it would open an investigation into EPA's role in the spill.  In June 2016, the OIG informed the Committee that a criminal inquiry into the blowout had been opened.

109.    On October 11, 2016, the OIG held a conference call with congressional staff to discuss the status of this investigation.  During the call, the OIG stated that it had found evidence of criminal wrongdoing by an unnamed EPA official, including providing false statements in a criminal investigation and violations of the Clean Water Act.  The OIG also told congressional staff participants that it had referred these criminal findings to the United States Attorney for the District of Colorado.  On the same day, however, the U.S. Attorney declined to prosecute these charges.

110. On information and belief, the work conducted by EPA, DRMS, Environmental Restoration, and Weston Solutions in connection with the Gold King Mine amounted to reckless, careless, and grossly negligent conduct that was not driven or supported by social, economic, or public policy considerations. Furthermore, their actions substantially deviated from their own work plans, the mandatory directions given by Mr. Way, established engineering standards of care, and applicable federal and state regulations.

*New Mexico's Environmental and Economic Injuries from the Gold King Mine Release*

111. After New Mexico received notice of the Gold King Mine release on August 6, NMED immediately contacted public water systems and recommended that they consider shutting off the intake of water along the Animas River until more information about the contamination was known. The next day, NMED contacted Arizona, Utah, and the Navajo Nation to coordinate and share information. On August 8, the plume of contamination passed the confluence of the Animas and San Juan Rivers. On August 10, New Mexico's Governor Susana Martinez, declared a state of emergency in New Mexico.

112. New Mexico incurred millions of dollars in immediate emergency response costs because of the Gold King Mine release. New Mexico's initial response and monitoring costs involved 14 different New Mexico state agencies, academic organizations, and communities. State and local emergency response staff, engineers, scientists, public servants, academics, and private citizens came together to monitor the plume of contamination as it meandered downstream. Those response and monitoring activities included advance, crisis, and post-crisis water sampling and testing, sediment testing, agricultural ditch inventories and testing, public outreach, hundreds of private well tests, providing potable water, supporting drinking water systems, supplying showering stations, and offering monitoring equipment.

113.    New Mexico will incur further costs in implementing a long-term monitoring plan and a run-off preparedness plan.  These plans address the imminent and ongoing melting of the spring snowpack, which will increase surface water turbidity, re-suspend, and re-mobilize metals that were deposited throughout the Animas and San Juan Rivers, as demonstrated by recent sampling.  For example, NMED recently took samples north of Durango, Colorado, where yellow discolored sediment was visible at residential properties along the Animas River.  NMED received lab results of these samples on May 3, 2016, which EPA received on the same day.  The sediment sample contained 3,100 ug/g (equal to 3,100 mg/kg or "parts per million") of lead. This lead concentration far exceeds the risk level of 400 mg/kg developed by EPA for lead in residential soil—a level specifically calculated for non-carcinogenic effects in children.  A lead concentration of 500 mg/kg has been used as a cleanup target for contaminated sediments at numerous Superfund sites in New Mexico and elsewhere.  A 500 mg/kg target would be entirely appropriate for sediments affected by the Gold King Mine release, an event that – by EPA's own estimation – discharged 880,000 pounds of metals into the Animas River.

114.    New Mexico is especially concerned about the further migration of these metals from the Animas River, the continuing discharges of the Sunnyside mine pool, and the concomitant long-term impacts to New Mexico's waterways.  It is now clear that releases from those mines occurred before, during, and after the Gold King Mine blowout.  Those releases will continue until a more comprehensive control strategy is implemented at the mining sites, and the contamination in the sediments of the Animas and San Juan Rivers is fully addressed.  New Mexico, its counties, and its local governments will continue to incur additional costs to monitor the residual effects of these pollutants for an indefinite future period.

115.    New Mexico has also suffered enormous economic losses from reduced business activity and lost tax revenue as a direct and proximate result of the Gold King Mine release. Many businesses in northern New Mexico rely on the Animas and San Juan Rivers for recreational rafting and fishing services or irrigation, farming, and ranching activities.  Because of the uncertainty and anxiety generated by widely-circulated images of a sickly yellow river, recreational and agricultural uses stopped or slowed to a crawl, while many anglers and tourists avoided visiting San Juan County altogether.  The reduced economic activity and concomitant reduction in GDP caused by the spill have directly affected New Mexico's tax base.  Simply put, the Gold King Mine release has already cost the State of New Mexico millions of dollars in taxes, fees, and other income from regional economic activities.

116.    The discharged wastewater and sludge from the Gold King Mine was highly acidic and contained arsenic, lead, mercury, cadmium, copper, zinc, and other dangerous heavy metals.  Many of these pollutants have now fallen out of the water column and settled in the sediments of the Animas and San Juan Rivers, as well as Lake Powell.  These pollutants now pose imminent and substantial human health and environmental risks.  Public health officials believe that large volumes of these heavy metals and contaminated sediments have formed hot spots in various "sinks" in the Animas River above and below New Mexico's border with Colorado.  Similar depositional areas containing hot spots of heavy metals and contaminated metals likely exist throughout the Animas and San Juan Rivers and in Lake Powell.  Public health officials have discovered heavy metal-laden sediment in affected irrigation ditches in New Mexico, both immediately after the spill and in recent months.  High flow events, storms, and the annual spring runoff will re-suspend and re-mobilize these contaminants, distribute them throughout the Animas and San Juan Rivers, and push them into Lake Powell for years to come.

117.    Additionally, the Animas and San Juan Rivers have been stigmatized by the metals, acidic rock waste, and contamination from the Gold King Mine release.  The indelible images of a mustard-hewed toxic plume meandering downstream – into the habitat of several endangered species and superb sport fishing and recreational grounds – will linger long after the visible impacts of the release have vanished.  Stigma from the Gold King release will continue to reduce the economic benefits of New Mexico's natural resources until its lands and waterways are fully restored, and very likely beyond.  The direct and tangible effects of this lingering stigma include lost economic activity and associated taxes, fees, and income because of reduced tourism, fishing, and land uses, including a significant reduction in agricultural and ranching activities in the Animas and San Juan River Valley in northwestern New Mexico.

118.    Indeed, the local effects of the Gold King Mine release have continued over a year later, as many farmers, ranchers, residents, and consumers have lost trust in the health and integrity of the Animas and San Juan Rivers.  Besides losing crops due to the shutdown of irrigation ditches for weeks after the release, farmers in the Animas and San Juan River Valley continue to suffer from markedly diminished revenues because consumers refuse to purchase produce grown in this region.  The stigma attached to locally grown produce has formed many farmers to significantly reduce, and in some cases, abandon crop production altogether.  Many ranchers, especially those who lost livestock following the release, refuse to use river water for their remaining herds.  Rather, they have chosen to haul in water from miles away, which has significantly reduced their herds.  What is more, property values along and near the Animas and San Juan Rivers have dropped due to the stigmatic effects of the release.  Concerns about long-term health risks of the release have caused many residents to abandon gardens, orchards, and other plant life on their properties.  Residents reported observing that wildlife and livestock

refused to drink from the rivers after the release.  They have also reported that fishing and recreation in parts of the rivers affected by the release have all but ceased.  And they have observed discolored sediment, continuing discoloration of the affected waters, and an increased mortality in aquatic life.  Beyond the losses already suffered by New Mexico and its residents, the State estimates that the contamination and stigma from the Gold King Mine release will cause additional economic losses and damages for years to come, far surpassing those the State has already suffered.

*EPA Lists the "Bonita Peak Mining District" on the National Priorities List of Sites Eligible for the Superfund Cleanup Program*

119.    On September 9, 2016, EPA designated a group of inactive and abandoned mining sites near the Animas River headwaters for the National Priorities List ("NPL").  As a result, these sites are eligible for cleanup financed under the federal Superfund program.  The geographic scope of the "Bonita Peak Mining District" site is currently restricted to 46 mining sites and 2 additional study areas.  All but one of these proposed sites are north of Silverton, Colorado.  EPA's site boundary entirely excludes the Animas River, which has been contaminated by the heavy metals, mine-dump runoff, and other hazardous substances deposited by the Gold King Mine release.

120.    EPA has excluded downstream communities, including New Mexico, from participation in the Superfund process.  EPA has provided no work plans, permitting information, or data on potential treatment systems to downstream scientists, regulators, stakeholder groups, or citizens for review.  EPA is a responsible party for the Gold King Mine release of August 5, 2015—an event that brought national scrutiny to abandoned mining sites in the Upper Animas River Basin.  EPA cannot act as a regulator and supervisor of cleanup activities in the Bonita Peak Mining District while at the same time be a responsible party.

# CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION:
## COST RECOVERY UNDER CERCLA 42 U.S.C. § 9607(a)
## AGAINST EPA, ENVIRONMENTAL RESTORATION, WESTON SOLUTIONS,
## KINROSS, KINROSS GOLD
## U.S.A., AND SUNNYSIDE GOLD

121.    New Mexico incorporates the allegations in all preceding paragraphs.

122.    EPA, Environmental Restoration, Weston Solutions, Kinross, Kinross Gold U.S.A., and Sunnyside Gold are "persons" under CERCLA.  42 U.S.C. § 9601(22).

123.    The Gold King Mine and Sunnyside Mine are "facilities" under CERCLA.  42 U.S.C. § 9601(9).  Furthermore, the numerous downstream reaches of the Animas and San Juan Rivers, where heavy metals and waste from the mines and the Sunnyside mine pool have been deposited, are separate "facilities," under CERCLA.

124.    "Releases" of "hazardous substances"—including arsenic, lead, mercury, cadmium, copper, and zinc—from these facilities have occurred and are still occurring.  42 U.S.C. §§ 9601(22) and (14).  These releases include the August 5, 2015 Gold King Mine release, as well as past and present releases from the Sunnyside mine pool through the Gold King Mine, the Sunnyside Mine, and surrounding areas owned or operated by EPA, Environmental Restoration, Kinross, Kinross Gold U.S.A., and Sunnyside Gold.  These hazardous substances have settled in sediments of the Animas and San Juan Rivers in New Mexico.

125.    Because of these "releases" and the substantial threat of future releases, the State of New Mexico incurred response costs that were both "necessary" and "not inconsistent with the national contingency plan."  42 U.S.C. § 9607(a)(4) and (a)(4)(B).

126.    Kinross, Kinross Gold U.S.A., and Sunnyside Gold are "owners" and "operators" of the Sunnyside Gold Mine, a "facility" under CERCLA.  42 U.S.C. §§ 9607(a)(1)-(2).

127.    By extensively managing, directing, and implementing reclamation activities at the Gold King Mine site, EPA, Environmental Restoration, and Weston Solutions were "operators" of the site when the August 5, 2015 release occurred.  These defendants had authority to control reclamation and remediation activities at the site, and their decisions caused the release that contaminated the Animas and San Juan Rivers in New Mexico.

128.    EPA, Environmental Restoration, Weston Solutions, and Sunnyside Gold by contract, agreement or otherwise arranged for the disposal, treatment, and transport of hazardous substances released from the mines.  EPA, Environmental Restoration, Weston Solutions, and Sunnyside Gold accepted hazardous substances from the mines for transport and disposal, including to settling ponds and other treatment facilities, and releases from those facilities occurred.

129.    By taking intentional steps to dispose, treat, and transport hazardous substances at the Gold King Mine site—both before and on August 5, 2015—EPA, Environmental Restoration, Weston Solutions, and Sunnyside Gold were "arrangers" under CERCLA.  42 U.S.C. § 9607(a)(3).  EPA, Environmental Restoration, Weston Solutions, and Sunnyside Gold had authority to dispose, treat, and transport of hazardous substances at the site, and no mining or waste disposal could occur without their approval.

130.    Congress has waived the federal government's sovereign immunity for claims under CERCLA.  42 U.S.C. § 9620(a)(1).

131.    EPA is a "person" under CERCLA.  42 U.S.C. § 9601(21).  Under CERCLA § 9607(d)(1), any person is liable for costs and damages if that person negligently renders care or advice in a manner that is inconsistent with the National Contingency Plan.

132.    Environmental Restoration and Weston Solutions are "persons" and "response action contractors" under CERCLA.  42 U.S.C. § 9619(a).  Under CERCLA § 9619(a)(2), a response action contractor shall be liable for a release caused by its negligence, gross negligence, or intentional misconduct.  Environmental Restoration and Weston Solution's negligence, gross negligence, and intentional misconduct caused or contributed to the release of hazardous substances from the mines.

133.    The actions of EPA, Environmental Restoration, Weston Solutions, Kinross, Kinross Gold U.S.A., and Sunnyside Gold substantially caused and contributed to the contamination of the Animas and San Juan Rivers in New Mexico, and they are jointly and severally liable for the resulting indivisible harms and contamination.

134.    New Mexico has incurred costs responding to the release and the substantial threat of releases of hazardous substances from the Gold King Mine.  These costs are not inconsistent with 42 U.S.C. § 9607(a)(4) and the National Contingency Plan requirements found in 40 C.F.R. Part 300.  New Mexico continues to incur response costs to address contamination in the Animas and San Juan Rivers from the August 5 release, as well past and ongoing releases from the Gold King Mine, the Sunnyside Mine, the Sunnyside mine pool, and surrounding areas owned or operated by EPA, Environmental Restoration, Weston Solutions, Kinross, Kinross Gold U.S.A., and Sunnyside Gold.

135.    New Mexico is a "State" authorized to recover costs to assess damages to natural resources under CERCLA. 42 U.S.C. § 9607(a).  Section 9607(a) provides that New Mexico may also recover interest on response costs incurred.

136.    EPA, Environmental Restoration, Weston Solutions, Kinross, Kinross Gold U.S.A., and Sunnyside Gold are jointly and severally liable to New Mexico for all response costs

incurred and costs that New Mexico will incur to clean up the Animas and San Juan Rivers, including enforcement costs and prejudgment interest on those costs.

## SECOND CAUSE OF ACTION:
## DECLARATORY JUDGMENT UNDER CERCLA 42 U.S.C. § 9613(g)(2) AGAINST EPA, ENVIRONMENTAL RESTORATION, WESTON SOLUTIONS, KINROSS, KINROSS GOLD U.S.A., AND SUNNYSIDE GOLD

137.   New Mexico incorporates the allegations in all preceding paragraphs.

138.   CERCLA specifies that in any action for recovery of costs under 42 U.S.C. § 9607 "the court shall enter a declaratory judgment on liability for response costs . . . that will be binding on any subsequent action or actions to recover further response costs . . . ." 42 U.S.C. § 9613(g)(2).

139.   New Mexico will continue to incur response costs to address the contamination of the Animas and San Juan Rivers.

140.   New Mexico is entitled to entry of a declaratory judgment that EPA, Environmental Restoration, Weston Solutions, Kinross, Kinross Gold U.S.A., and Sunnyside Gold are jointly and severally liable for future response costs and natural resource damages assessment costs based on the contamination of the Animas and San Juan Rivers to the extent that those costs are not inconsistent with the National Contingency Plan.

## THIRD CAUSE OF ACTION
## INJUNCTIVE RELIEF UNDER RCRA 42 U.S.C. § 6972(a)(1)(B) AGAINST ENVIRONMENTAL RESTORATION, KINROSS, AND SUNNYSIDE GOLD

141.   New Mexico incorporates the allegations in all preceding paragraphs.

142.   RCRA authorizes citizen suits against "any person … including the United States and any other governmental instrumentality or agency … who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health

or the environment." 42 U.S.C. § 6972(a)(1)(B). Under RCRA, a court may order any person referred to in paragraph (1)(B) "to take such . . . action as may be necessary" to eliminate endangerment to health or the environment. 42 U.S.C. § 6972(a).

143. RCRA defines "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3).

144. New Mexico is a "person" under RCRA, 42 U.S.C. § 6903(15), and is entitled to commence a civil action under RCRA's citizen suit provision.

145. Environmental Restoration, Kinross, and Sunnyside Gold are "persons" under RCRA. 42 U.S.C. § 6903(15).

146. The Gold King Mine release discharged arsenic, lead, mercury, cadmium, copper, and zinc into the Animas and San Juan Rivers. These substances are "hazardous wastes" and/or "solid wastes" under RCRA. 42 U.S.C. § 6903(5)(B).

147. By directly causing the Gold King Mine release, Environmental Restoration, Kinross, Kinross Gold U.S.A., and Sunnyside Gold have contributed and are contributing to the disposal of solid and/or hazardous wastes, which present an imminent and substantial endangerment to the health and the environment in the Animas and San Juan Rivers both above and below the Colorado-New Mexico state line.

148. By letter dated January 14, 2016, New Mexico notified Environmental Restoration, Kinross, and Sunnyside Gold of its intent to file suit to restrain or abate the conditions that present or may present an imminent and substantial endangerment to health or the

environment in New Mexico. *See* Exhibit E.   New Mexico's letter followed the notice requirements found in 42 U.S.C. § 6972(b).

149.    On January 15, 2016—one day after New Mexico served its RCRA notice letter—EPA released an "action memorandum," which documents EPA's decision to undertake an emergency removal action under CERCLA Section 104 after the Gold King Mine blowout. Since August 5, EPA has attempted to stabilize the Gold King Mine site and control the flow of acid mine drainage that significantly increased due to the August 5 release.   EPA has also installed a temporary water treatment system to treat the Gold King portal drainage through November 2016.  EPA stopped monitoring the Animas River watershed in mid-December 2015.

150.    The memorandum states that EPA's emergency response actions in New Mexico only involved providing alternative water supplies for human consumption, crop irrigation, and livestock during the temporary shutdown and diversions of the rivers immediately after the release.   EPA takes that position that "future provision of alterative water supplies [in New Mexico] may be provided as determined appropriate by EPA."   EPA is taking no further remedial actions related to the solid or hazardous waste disposed of in New Mexico.

151.    After EPA released the memorandum, NMED provided EPA with evidence that high levels of metals, turbidity, and suspended solids arrived in New Mexico's rivers after various high-flow and monsoonal events.   EPA has consistently discounted or ignored this evidence.   What is more, EPA continues to claim that contaminant levels in river water and sediment have returned to "pre-spill conditions," indicating that it plans to take no further action despite its awareness of sediments contaminated at levels that present a risk to human health or the environment.   And even though evidence of accumulations of discolored sediment and sediment samples with unacceptable levels of heavy metals in Durango have been sent to EPA,

both EPA and Colorado have declined to investigate further. Those sediments had lead concentrations six times greater than cleanup levels that EPA uses at other sediment sites; they also had concentrations of various other metals at unacceptable risk levels. For all of these reasons, EPA's actions at the Gold King Mine site do not address the imminent and substantial endangerment to health or the environment in New Mexico.

152. Without explanation, EPA has modified the arsenic and lead screening levels in the Animas to levels known to pose a risk to children (*e.g.*, 20,000 parts per million lead in sediment). Likewise, Colorado's Department of Public Health and Environment has adopted EPA's recreational screening levels, ignoring residents in the area by simply issuing public health messages such as: "Avoid discolored sediment/soil" and "Children under age six should be supervised when playing in and around the river to ensure they don't ingest river water or sediment."

153. The 880,000 pounds of heavy metals released from the Gold King Mine on August 5, 2015 included arsenic, copper, lead, mercury, and selenium. A substantial mass of these heavy metals now sit in the sediments of the Animas and San Juan Rivers, where they present an imminent and substantial endangerment to the ecosystem in northern New Mexico. The San Juan River—from its confluence with the Animas River to the Navajo Nation border— is managed for recovery of federally endangered fish species—the Colorado pikeminnow (*Ptychocheilus Lucius*) and razorback sucker (*Xyrauchen texanus*)—and support dozens of other species. Although the long-term heavy metal concentration in the Animas River remains uncertain, chronic exposure to heavy metals has been shown to have significant negative effects on fish behavior, gonad and embryonic development, and can cause other harmful effects. Heavy metals can also bio-accumulate into fish tissues and organs and transfer to other wildlife

species that prey on fish, such as eagles and otters. The potential for increased levels of selenium is particularly troublesome for the future of endangered fish in the San Juan River.

154. More than ninety days have passed since NMED sent Environmental Restoration, Kinross, and Sunnyside Gold its notice of intent to file suit under RCRA, 42 U.S.C. § 6972(a)(1)(B). The imminent and substantial threats described in that letter are continuing or are reasonably likely to continue. Therefore, New Mexico is entitled to entry of an injunction that may require, among other things, a full investigation and remediation of segments of the Animas River downstream of Silverton, Colorado, where vast amounts of hazardous substances from the Gold King Mine and neighboring mines now sit.

### FOURTH CAUSE OF ACTION:
### AGAINST THE ADMINISTRATOR OF EPA UNDER CWA 33 U.S.C. § 1365(h)

155. New Mexico incorporates the allegations in all preceding paragraphs.

156. The CWA prohibits, among other things, "the discharge of any pollutant by any person." 33 U.S.C. § 1311(a). The CWA's implementing regulations define "person" to include not just private individuals and companies, but also a state or federal Agency. 40 C.F.R. § 122.2.

157. The CWA allows mining companies to apply for National Pollutant Discharge Elimination System ("NPDES") permits. These permits limit the type and quantity of pollutants that will ultimately be released into navigable waters. While NPDES permits are normally issued by EPA, states can petition to run their own NPDES permit programs. U.S.C. § 1342(a)-(b). In administering these programs, states are free to treat EPA's pollution limits as a floor and impose requirements that are more stringent. 40 C.F.R. §§ 123(i)(1), 123.25. EPA has delegated permitting authority to Colorado and it is administered by WQCD under the Colorado Water Quality Control Act, COLO.REV.STAT. § 25-8-301, *et seq*.

158.    Once an NPDES permit has been issued, the state, EPA, citizens, and the governors of other states, can sue to enforce it.  *See* 33 U.S.C. §§ 1319(a)(3) (EPA enforcement), 1365(a) (citizen suit provision), 1365(h) (state governor suit provision).  Section 505(h) of the CWA authorizes the Governor of a State to bring a civil action against the Administrator of EPA for failing to enforce any "effluent standard or limitation" under the CWA which is occurring in another State and is causing an adverse effect on the public health or welfare in her State.[6]

159.    Section 505(f)(1) of the Clean Water Act defines "effluent standard or limitation" to include "an unlawful act" under Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).  As noted above, Section 301(a) of the CWA states that "the discharge of any pollutant by any person shall by unlawful," unless authorized by an NPDES permit.  33 U.S.C. § 1311(a).

160.    Discharges from inactive mines are "pollutants" and can violate the CWA.  See 40 C.F.R § 122.26(b)(14)(iii) (stating "active or inactive mining operations" are among the industrial activities that require a stormwater discharge permit under 33 U.S.C. § 1342(p));  EPA Region VIII policy statement, Ref. 8WM-C (Dec. 22, 1993) (stating "discharges from abandoned mine adits are point sources which require a traditional NPDES permit").

161.    Further, EPA issued regulations in 1985 establishing that post-mining discharges are subject to the NPDES scheme.  *See* 50 Fed. Reg. 41,296 (Oct. 9, 1985).  In those regulations, EPA "reemphasized that post-bond release discharges are subject to regulation under the Clean Water Act," observing that "[I]f a point source discharge occurs after bond release, then it must be regulated through an NPDES permit." *Id*. at 41,298.  To the extent parties do not comply, the regulations state that they will be "subject to enforcement action by EPA under section 309 of the Act and by citizens under section 505(a)(1) of the Act." *Id.* at 41,298.  While these

---

[6] Governor Susana Martinez has authorized Secretary Ryan Flynn of the Environment Department to exercise her right to sue under Clean Water Act Section 505(h).

regulations explicitly address situations where a bond is released rather than forfeited to the state, EPA's intent is plain: both those who generate pollution and those who superintend ongoing discharges must obtain NPDES permits.

162.    Colorado has operational responsibility to treat discharges of acid mine drainage at sites where reclamation of mined areas has not been completed, including discharges from mining sites in the Upper Animas River Basin (*e.g.*, the Sunnyside Mine, Gold King Mine).  As previously alleged, for more than a decade, Colorado has failed to permit numerous inactive or abandoned mines in the Upper Animas River Basin, and elsewhere, that are discharging acid mine drainage and pollutants into navigable waters.  Past and present discharges from these inactive mines—including but not limited to the Gold King Mine release—have entered and are still entering New Mexico's waters and are causing adverse effects on the public health and welfare in New Mexico.  Colorado's failure to permit discharges from inactive mines is an "unlawful act" under Section 301(a) of the CWA.  Accordingly, New Mexico is authorized, through Section 505(h), to compel the Administrator of EPA to abate pollution from the hundreds of inactive and abandoned mines that discharge pollutants into the Animas River in Colorado and adversely affect the public health and environment in New Mexico.

### FIFTH CAUSE OF ACTION:
### PUBLIC NUISANCE AGAINST THE UNITED STATES, ENVIRONMENTAL RESTORATION, WESTON SOLUTIONS, KINROSS, KINROSS GOLD U.S.A., AND SUNNYSIDE GOLD

163.    New Mexico incorporates the allegations in all preceding paragraphs.

164.    The use and enjoyment of the Animas and San Juan Rivers in New Mexico are rights common to, and belonging to, all members of the public.

165.    Kinross, Kinross Gold U.S.A., and Sunnyside Gold specifically intended to plug the Sunnyside Mine's American Tunnel and its other workings.

166.    Kinross, Kinross Gold U.S.A., and Sunnyside Gold knew or should have known that plugging the American Tunnel and the other drainage features of the Sunnyside Mine would increase the pressure of acidic water within the mine's workings.  They also knew or should have known that the water would rise to a level above the portals of neighboring mines, and could create new discharges from neighboring mine portals that would offset any reduction in pollutant loading from the American Tunnel bulkhead.

167.    Kinross, Kinross Gold U.S.A., and Sunnyside Gold knew or should have known that ending the treatment of the acid mine drainage from the Sunnyside mine pool would send vast amounts of contamination into New Mexico's waters.   In fact, immediately after the shuttering of the Gladstone treatment facility, the water quality of the Animas and San Juan Rivers declined, and native trout all but disappeared in the Animas above Durango, Colorado. Sunnyside Gold's discharges of contamination flowed into New Mexico and beyond, degrading New Mexico's waters and riverbeds for more than a decade.

168.    Kinross, Kinross Gold U.S.A., and Sunnyside Gold knew that they created a hazardous condition by plugging the Sunnyside Mine and other mines, and they disregarded multiple warnings about the potential consequences of that decision.

169.    Kinross, Kinross Gold U.S.A., and Sunnyside Gold knew or should have known that discharges from the Gold King Mine had increased dramatically because of the plugging of the American Tunnel and other features that once drained the Sunnyside's workings.

170.    Kinross, Kinross Gold U.S.A., and Sunnyside Gold knew or should have known that the Sunnyside mine pool continued to rise with each successive mine it flooded.  And they knew or should have known that they flooded the Gold King Mine with acid mine drainage that formed in the Sunnyside mine pool.

171.    Kinross, Kinross Gold U.S.A., and Sunnyside Gold knew or should have known that foreseeable future reclamation activities at the Gold King Mine, including digging out the debris and blockage at Gold King Mine Level 7 adit, could cause a blowout of the water impounded in the mine.

172.    The United States, through its agency EPA, and Environmental Restoration intentionally dug out the pipes and debris at the Gold King Mine Level 7 adit.  They knew or should have known that digging out the pipes and earthen debris would release an enormous volume of water impounded in the mine, and these actions directly caused the blowout of the Gold King Mine on August 5, 2015.

173.    Environmental Restoration and Weston Solutions did not construct a water management system to handle the anticipated release of acid mine drainage from the Gold King Mine Level 7 adit, as prescribed by their own work plan and by OSC Steven Way.  They also failed to prepare a Health and Safety Plan or Emergency Action Plan that included a contingency plan to address a large release of impounded acid mine drainage.  They knew or should have known that the failure to build and install a water management system and the lack of a contingency plan would increase the likelihood that a large volume of acid mine drainage would contaminate the Animas River system and the environment.

174.    Colorado Mined Land Reclamation Act ("MLRA"), Colo. Rev. Stat. § 34-32-101 *et seq.*, and its implementing regulations, 2 Colo. Code. Regs. § 407-1, regulates reclamation of mined land and fosters the protection of human health, welfare, and the environment.  The statute and its implementing rules require operators to submit and obtain approval of an Environmental Protection Plan, *see* § 34-32-116.5(5), that will "protect all areas that have potential to be

affected by designated chemicals, toxic or acid-forming materials or acid mine drainage." 2

Colo. Code. Regs. § 407.1, Rule 6.4.21.  To that end, an Environmental Protection Plan must:

> Fully describe the procedures for the disposal, decommissioning, detoxification or stabilization for all designed chemicals and toxic or acid-forming materials.  Specifically describe measures to be taken to prevent any unauthorized release of pollutants to the environment.  Inadequate reclamation and closure practices for such designated chemicals, toxic or acid-forming materials and how unauthorized discharge of acid mine drainage will be prevented.

2 Colo. Code. Regs. § 407.1, Rule 6.4.21(6)(a).  The MLRA and its implementing regulations

were relevant and appropriate to the activities that triggered the August 5 blowout.  The Gold

King Mine operation was similar to reclamation at a private mining operation, and EPA, DRMS,

Environmental Restoration, and Weston Solutions should have considered the substantive

provisions of those regulations, including water control measures, before attempting to remove

the adit blockage.

175.    EPA failed to ensure that Environmental Restoration and Weston Solutions

developed and implemented an adequate Health and Safety Plan and Emergency Action Plan for

the Gold King Mine site operation.  The actual Health and Safety Plan for the Gold King Mine

operation did not comply with OSHA requirements for hazardous waste site operations identified

in 29 C.F.R. § 1910.120, and did not comply with EPA regulations for response actions.  *See* 40

C.F.R. § 300.700(c)(5)(i) (incorporating the requirement of 40 C.F.R. § 300.150(a) that

"[r]esponse actions under the NCP … comply with the provisions for response action worker

safety and health in 29 C.F.R. § 1910.120).

176.    The United States, through its agency EPA, Environmental Restoration, and

Weston Solutions ignored provisions of the Federal Mine Safety and Health Act of 1977

("MSHA") and Title 30, Code of Federal Regulations, Part 75, which are intended to protect

workers from uncontrolled releases of impounded water in abandoned mine workings.  Before

any excavation near impounded water in flooded abandoned mine workings can occur, mine operators are required to determine the location and extent of the water (by reviewing mine maps, geophysical methods, or by direct observation through boreholes) and to implement measures that will protect workers from a sudden inflow of water.  *See* 30 C.F.R. § 75.372 (requiring "up-to-date map of the mine drawn to a scale of not less than 100 nor more than 500 feet to the inch"); *id*. § 75.388(a)(2) (requiring mine operators to drill boreholes as the working place approaches within 200 feet of an area of the mine not shown by certified surveys); *id*. § 75.1200 (requiring mine operators to maintain an "accurate and up-to-date map" of a mine "in an area on the surface of the mine").[7]  Indeed, EPA's internal investigation and BOR's technical review of the blowout both concluded that the failure to drill a borehole into the adit to determine the volume and pressure of water impounded behind the adit blockage was a primary cause of the August 5, 2015 blowout.

177.    The contamination of the Animas River and San Juan River and surrounding environs that resulted from releases of hazardous substances caused by the United States, through its agency EPA, Environmental Restoration, Weston Solutions, Kinross, Kinross Gold U.S.A., and Sunnyside Gold constitutes a physical invasion of public and private property.  The contamination is also an unreasonable and substantial interference, both actual and potential,

---

[7] The borehole drilling requirements of section 75.388 track and expand upon those imposed by section 317(b) of MSHA, 30 U.S.C. § 877(b).  The borehole provision was originally enacted in the Federal Coal Mine Health and Safety Act of 1969, 30 U.S.C. § 801 et seq. (1976) and carried over without change to MSHA.  Its legislative history is short, but telling: "The necessity of maintaining drill holes in advance of the face in any working place approach abandoned mine openings known or suspected to contain dangerous quantities of water or noxious or explosive gases is obvious and such are required by law in many coal-mining states." S. Rep. No. 411, 91st Cong., 1st Sess. 94 (1969), *reprinted in* Senate Subcommittee on Labor, Committee on Labor and Public Welfare, 94th Cong., 1st Sess., Part I *Legislative History of the Federal Coal Mine Health and Safety Act of 1969*, at 210 (1975).  The text of section 75.388(a) makes plain that the borehole drilling requirements apply in lieu of the pre-shift examination required by 30 C.F.R. § 75.360, which by its nature cannot take place in inaccessible areas of a mine.  In its twin goals of preventing entry into sealed areas containing unknown hazards and promoting the timely ascertainment of those hazards, section 75.388 serves the same purpose as the pre-shift examination requirement: preventing human exposure to undetermined hazards.

with the exercise of New Mexico's right and the common right of the public to the use and enjoyment of the rivers, including the biota, lands, waters, and sediments therein.

178.     These releases have interfered with and continue to interfere with New Mexico's and the public's use and enjoyment of the rivers and surrounding areas.  These releases also present an unreasonable and substantial danger to the public's health and safety.  New Mexico has suffered special injuries, which the public as a whole does not share.  New Mexico has and will continue to suffer lost economic activity, tax revenues, and stigmatic damages arising from these releases.

179.     The past, present and ongoing conduct of the United States, through its agency EPA, Environmental Restoration, Weston Solutions, Kinross, Kinross Gold U.S.A., and Sunnyside Gold, and the contamination caused by their conduct, constitute a public nuisance. These defendants have caused continuing and substantial injuries, which threaten irreparable harm to New Mexico's public and its environment.  This public nuisance will continue as long as the Animas and San Juan Rivers and surrounding areas are contaminated with the hazardous substances released from the Gold King and Sunnyside mine pool.

180.     Unless the United States, through its agency EPA, Environmental Restoration, Weston Solutions, Kinross, Kinross Gold U.S.A., and Sunnyside Gold abate this public nuisance in the Animas and San Juan Rivers and surrounding areas, they will remain liable for the creation and continued maintenance of a public nuisance.

181.     The United States, through its agency EPA, Environmental Restoration, Weston Solutions, Kinross, Kinross Gold U.S.A., and Sunnyside Gold acted in concert, or successively.

182.     The harm caused by these Defendants' tortious conduct is indivisible and they are jointly and severally liable.

183.    New Mexico is entitled to recover damages from the United States, Environmental Restoration, Weston Solutions, Kinross, Kinross Gold U.S.A., and Sunnyside Gold.

184.    New Mexico is entitled to entry of an order compelling the United States, through its agency EPA, Environmental Restoration, Weston Solutions, Kinross, Kinross Gold U.S.A., and Sunnyside Gold, jointly and severally, to abate the nuisance.

### SIXTH CAUSE OF ACTION:
### TRESPASS AGAINST THE UNITED STATES, WESTON SOLUTIONS, ENVIRONMENTAL RESTORATION, KINROSS, KINROSS GOLD U.S.A., AND SUNNYSIDE GOLD

185.    The State of New Mexico incorporates the allegations in all preceding paragraphs.

186.    Kinross, Kinross Gold U.S.A., and Sunnyside Gold specifically intended to plug the Sunnyside Mine's American Tunnel and its other workings.

187.    Defendants Kinross, Kinross Gold U.S.A., and Sunnyside Gold knew or should have known that plugging the American Tunnel would increase the pressure of acidic water within the mine's workings.  They knew or should have known that the water could rise to a level above the portals of neighboring mines, and could create new discharges that would offset any reduction in pollutant loading from the American Tunnel bulkhead.

188.    Kinross, Kinross Gold U.S.A., and Sunnyside Gold knew that they created a hazardous condition by plugging the Sunnyside Mine and other mines, and they disregarded multiple warnings about the potential consequences of that decision.

189.    Kinross, Kinross Gold U.S.A., and Sunnyside Gold knew or should have known that stopping the treatment of the acid mine drainage from the Sunnyside mine pool would send vast amounts of contamination into New Mexico's waters and beyond.  In fact, immediately after the shuttering of the Gladstone treatment facility, the water quality of the Animas and San Juan

Rivers declined, and native trout all but disappeared in the Animas above Durango, Colorado. Sunnyside Gold's discharges of contamination have degraded New Mexico's waters and riverbeds for more than a decade.

190.    Kinross, Kinross Gold U.S.A., and Sunnyside Gold knew or should have known that the Sunnyside mine pool continued to rise with each successive mine it flooded.  And they knew or should have known that they flooded the Gold King Mine with acid mine drainage that formed in the Sunnyside mine pool.

191.    Kinross, Kinross Gold U.S.A., and Sunnyside Gold knew or should have known that discharges from the Gold King Mine had increased because of the plugging of the American Tunnel and successive mines.

192.    Kinross, Kinross Gold U.S.A., and Sunnyside Gold knew or should have known that foreseeable reclamation activities at the Gold King Mine, including digging out the debris and blockage at Gold King Mine Level 7 adit, could result in a blowout of the water impounded in the mine.

193.    The United States, through its agency EPA, and Environmental Restoration intentionally dug out the pipes and debris at the Gold King Mine Level 7 adit.  They knew or should have known that digging out the pipes and debris would release an enormous amount of water impounded in the mine, and these actions directly caused the blowout of the Gold King Mine on August 5, 2015.

194.    Environmental Restoration and Weston Solutions failed to build and install a water management system to handle the anticipated release of acid mine drainage from the Gold King Mine Level 7 adit.  They also failed to prepare a work plan that included contingency plans for blowout.  They knew or should have known that the failure to install a water management

system and the lack of a contingency plan would increase the risk that a large release of acid mine drainage would enter into and contaminate the Animas River system and the environment.

195.   Accordingly, the United States, through its agency EPA, Environmental Restoration, Weston Solutions, Kinross, Kinross Gold U.S.A., and Sunnyside Gold are liable for trespass, and continued trespass, because they intentionally released, discharged, and failed to prevent the releases of acid mine water, mine-dump runoff, metals, and other hazardous substances into the Animas and San Juan Rivers and the surrounding environs within New Mexico's borders.

196.   As long as New Mexico's waterways and surrounding areas remain contaminated with these hazardous substances, the trespass will continue.

197.   The harm caused by these defendants' tortious conduct is indivisible and they are jointly and severally liable.

198.   New Mexico is entitled to recover compensatory and restitutionary damages from Environmental Restoration, Kinross, Kinross Gold U.S.A., and Sunnyside Gold.

199.   New Mexico is entitled to entry of an order compelling Environmental Restoration, Kinross, Kinross Gold U.S.A., and Sunnyside Gold, jointly and severally, to abate the trespass.

**SEVENTH CAUSE OF ACTION:**
**NEGLIGENCE AND GROSS NEGLIGENCE AGAINST THE UNITED STATES,**
**ENVIRONMENTAL RESTORATION, WESTON SOLUTIONS, KINROSS, KINROSS**
**GOLD U.S.A., AND SUNNYSIDE GOLD**

200.   The State of New Mexico incorporates the allegations in all preceding paragraphs.

201.   The United States, through its agency EPA, Environmental Restoration, Weston Solutions, Kinross, Kinross Gold U.S.A., and Sunnyside Gold had a duty to oversee, manage, maintain, and regulate the Gold King Mine and Sunnyside Mine with reasonable care.  They also

had a duty to conduct their investigations and work activities at the mines with reasonable care. It was foreseeable that the failure to use reasonable care in performing these activities would cause injuries and damages to states, local communities, and individuals downstream of the mines.

202.    As further alleged below, the actions of the United States, through its agency EPA, Environmental Restoration, Kinross, Kinross Gold U.S.A., and Sunnyside Gold were grossly negligent, meaning their actions constituted reckless, wanton, and willful misconduct.

203.    Kinross, Kinross Gold U.S.A., and Sunnyside Gold were negligent or grossly negligent by plugging the American Tunnel and surrounding mine portals, thereby creating a highly hazardous condition within the Gold King Mine.

204.    Kinross, Kinross Gold U.S.A., and Sunnyside Gold were negligent or grossly negligent by failing to treat the discharges from the American Tunnel and surrounding mine portals.

205.    The United States, through its agency EPA, Environmental Restoration, and Weston Solutions were negligent or grossly negligent by, among other things:

- Failing to investigate or test the hydraulic pressure within Gold King Mine Level 7 adit before digging out the earthen plug, despite knowing that the mine was holding back significant quantities of water;

- Judging the elevation of the water *inside* the mine based primarily on observations of seepage *outside* the mine, and relying on flawed assumptions that contradicted publicly available records;

- Excavating the Level 7 portal's drainage pipes and the earthen plug without using a stinger pipe, a pump, and other equipment necessary to dewater the mine in a safe and controlled manner, in violation of Mr. Way's specific, mandatory instructions;

- Conducting operations with a work plan that lacked any contingency plan addressing the potential for an uncontrolled release of water and hazardous substances from the

mine, in violation of OSHA hazardous waste operation requirements identified in 29 CFR 1910.120.[8]

- Deviating from the Mr. Way's specific written instructions and plans concerning the timing, scope, and method of excavating the collapsed portal;

- Carrying out adit excavation work on August 4 and 5 in Mr. Way's absence and without waiting for BOR's engineer to inspect the site and provide advice—again, in violation of Mr. Way's unequivocal instructions.

206. The conduct of the United States, through its agency EPA, Environmental Restoration, Weston Solutions, Kinross, Kinross Gold U.S.A., and Sunnyside Gold caused direct and identifiable harms to New Mexico and its citizens.

207. The harm caused by these defendants' tortious conduct is indivisible and they are jointly and severally liable.

208. New Mexico is entitled to recover compensatory damages from the United States, through its agency EPA, Environmental Restoration, Weston Solutions, Kinross, Kinross Gold U.S.A., and Sunnyside Gold.

209. New Mexico is entitled to recover punitive damages from Environmental Restoration, Weston Solutions, Kinross, Kinross Gold U.S.A., and Sunnyside Gold.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, the State of New Mexico, prays for an order and judgment:

210. Declaring that Defendants EPA, Environmental Restoration, Weston Solutions, Kinross, Kinross Gold U.S.A., and Sunnyside Gold are jointly and severally liable under CERCLA, 42 U.S.C. § 9607(a), for all costs, including prejudgment interest, incurred by New

---

[8] The safety plan was also inadequate and inconsistent with the NCP, which requires a worker health and safety plan before any cleanup activity commences. *See* 40 C.F.R. § 300.700(c)(5)(i) (incorporating the requirement of 40 C.F.R. § 300.150(a) that "[r]esponse actions under the NCP . . . comply with the provisions for response action worker safety and health in 29 C.F.R. § 1910.120). Section 1910.120 further states that employers must have "a site-specific safety and health plan . . . [at] each phase of site operation. 29 C.F.R. § 1910.120(b)(1), (b)(4).

Mexico in responding to releases or threatened releases of hazardous substances from the Gold King, the Sunnyside Mine, or the American Tunnel to the date of judgment;

211.   Declaring that Defendants EPA, Environmental Restoration, Weston Solutions, Kinross, Kinross Gold U.S.A., and Sunnyside Gold are jointly and severally liable under CERCLA, 42 U.S.C. § 9613(g)(2), for all response costs that will be incurred by New Mexico in responding to releases or threatened releases of hazardous substances from the Gold King Mine, the Sunnyside Mine, or the American Tunnel;

212.   Declaring that Defendants Environmental Restoration, Kinross, Kinross Gold U.S.A., and Sunnyside Gold are in violation of RCRA's imminent and substantial endangerment provision, 42 U.S.C. § 6972(a)(1)(B), until they cease the disposal of hazardous substances from the Gold King and Sunnyside Mines including, but not limited to, acid wastewater, mine sludge, mine-dump runoff, and metals, into the Animas River watershed;

213.   Compelling the Administrator of EPA, Defendant McCarthy, to seek abatement of pollution from the numerous inactive and abandoned mines in Colorado that discharge acid mine drainage and other waste into the Animas River in Colorado and adversely affect the public health and environment in New Mexico;

214.   Declaring that Defendants the United States, through its agency EPA, Environmental Restoration, Weston Solutions, Kinross, Kinross Gold U.S.A., and Sunnyside Gold were negligent, grossly negligent, or both, and awarding New Mexico compensatory, consequential, and punitive damages caused by Defendants' conduct, including, but not limited to, investigation, clean-up, and remedial costs, economic loss, loss of use, diminution in value, and stigma damages;

215.    Disgorging all profits made, or costs avoided, by Defendants Kinross, Kinross Gold U.S.A., and Sunnyside Gold, because of their tortious and wrongful conduct;

216.    Ordering Defendants the United States, through its agency EPA, Environmental Restoration, Weston Solutions, Kinross, Kinross Gold U.S.A., and Sunnyside Gold to abate the nuisance and cure the trespass in the Animas and San Juan Rivers within Colorado;

217.    Declaring that Defendants the United States, through its agency EPA, Environmental Restoration, Weston Solutions, Kinross, Kinross Gold U.S.A., and Sunnyside Gold are jointly and severally liable for all costs incurred and costs that may be incurred by New Mexico to abate the nuisance and cure the trespass in the Animas and San Juan Rivers within New Mexico;

218.    Awarding New Mexico its costs of this action, including attorneys' fees; and

219.    Granting any further relief, at law or in equity, as this Court deems just and proper.

Dated: May 11, 2018                          Respectfully submitted,

                                             **HECTOR H. BALDERAS**
                                             **NEW MEXICO ATTORNEY GENERAL**


                                             /s/ P. Cholla Khoury
                                             P. Cholla Khoury
                                             Assistant Attorney General
                                             P.O. Drawer 1508
                                             Santa Fe, NM 87504-1508
                                             (505) 717-3530
                                             pkhoury@nmag.gov



William J. Jackson
John D.S. Gilmour
Kelley Drye & Warren LLP
515 Post Oak Blvd., Suite 900
Houston, TX 77027
Telephone: (713) 355-5005 (Direct)
Facsimile: (713) 355-5001 (Fax)
Email: bjackson@kelleydrye.com

Marcus J. Rael, Jr.
Robles, Rael & Anaya, P.C.
500 Marquette Ave NW, Suite 700
Albuquerque, NM 87102
Email: marcus@roblesrael.com
Telephone: (505) 242-2228
Facsimile: (505) 242-1106
Email: marcus@roblesrael.com

***Counsel for Plaintiff New Mexico***