<u>UNITED STATES DISTRICT COURT</u>
<u>FOR THE DISTRICT OF NEW MEXICO</u>

| | |
|---|---|
| In re: Gold King Mine Release in San Juan County, Colorado on August 5, 2015<br><br>*This Document Relates to:*<br>    *No. 16-cv-465-WJ/LF*<br>    *No. 16-cv-931-WJ/LF*<br>    *No. 18-cv-319-WJ* | No. 1:18-md-02824-WJ |

<u>**SUNNYSIDE GOLD CORPORATION'S MOTION FOR PARTIAL SUMMARY
JUDGMENT ON THE FEDERAL DEFENDANTS' COST RECOVERY CLAIM
RELATED TO THE SUNNYSIDE MINE FACILITY PURSUANT TO THE STATUTE
OF LIMITATIONS, BRIEF IN SUPPORT, AND STATEMENT OF UNDISPUTED
MATERIAL FACTS**</u>

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................... 1

STANDARD OF REVIEW ..................................................................................................... 3

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................................ 4

ARGUMENT .......................................................................................................................... 15

    I.   The Federal Defendants' CERCLA cost recovery claim related to the Sunnyside Mine Facility is barred by the statute of limitations.......................................................................... 15

        A.  SGC conducted a remedial action at the Sunnyside Mine Facility. ............................... 15

        B.  Initiation of physical on-site construction of the remedial action starts the running of the statute of limitations for all parties who incur response costs at the facility. ....................... 18

        C.  SGC's remedial action at the Sunnyside Mine Facility was initiated more than two decades before the Federal Defendants filed their CERCLA cost recovery claim against SGC.......................................................................................................................................... 21

    II.     The fact that SGC's remedial action was not conducted under CERCLA is immaterial to the statute of limitations analysis........................................................................................... 23

CONCLUSION........................................................................................................................ 25

EXHIBIT INDEX .................................................................................................................... 27

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................... 3

*Atl. Richfield Co.* ("*ARCO*") *v. U.S.*, 181 F. Supp. 3d 898 (D. N.M. 2016) ..................... 16, 17, 19

*Burlington N. & Santa Fe Ry. Co. v. U.S.*, 556 U.S. 599 (2009) .................................... 19

*Calmat Co. v. San Gabriel Valley Gun Club*, 809 F. Supp. 2d 1218 (C.D. Cal. 2011) ............... 24

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......................................................... 3, 4

*Colorado v. Sunoco, Inc.*, 337 F.3d 1233  (10th Cir. 2003) ............................................ 16, 18, 19

*Elsken v. Network Multi–Family Sec. Corp.,* 49 F.3d 1470 (10th Cir. 1995)................................ 3

*FMC Corp. v. Aero Industries, Inc.*, 998 F.2d 842 (10th Cir. 1993) ........................................ 22

*Franklin v. Thompson,* 981 F.2d 1168 (10th Cir. 1992) ...................................................... 3

*moco Oil Co. v. Borden, Inc.*, 889 F.2d 664 (5th Cir.1989) .............................................. 22

*New Mexico v. Gen. Elec. Co.*, 467 F.3d 1223 (10th Cir. 2006) ........................................ 23

*New York State Elec. and Gas Corp.* ("*NYSEG*") *v. FirstEnergy Corp.*, 766 F.3d 212
   (2d. Cir. 2014)........................................................................................ 20

*New York v. Next Millennium Realty, LLC*, 732 F.3d 117 (2d Cir. 2013) .................................. 16

*Pub. Serv. Co. of Colorado v. Gates Rubber Co*., 175 F.3d 1177 (10th Cir. 1999) .................... 16

*Recovery of Costs for CERCLA Response Actions*, 57 FR 34742-01 at *347444 (1992) ............ 19

*Sunnyside Gold Corporation v. Colorado Water Quality Control Division of the Colorado
   Department of Public Health and Environment*, Case No. 94 CV 5459 (Colo. Dist. Ct.,
   original decree entered May 8, 1996) ................................................................ 1

*U.S. v. Navistar Intern. Transp. Corp*., 152 F.3d 702 (7th Cir. 1998)..................................... 19, 20

U.S. v. W.R. Grace & Co., 429 F.3d 1224 (9th Cir. 2005)............................................... 16

*Union Carbide Corp. v. Thiokol Corp.*, 890 F. Supp. 1035 (S.D. Ga. 1994) .............................. 23

*Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.,* 934 F.3d 553 (7th Cir. 2019)............................ 16

*Wason Ranch Corp. v. Hecla Mining Co.*, 2008 WL 906110, at *3 (D. Colo. 2008) ................. 23

**Statutes**

Comprehensinve Environmental Response, Compensation, and Liability Act, 42 U.S.C.
   §§ 9601 to 9675 (2012) ................................................................................................ passim
Colorado Mined Land Reclamation Act, C.R.S. § 34-32-101, *et seq* ............................................. 4
Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387 ........................................... 5, 8

**Rules**

Fed. R. Civ. P. 1 ...................................................................................................................... 4
Fed. R. Civ. P. 56(a) ................................................................................................................ 3

**Treatises**

*Effluent Trading in Watersheds Policy Statement*, 61 FR 4994-01 (Feb. 9, 1996) ...................... 10

Sunnyside Gold Corporation ("SGC") moves for partial summary judgment dismissing the Federal Defendants' CERCLA cost recovery claim against SGC related to the Sunnyside Mine Facility.  The Federal Defendants' claim against SGC is premised on SGC's involvement with and implementation of the remedial action set out in the 1996 court-approved Consent Decree[1] at the Sunnyside Mine Facility, consisting of areas identified in the Consent Decree's Work Plan and related permit boundaries,[2] including the Sunnyside Mine, the American Tunnel, the Terry Tunnel, the Mayflower Mill, and the Mayflower Tailings Impoundments.  There can be only one remedial action at any given facility for purposes of CERCLA's cost recovery statute of limitations.  SGC completed the remedial action at the Sunnyside Mine Facility over a decade ago.  The Federal Defendants' claim regarding that facility is therefore barred by the passage of time.  Counsel for SGC has conferred in good faith with counsel for the Federal Defendants, who have represented they oppose this motion.  This motion is supported by the following brief and statement of undisputed material facts.

## INTRODUCTION

The Sunnyside Mine Facility is located within what is now known as the Bonita Peak Mining District ("BPMD") Superfund Site near Silverton, Colorado.  In 1991, SGC began the process of closing and remediating the Sunnyside Mine Facility.  SGC's work was performed in accordance with SGC's MLR and NPDES Permits, Reclamation Plan, and the Consent Decree eventually entered and enforced by a Colorado District Court.  SGC's remedial action at the Sunnyside Mine Facility was subject to extensive review and comment by the general public, the

---

[1] MDL ECF 42-1, Consent Decree and Order, as amended, *Sunnyside Gold Corporation v. Colorado Water Quality Control Division of the Colorado Department of Public Health and Environment*, Case No. 94 CV 5459 (Colo. Dist. Ct., original decree entered May 8, 1996).
[2] *See* MDL ECF 42-1 at pp. 5, 7, 11, 14-16.

State of Colorado ("Colorado"), the U.S. Bureau of Land Management ("BLM"), and the U.S. Environmental Protection Agency ("EPA").  After Colorado, BLM, and EPA blessed the remedial action, SGC spent millions of dollars completing the associated work under both state and federal oversight.  By 2003, SGC's remedial action at the Sunnyside Mine Facility was substantially complete.

On August 5, 2015, more than two decades after SGC's remedial action at the Sunnyside Mine Facility was initiated, and more than one decade after the remedial action was substantially complete, EPA and its contractors triggered a blowout of over 3,000,000 gallons of water from a different facility in the BPMD, the Gold King Mine (the "Blowout").  SGC never owned any interest in the Gold King Mine, never operated the Gold King Mine, and did nothing to cause the Blowout.  EPA initially accepted responsibility for the Blowout, but then pivoted in its approach.  The Federal Defendants filed a CERCLA cost recovery claim against SGC in an attempt to require SGC to pay to clean up EPA's mess.  The Federal Defendants' cost recovery claim does not allege that SGC was somehow the owner or operator of the Gold King Mine.  Rather, the basis of the cost recovery claim as to SGC is focused on the Sunnyside Mine Facility and SGC's implementation of the remedial action at that facility.  (*See* MDL ECF 192 at pp. 49-78; MDL ECF 195 at pp. 46-75; MDL ECF 200-1 at pp. 28-51).[3]  The fact that EPA did not cause the Blowout at the Gold King Mine until 2015 does not change the fact that the Federal Defendants' cost recovery claim relates to SGC's past remedial work at the Sunnyside Mine Facility and is barred by the passage of time.

---

[3] References to "MDL ECF" are to documents as filed and numbered in MDL Case 1:18-md-02824-WJ (D. N.M.).

The Federal Defendants cannot use a CERCLA cost recovery claim to second guess the long-completed Sunnyside Mine Facility remedial action in an effort to force SGC to fund the cleanup of the EPA-caused Blowout at a different BPMD facility.  Requiring SGC to fund the cleanup of the EPA-caused Blowout would be fundamentally unfair and unjust.  SGC should be granted summary judgment dismissing the Federal Defendants' CERCLA cost recovery claim related to the Sunnyside Mine Facility.

## STANDARD OF REVIEW

A motion for partial summary judgment is resolved under the same standard as a motion for complete summary judgment under Fed. R. Civ. P. 56(a).  *Franklin v. Thompson,* 981 F.2d 1168, 1169 (10th Cir. 1992).  Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The movant bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has met this initial burden, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  *Id.* at 252.  "Conclusory allegations that are unsubstantiated do not create an issue of fact and are insufficient to oppose summary judgment . . . ."  *Elsken v. Network Multi–Family Sec. Corp.,* 49 F.3d 1470, 1476 (10th Cir. 1995).  Summary judgment is an "integral part of the Federal Rules [of Civil Procedure] as a whole, which are

designed 'to secure the just, speedy[,] and inexpensive determination of every action.'" *Celotex Corp.*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

<u>**STATEMENT OF UNDISPUTED MATERIAL FACTS**</u>

There is no genuine issue as to the following facts material to this motion:

1.      In late 1985, SGC acquired interests in parts of the Sunnyside Mine Facility from Standard Metals Corporation ("Standard Metals").  (*See* MDL ECF 42-1 at p. 3, ¶¶ 1-2; Exhibit 12.b of MDL ECF 1217 (the "FPR Defense MSJ") at p. 1, ¶ 1).

2.      Colorado's Mined Land Reclamation Board ("MLRB") approved the transfer of Standard Metals' Mined Land Reclamation Permit No. M77-378 ("MLR Permit") to SGC.  The MLR Permit governed SGC's mining and milling operations at the Sunnyside Mine Facility pursuant to the Colorado Mined Land Reclamation Act, C.R.S. § 34-32-101, *et seq*. ("MLRA").  For activities undertaken by SGC on lands owned by BLM, the MLR Permit served as BLM's required plan of operations under memorandums of understanding between BLM and Colorado. BLM's regulations applied to SGC's operations and BLM had to affirmatively approve SGC's activities.  (MDL ECF 42-1 at p. 5; Exhibit 12.a of the FPR Defense MSJ at pp. 1-8; Exhibit 8).

3.      SGC also held National Pollution Discharge Elimination System water discharge permits ("NPDES Permits") for its operations at the Sunnyside Mine Facility.  The NPDES Permits authorized discharges by SGC: (a) from the American Tunnel (the Sunnyside Mine's main access portal) to Cement Creek (Colorado Discharge Permit System ("CDPS") Permit No. CO-0027529 ("American Tunnel Permit")); (b) from the Terry Tunnel (the Sunnyside Mine's secondary access portal) to Eureka Gulch (CDPS Permit No. CO-0036056 ("Terry Tunnel Permit")); and (c) from the Mayflower Tailings Impoundments to the Animas River (CDPS Permit No. CO-0000426 ("Mayflower Impoundments Permit")).  The NPDES Permits were issued by the Colorado Department of Public Health and Environment, Water Quality

Control Division ("WQCD"), acting pursuant to delegated authority bestowed by EPA pursuant to the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387 (*aka* the "Clean Water Act" or "CWA").  (*See* MDL ECF 42-1 at p. 3; CWA § 402(b) (33 U.S.C. § 1342(b)); Colorado's Water Quality Control Act ("WQCA"), C.R.S. § 25-8-501).

4.     From 1986 until 1991, SGC operated parts of the Sunnyside Mine Facility under its MLR Permit and NPDES Permits, as well as applicable state and federal laws, regulations, and standards.  (*See* MDL ECF 42-1 at p. 3, Exhibit 1 at p. 2, ¶ 3).

5.     Starting in 1991, after the cessation of its mining and milling operations, SGC initiated physical on-site construction of the final remedial action of the Sunnyside Mine Facility in accordance with the statutorily required Reclamation Plan that was part of SGC's MLR Permit ("Reclamation Plan").  (MDL ECF 42-1 at p. 5).

6.     The remedial action included a conceptual proposition for SGC to install one bulkhead in the American Tunnel and one bulkhead in the Terry Tunnel, the requirements and design details of which were later specified in a technical revision to the Reclamation Plan ("TR-14") recommended by the Division of Minerals and Geology of the Colorado Department of Natural Resources ("DMG," predecessor of the Division of Reclamation, Mining and Safety or "DRMS") and approved by MLRB.  The recommendation and approval of TR-14 stated that "[i]ndefinite or perpetual mine drainage treatment is not desirable for final reclamation" and that "hydraulic seals [(*i.e.* bulkheads)] offer the best alternative . . . for final mine site reclamation . . . ."  DMG and MLRB found that the "physical setting of the Sunnyside Mine appears to make it ideal for a hydraulic sealing [(*i.e.* bulkheading)] scheme."  (MDL ECF 42-1 at pp. 5-6, 14-15, 45-48; Exhibit 1 of the FPR Defense MSJ at pp. 1-3; Exhibit 2.b of the FPR Defense MSJ at p. 5; Exhibit 12.c of the FPR Defense MSJ).

7.      Notice of the proposed bulkheading under TR-14, and the opportunity for the general public to provide comments about the bulkheading, was published in the *Silverton Standard* on September 23, 1993.  Direct notice of TR-14 was also sent to BLM, the San Juan County Board of Commissioners, and adjacent private property owners.  (Exhibits 2.a - 2.b).

8.      The purpose of installing bulkheads in the American and Terry Tunnels was to isolate the Sunnyside Mine workings and restore the natural hydrology of the region.  The bulkheads were designed to confine discharges from the Sunnyside Mine Facility within the Sunnyside Mine as part of the final closure of the Sunnyside Mine.  (MDL ECF 42-1 at p. 7 ("[I]nstallation of these bulkhead seals will impound water behind the bulkheads, eventually flooding the Mine . . . .")).  SGC, Colorado regulators (*i.e.*, WQCD, MLRB, and DMG), and EPA all anticipated that the bulkheading would result in the saturation of the Sunnyside Mine's interior workings, and ultimately approximate the natural hydrology as groundwater reestablished flows through underground fractures and faults and discharged at seeps and springs.  MLRB's approval of TR-14 required that SGC monitor any measurable change in water quality or quantity in the seeps and springs of the drainages surrounding the Sunnyside Mine and report them to DMG and WQCD.  (*Id.* at pp. 5-7, 14; Exhibit 2.b of the FPR Defense MSJ at p. 1; Exhibit 5 of the FPR Defense MSJ at p. 2, ¶ 2; Exhibit 7 of the FPR Defense MSJ at p. 2, ¶ 2; Exhibit 8 of the FPR Defense MSJ at pp. 1-2).

9.      SGC and WQCD initially disagreed as to whether discharge permits would be required for any seeps and springs that emerged or increased following installation of the bulkheads in the American and Terry Tunnels.  Accordingly, in 1994, SGC filed a Complaint for Declaratory Relief, requesting that the Colorado District Court determine the applicability of discharge permitting requirements to the remedial action.  The lawsuit was resolved in 1996 via

the Consent Decree after negotiations between WQCD and SGC, review and input from EPA, and a formal public notice and comment period.  (MDL ECF 42-1 at pp. 7-8; *see also* Exhibit 3 of the FPR Defense MSJ at p. 1, ¶ 1; Exhibit 4 of the FPR Defense MSJ at pp. 1, 3; Exhibit 5 of the FPR Defense MSJ at pp. 1-3; Exhibit 6 of the FPR Defense MSJ at pp. 1-2).

10.     In the Consent Decree, "[WQCD] agree[d], based on the facts of this case, that after a [s]uccessful Permit Termination Assessment and termination of [SGC's] permits, no future CDPS point source permit [would] be required of SGC or its parent company for seeps or springs which emerge or increase in the Upper Animas River or Cement Creek drainages following installation and closure of bulkhead seals in the American or Terry Tunnels."  (MDL ECF 42-1 at p. 24, ¶ 22).  To mitigate any new or increased flows from such seeps and springs, SGC agreed to conduct watershed-based mitigation work, subject to approval by DMG and WQCD, as part of the remedial action at the entire Sunnyside Mine Facility, including at third-party mines SGC never owned or operated.  SGC was issued a new NPDES Permit for its Consent Decree watershed-based mitigation work (CDPS Permit No. CO-0044768, referred to as the "Mine Remediation Projects Permit").  (*See id.* at p. 12, ¶ 8, p. 15, ¶ 9.b, p. 24, ¶ 22, p. 25, ¶ 24.a, pp. 37-44, 49-55; Exhibit 5 of the FPR Defense MSJ at p. 3; Exhibit 7 of the FPR Defense MSJ at p. 2, ¶ 2).

11.     The Consent Decree was designed to bring about the "final" closure of the Sunnyside Mine Facility.  (*See* MDL ECF 42-1 at pp. 7-8).  As the Consent Decree notes, "indefinite or perpetual mine drainage treatment was not desirable for <u>final</u> reclamation and . . . hydraulic seals offer the best alternative for <u>final</u> mine site reclamation.  The DMG approval rationale also stated that the physical setting of the Sunnyside Mine appeared to be ideal for a hydraulic sealing scheme."  (*Id.* at p. 6 (emphasis added)).  The parties to the Consent Decree

desired "that reclamation of the Mine proceed to completion" and that SGC be allowed "to proceed with <u>final</u> reclamation of the Sunnyside Mine, to provide for closure of the American and Terry Tunnels by hydraulic seals, to provide for mitigation of certain other historic mining conditions, to protect the waters of the State of Colorado, and to provide for the <u>final</u> termination of CDPS Permits No. CO-0027529 and CO-0036056 . . . ." (*Id.* at pp. 7-8 (emphasis added)).

12.     Before the Consent Decree was finalized, Colorado was required to provide notice of the Consent Decree to the general public and to "any other State the waters of which may be affected" by the Consent Decree and allow them the opportunity to review and comment on the Consent Decree's permitting provisions.  Affected downstream States had the right to object to the Consent Decree and appeal to EPA to use EPA's discretionary administrative powers to disapprove the proposed Mine Remediation Projects Permit and assume permitting jurisdiction. CWA § 402(b)(3), (b)(5) (33 U.S.C. § 1342(b)(3), (b)(5)).

13.     In satisfaction of Colorado's notice requirements, WQCD issued a press release and public notice regarding: (a) the Consent Decree; (b) renewal of the American Tunnel and Terry Tunnel Permits; and (c) issuance of the Mine Remediation Projects Permit.  The press release and public notice provided an overview of the Consent Decree, with specific reference to the proposed bulkheading of the American and Terry Tunnels as part of the Reclamation Plan, as well as the watershed-based remediation projects to be performed by SGC "in order to protect the quality of water in the Animas River from seeps and springs which may emerge following mine closure."  Regional newspapers picked up the press release and the *Rocky Mountain News*, the *Denver Post*, and the *Durango Herald* all published related articles.  (*See* Exhibit 4 of the FPR Defense MSJ at pp. 3-4; Exhibit 1 at pp. 1-2; Exhibits 3.a – 3.d).

14.     A *Notice of Lodging of Proposed Consent Decree and Order* was also filed with the Colorado District Court and WQCD held a public meeting in Silverton to discuss the proposed Consent Decree.  According to a written summary of the meeting provided by the Animas River Stakeholders Group ("ARSG"),[4] 35 attendees were present at the meeting, including representatives from WQCD, DMG, BLM, EPA, the U.S. Forest Service, the U.S. Geological Survey, San Juan County, the *Silverton Standard*, the *Durango Herald*, and SGC. During the meeting, WQCD's then-Director, David Holm, made a presentation outlining the "overall features" of the proposed Consent Decree, including "the plugging of the American and Terry Tunnels."  It was noted at the meeting that the time period for the general public to comment on the proposed Consent Decree extended to April 4, 1996, and "many clarifying questions were asked along with several general comments."  (Exhibit 4; Exhibit 5 at p. 1; Exhibit 5.a at p. 1, ¶ 2).

15.     EPA reviewed and commented on the Consent Decree, as did BLM and members of the general public.  (*See* Exhibit 5 of the FPR Defense MSJ at pp. 1-5; Exhibit 6 of the FPR Defense MSJ at p. 1, ¶ 2; Exhibit 6 at pp. 1-2).  In doing so, EPA never assumed jurisdiction over the NPDES Permits referenced in the Consent Decree.  Instead, EPA complimented the WQCD on the Consent Decree:

> The [EPA] commends both the State of Colorado and [SGC] in your innovative approach to problems encountered in final closure of the Sunnyside Gold Mine. Furthermore, the EPA is pleased that Colorado has chosen to use a watershed/ trading approach as one step toward achieving the goals of improving water quality in the Animas River.

---

[4] ARSG was a collaborative, watershed-based coalition formed in 1994 and disbanded in 2019, which brought together local, state, and federal agencies (including EPA, BLM, DMG/DRMS, and WQCD), as well as private mining companies (including SGC) and interested individuals, with the mission to improve water quality and aquatic habitats in the Animas River watershed, including through the cleanup of legacy mine sites in and around Silverton.

(Exhibit 5 of the FPR Defense MSJ at p. 1).  EPA chose to "[l]et the Mine take care of it," rather than "enforce as NPDES overfiling or as Superfund" or "[p]articipate as a partner in negotiations."  (Exhibit 7 at pp. 1, 3; *see also* Exhibit 5 of the FPR Defense MSJ at p. 1).  EPA noted that "[s]ealing of the mine tunnel is considered by most experts to be the best management practice given certain conditions."  (Exhibit 7 at p. 3).

16.     BLM was required to affirmatively approve the portions of the Consent Decree work occurring on BLM lands.  In response to a request to conduct Consent Decree cleanup activities on BLM lands, BLM approved of the proposed work and indicated "[s]ince the proposed remediation would enhance and **improve the health of the land** by eliminating the calculated daily zinc loading to the Animas River, we see no problem with what is proposed." (Exhibit 8 at p. 1, ¶ 2 (emphasis in original)).

17.     No affected downstream State ever objected to the Consent Decree or appealed to EPA to use its discretionary administrative powers to disapprove the NPDES Permits referenced in the Consent Decree and assume permit issuing jurisdiction.  (*See* Exhibit 3 of the FPR Defense MSJ; Exhibit 5 of the FPR Defense MSJ; Exhibit 8 of the FPR Defense MSJ; Exhibit 6 at pp. 1-2).

18.     The Consent Decree comported with EPA's *Effluent Trading in Watersheds Policy Statement*, 61 FR 4994-01 (Feb. 9, 1996) and its goals to "strongly promote" and encourage watershed-based trading to improve water quality and "achieve water quality objectives and standards."  (*See also* Exhibit 5 of the FPR Defense MSJ at p. 1).

19.     WQCD provided written responses to the comments it received concerning the Consent Decree and noted in its response to EPA that "[i]t was gratifying to see the level of

interest in this settlement agreement as reflected in the voluminous comments received by the Division." (Exhibit 6 of the FPR Defense MSJ at p. 1, ¶ 2; Exhibit 7 of the FPR Defense MSJ).

20.     The Colorado District Court approved the Consent Decree on May 8, 1996. The Consent Decree was then amended in April 1997, January 1999, October 2000, and December 2002. Each amendment was reviewed and approved by Colorado, specifically WQCD, the Attorney General's Office, and the Colorado District Court. (MDL ECF 42-1 at pp. 2, 7-8, 14-15, 25, 37-55; *see also* Exhibit 6 of the FPR Defense MSJ at p. 1).

21.     The Consent Decree contemplated the installation of additional bulkheads in the American Tunnel (after the bulkheaded mine pool in the Sunnyside Mine's interior workings reached equilibrium and a two-year observation period) to address any remaining discharge at the American Tunnel's portal and allow for final reclamation under SGC's MLR Permit. The Third Amendment to the Consent Decree, as jointly submitted by SGC and WQCD and entered by the Colorado District Court in October 2000, provided for placement of these additional bulkheads. At that time, SGC and WQCD stipulated that the initial bulkhead installed in the American Tunnel "has functioned and continues to function as designed," and that "additional outbound plugs in the lower American Tunnel in order to complete closure" would be placed after final design review and approval by DMG. DMG approved the final design and placement of the additional bulkheads in its March 2001 approval of Technical Revision 25 to SGC's MLR Permit. (*See* MDL ECF 42-1 at pp. 14-15, 37-54; Exhibit 1 of the FPR Defense MSJ).

22.     By 2003, SGC had completed all of the Consent Decree requirements and had substantially completed the response activities required as part of the remedial action under the MLR Permit and Reclamation Plan. SGC completed the response activities in conformance with state and federal laws, as well as applicable mine regulations and reclamation standards. (*See*

MDL ECF 42-1 at p. 55; Exhibits 12.a-12.l of the FPR Defense MSJ; Exhibits 13.a-13.j of the

FPR Defense MSJ).

23.    SGC submitted construction reports to DMG for the completed work, DMG

inspected the work, and DMG never objected to the sufficiency of SGC's work.  (*See* MDL ECF

42-1 at pp. 12-14, ¶ 8).

24.    On February 26, 2003, WQCD concluded that SGC's obligations under the

Consent Decree had been fully satisfied and that SGC would have no further obligation to treat

Cement Creek or any seepage that might issue from or in the vicinity of the American Tunnel (or

anywhere else in the Cement Creek or Upper Animas River drainages).  On July 3, 2003, WQCD

notified the Colorado District Court that there had been "a successful permit termination

assessment, pursuant to paragraph 14 of the Consent Decree, as well as termination of permits

and Agreement Completion."  (MDL ECF 42-1 at p. 55; *see also* Exhibit 10 of the FPR Defense

MSJ at p. 1, ¶ 2, p. 3, ¶ 2).

25.    Almost all of the Sunnyside Mine Facility acreage subject to the MLR Permit has

been fully remediated and released from the MLR Permit.  At the Mayflower Tailings

Impoundments, although all required final reclamation work was substantially completed by

SGC and approved by Colorado in the early 2000s, and most of this area was subsequently

released from the MLR Permit, SGC continues to hold the MLR Permit with respect to

approximately 64 permitted acres.  Under the MLR Permit, SGC's only continuing obligation is

to perform water quality monitoring at Animas River sites up and downstream of the Mayflower

Tailings Impoundments.  Colorado's continued MLR Permit inspection reports have never raised

any violations or deficiencies in SGC's long-completed remedial action.  (*See* Exhibits 13.a-13.j

of the FPR Defense MSJ).

26.     In 2013, while EPA and Colorado began drafting documents related to the Gold King Mine, Colorado acknowledged the lack of connection between the Sunnyside Mine, the American Tunnel, and the Gold King Mine, and noted that the bulkheads installed as part of the Consent Decree "greatly reduced the volume of discharge from the American Tunnel," with the remaining discharge being "presumably from near-surface groundwater."  (Exhibit 9 at p. 1, ¶¶ 1-2).

27.     In 2015, more than two decades after SGC's remedial action at the Sunnyside Mine Facility was initiated, and more than one decade after the remedial action was substantially completed, EPA and its contractors caused the Blowout at the Gold King Mine.  EPA initially accepted responsibility for the Blowout.  (*See* Exhibit 10 ("EPA takes responsibility for the Gold King Mine release . . . .")).  EPA then pivoted in its approach and "messaging" regarding the Blowout – specifically moving "from 'EPA caused this' to 'this has been a long[-]standing issue of neglect on behalf of many that EPA is trying to fix . . .' while still ensuring that [EPA] own[s] this issue and [is] putting resources towards correcting [it] . . . ."  (Exhibit 11 at p. 1).

28.     On July 1, 2019, the Federal Defendants filed a CERCLA cost recovery claim against SGC in an attempt to require SGC to pay to clean up EPA's mess.  (*See* MDL ECF 192 at pp. 49-78; MDL ECF 195 at pp. 46-75; MDL ECF 200-1 at pp. 31-54).  The basis for liability against SGC in the Federal Defendants' cost recovery claim is focused on the Sunnyside Mine Facility and the remedial action implemented by SGC decades previously.  (*See* MDL ECF 192 at pp. 49-78; MDL ECF 195 at pp. 46-75; MDL ECF 200-1 at pp. 28-51).  The Federal Defendants noted the desire to avoid perpetual treatment and to install bulkheads to "create a vast pool of impounded water."  (MDL ECF 192 at p. 62, ¶ 63).  They then alleged that

13

installation of the bulkheads caused Gold King Mine discharges to increase.  (*Id.* at p. 67, ¶ 77).

Finally, they acknowledged the August 5, 2015 Blowout.  (*Id.* at p. 67, ¶ 82).

29.     The Federal Defendants admitted, and have argued in their pleadings, that the

Sunnyside Mine is its own CERCLA facility, as have Plaintiffs in these matters.  (*See* MDL ECF

195 at p. 55, ¶ 47 (for EPA's definition of "Mining Source Areas"), p. 72, ¶ 126; MDL ECF 192

at p. 33, ¶ 150 (admitting that the Sunnyside Mine is a "facility" within the meaning of CERCLA

§ 101(9)).  The nature and scope of SGC's remedial action directed at that separate facility, as

reflected in the Consent Decree, was tailored to address any Sunnyside Mine Facility

contamination and where any such contamination might come to be located.  (*See* MDL ECF 42-

1 at pp. 7-8, 14-20).

30.     The intent and clear motive behind the Consent Decree and the work done by

SGC—conducted under state and federal supervision for over a decade—was to implement the

final, all-encompassing remedial action for the Sunnyside Mine Facility.  (*See* Exhibit 5 of the

FPR Defense MSJ at p. 1; Exhibit 7 at p. 1, ¶ 1, p. 2, ¶ 2; the Consent Decree generally,

including MDL ECF 42-1 at pp. 5-8*,* 14-16).  The Consent Decree uses the word "final" fifteen

separate times.  (MDL ECF 42-1 at pp. 1-56).  EPA's internal memo on the Consent Decree

described "[p]olicy questions" that had arisen "regarding innovative actions and <u>final mine</u>

<u>closure</u> requirements . . . ."  (Exhibit 7 at p. 1 (emphasis added)).  The "option" EPA ultimately

selected was to "[l]et the Mine take care of it" because "[t]he mine plug will be closed—no

additional environmental clean-up (Sealing of the mine tunnel is considered by most experts to

be the best management practice given certain conditions)."  (*Id.* at p. 3).  The CDPHE press

release issued following entry of the Consent Decree stated, "The agreement, reached after

lengthy negotiations between the parties and involving the Colorado Attorney General's Office,

will permit Sunnyside to <u>permanently close</u> its Sunnyside Gold Mine and plug the American and

Terry Mine Tunnels, which provided access to the mine."  (Exhibit 1 at p. 1 (emphasis added)).

The press release continued, "The agreement was drafted to cover a seven-to-[ten] year period.

When the terms of the agreement are fulfilled and the project completed, Sunnyside will be

released from the terms of its discharge permit issued by the department's Water Quality Control

Division."  (*Id.* at p. 2).

## **ARGUMENT**

### I. **The Federal Defendants' CERCLA cost recovery claim related to the Sunnyside Mine Facility is barred by the statute of limitations.**

The applicable statute of limitations bars the Federal Defendants' cost recovery claim

against SGC related to the Sunnyside Mine Facility.  Pursuant to 42 U.S.C. § 9613(g)(2)(B),

"[a]n initial action for recovery of the costs referred to in section 9607 of this title must be

commenced . . . for a remedial action, within 6 years after initiation of physical on-site

construction of the remedial action . . . ."  "A subsequent action or actions . . . for further

response costs at the vessel or facility may be maintained at any time during the response action,

but must be commenced no later than 3 years after the date of completion of all response

actions."  *Id.*

### A. **SGC conducted a remedial action at the Sunnyside Mine Facility.**

The terms "response" and "remedial action" are terms of art under CERCLA.

"Response" is broadly defined to mean "remove, removal, remedy, and remedial action . . . ."  42

U.S.C. § 9601(25).  "Remedial action" is defined to mean:

> [T]hose actions consistent with permanent remedy taken instead of or in addition
> to removal actions in the event of a release or threatened release of a hazardous
> substance into the environment, to prevent or minimize the release of hazardous
> substances so that they do not migrate to cause substantial danger to present or
> future public health or welfare or the environment.  The term includes, but is not
> limited to, such actions at the location of the release as . . . <u>confinement</u>, . . .

15

> neutralization, cleanup of released hazardous substances and associated contaminated materials, . . . and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment . . . .

42 U.S.C. § 9601(24) (emphasis added).  The bulkheads SGC implemented pursuant to the Consent Decree were precisely designed to "<u>confine</u>" discharges from the Sunnyside Mine Facility within the Sunnyside Mine as part of the final closure of the Sunnyside Mine.  (SUMF at ¶ 8).

As this Court has held, a remedial action "seeks to effect a permanent remedy to the release of hazardous substances."  *Atl. Richfield Co.* ("*ARCO*") *v. U.S.*, 181 F. Supp. 3d 898, 914 (D. N.M. 2016) (quoting *Colorado v. Sunoco, Inc.*, 337 F.3d 1233, 1240 (10th Cir. 2003)); *see also Pub. Serv. Co. of Colorado v. Gates Rubber Co*., 175 F.3d 1177, 1182 (10th Cir. 1999). Unlike a removal action, a "remedial action is generally: designed as a permanent or complete fix; performed not in response to an imminent environmental threat; lengthy; designed to address the root of the problem; and/or designed to address the entire problem."  *Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.,* 934 F.3d 553, 564 (7th Cir. 2019) (citing 42 U.S.C. § 9601(23), (24); *New York v. Next Millennium Realty, LLC*, 732 F.3d 117, 127 (2d Cir. 2013); *U.S. v. W.R. Grace & Co.*, 429 F.3d 1224, 1244-1245 (9th Cir. 2005); *Sunoco*, 337 F.3d at 1240).

The Consent Decree constitutes a remedial action.  It was designed to bring about the "final" closure of the Sunnyside Mine Facility.  (SUMF at ¶ 11).  As the Consent Decree notes, "indefinite or perpetual mine drainage treatment was not desirable for <u>final</u> reclamation and . . . hydraulic seals offer the best alternative for <u>final</u> mine site reclamation.  The DMG approval rationale also stated that the physical setting of the Sunnyside Mine appeared to be ideal for a hydraulic sealing scheme."  (*Id.* (emphasis added)).  The parties to the Consent Decree desired "that reclamation of the Mine proceed to completion" and that SGC be allowed "to proceed with

<u>final</u> reclamation of the Sunnyside Mine, to provide for closure of the American and Terry Tunnels by hydraulic seals, to provide for mitigation of certain other historic mining conditions, to protect the waters of the State of Colorado, and to provide for the <u>final</u> termination of CDPS Permits No. CO-0027529 and CO-0036056 . . . ."  (*Id.* (emphasis added)).

In *ARCO*, a mining company's successor in interest ("Successor Mining Company") brought CERCLA cost recovery claims against the United States for settlement costs the Successor Mining Company paid the Pueblo of Laguna ("Laguna") in relation to Laguna's environmental cleanup of a uranium mine.  *ARCO*, 181 F. Supp. 3d at 901, 913-914.  In ruling on a motion to dismiss filed by the United States, this Court found that Laguna's environmental cleanup efforts constituted a "remedial action" because they "[sought] to effect a permanent remedy to the release of hazardous substances."  *Id.* at 914.  Accordingly, this Court held that the Successor Mining Company was required to file an initial CERCLA cost recovery action within six years after Laguna initiated physical on-site construction of the remedial action.  *Id.*  The Successor Mining Company failed to do so since Laguna initiated the remedial action "sometime around 1986," and the Successor Mining Company's did not file an initial cost recovery action until 2015.  *Id.*  This Court dismissed the Successor Mining Company's cost recovery claims as untimely under 42 U.S.C. § 9613(g)(2)(B).  *Id.*  The same result should apply here.

There is no question that SGC's actions were considered a final, permanent remedy.  The Consent Decree uses the word "final" fifteen times.  (SUMF at ¶ 30).  EPA's internal memo on the Consent Decree described "[p]olicy questions" that had arisen "regarding innovative actions and <u>final mine closure</u> requirements . . . ."  (*Id.* (emphasis added)).  The "option" EPA ultimately selected was to "[l]et the Mine take care of it" because "[t]he mine plug will be closed—<u>no additional environmental clean-up</u> (Sealing of the mine tunnel is considered by most

experts to be the best management practice given certain conditions)." (*Id.* (emphasis added)).

In commenting on the Consent Decree, EPA commended "both the State of Colorado and [SGC]

in [their] innovative approach to problems encountered in <u>final</u> closure of the Sunnyside Gold

Mine[.]" (*Id.* at ¶ 15 (emphasis added)).  The CDPHE press release issued following entry of the

Consent Decree stated, "The agreement, reached after lengthy negotiations between the parties

and involving the Colorado Attorney General's Office, will permit Sunnyside to <u>permanently</u>

<u>close</u> its Sunnyside Gold Mine and plug the American and Terry Mine Tunnels, which provided

access to the mine." (*Id.* at ¶ 30 (emphasis added)).  The press release continued, "The

agreement was drafted to cover a seven-to-[ten] year period.  When the terms of the agreement

are fulfilled and the project completed, Sunnyside will be released from the terms of its discharge

permit issued by the department's Water Quality Control Division." (*Id.*)

     The intent and clear motive behind the Consent Decree and the work done by SGC—

conducted under state and federal supervision for over a decade—was to implement the final, all-

encompassing remedial action for the Sunnyside Mine Facility.  (*See id.*)  Given the several-year

duration of the work, the stated intent to achieve final mine closure, and the several-million-

dollar cost, SGC's work falls squarely within the definition of a remedial action.

    **B.**    <u>**Initiation of physical on-site construction of the remedial action starts the**</u>
<u>**running of the statute of limitations for all parties who incur response costs**</u>
<u>**at the facility.**</u>

    There can be only one remedial action at any given facility for purposes of CERCLA's

cost recovery statutes of limitations.  *Sunoco*, 337 F.3d at 1241.  In *Sunoco*, Colorado brought

CERCLA cost recovery claims against potentially responsible parties ("PRPs") for costs

Colorado incurred in relation to plugging an adit, installing groundwater monitoring wells, and

disposing of hazardous waste at an abandoned gold mine.  *Id.* at 1236-1238.  In deciding a

motion for summary judgment filed by the PRPs, the trial court rejected Colorado's argument

that CERCLA's cost recovery statutes of limitations apply separately to the "operable units" of a response action.  *Id.* at 1240-1241.  On appeal, the Tenth Circuit agreed, finding there can be but one "remedial action" at any given facility and CERCLA's statutes of limitations do not apply separately to the "operable units" of such actions.  *Id.* at 1241.

Because there can be only one remedial action at any given facility, when one party's actions trigger the applicable CERCLA statute of limitations, the statute of limitations begins running for all parties that have or will incur response costs at that same facility.  *See id.*  Such a finding comports with CERCLA's objective of encouraging timely cleanup of contaminated sites, with private parties taking the lead.  *See ARCO*, 181 F. Supp. 3d at 908 (quoting *Burlington N. & Santa Fe Ry. Co. v. U.S.*, 556 U.S. 599, 602 (2009) ("Broadly speaking, CERCLA promotes 'the timely cleanup of hazardous waste sites' and ensures 'that the costs of such cleanup efforts [are] borne by those responsible for the contamination.'")); *Recovery of Costs for CERCLA Response Actions*, 57 FR 34742-01 at *347444 (1992) (Congress intended that private parties take the lead in contaminated site cleanup and related response activities).  By including statutes of limitations in CERCLA's statutory text, Congress "expressed a determination that, in order to achieve timely clean-up of affected sites and to ensure replenishment of the fund, cost recovery actions must commence in a timely fashion."  *U.S. v. Navistar Intern. Transp. Corp.*, 152 F.3d 702, 707 (7th Cir. 1998).

CERCLA's statute of limitations contemplates that remedial actions are long-term and may take years to complete, with some further response costs likely at a later time.  42 U.S.C. § 9613(g)(2).  As a result, the statute allows for subsequent actions to recover further response costs.  *Id.*  However, to protect parties that engage in an early remedial action from being forever subject to unknown future claims, subsequent actions to recover such costs may only be brought

if an initial action was timely filed. *Navistar*, 152 F.3d at 710 ("[A] 'subsequent action' against a party can be brought only after an 'initial action' has been brought against it."). If an initial action is not timely filed, there can be no subsequent action to recover further response costs. *See id.*

Here, the Federal Defendants waited more than two decades after SGC's remedial action at the Sunnyside Mine Facility was initiated, and more than one decade after the remedial action was substantially completed, to file their CERCLA claim against SGC. "A remedial action is supposed to be a final, once-and-for-all cleanup of a site, and once a PRP completes an approved remediation plan, it would not be logical—or fair—to subject that entity to additional CERCLA lawsuits seeking yet additional permanent relief . . . ." *New York State Elec. and Gas Corp.* ("*NYSEG*") *v. FirstEnergy Corp.*, 766 F.3d 212, 236 (2d. Cir. 2014). EPA made a choice back in 1996 at the time the Consent Decree was entered and then again in 2003 when all obligations were complete and the Consent Decree concluded. EPA filed nothing until it caused the Blowout in 2015 and only then sought to have someone else pay for the response.[5]

The Federal Defendants, after applauding SGC's approach and watching as SGC expended millions of dollars effectuating a final, remedial action, waited decades without taking any action against SGC. Regardless of when the Federal Defendants caused the Blowout at the Gold King Mine facility or when they elected to create the BPMD NPL site, the Federal Defendants' cost recovery claim against SGC related to the Sunnyside Mine Facility is barred by the passage of time. 42 U.S.C. § 9613(g)(2)(B).

---

[5] SGC conducted the remedial action pursuant to its MLR Permit, NPDES Permits, Reclamation Plan, and the Consent Decree, as well as in conformance with state and federal laws and applicable mine regulations and reclamation standards. (SUMF at ¶¶ 5-22). The CERCLA statute of limitations is triggered regardless of the fact that SGC's remedial action was not conducted pursuant an express agreement with EPA. *See infra* at pp. 24-26.

C. **SGC's remedial action at the Sunnyside Mine Facility was initiated more than two decades before the Federal Defendants filed their CERCLA cost recovery claim against SGC.**

SGC initiated physical on-site construction of the remedial action in 1991, shortly after SGC ceased its five-year mining and milling activities. (SUMF at ¶¶ 4-5). The remedial action involved installation of bulkheads in the American and Terry Tunnels, as well as watershed-based mitigation work elsewhere at the Sunnyside Mine Facility, including at third-party mines SGC never owned or operated. (*Id.* at ¶¶ 6, 10, 21). SGC spent millions of dollars implementing the remedial action after the approach was blessed by Colorado, BLM, and EPA. (*Id.* at ¶¶ 5-22).

By 2003, SGC's remedial action at the Sunnyside Mine Facility was substantially complete. (*Id.* at ¶ 22). SGC had fulfilled all of the Consent Decree requirements and completed the majority of the remedial work required under the MLR Permit and Reclamation Plan. (*Id.*) SGC submitted construction reports to DMG for the completed work, DMG inspected the work, and DMG never objected to the sufficiency of the work. (*Id.* at ¶ 23). On February 26, 2003, WQCD concluded that SGC's obligations under the Consent Decree had been fully satisfied and, on July 3, 2003, WQCD notified the Colorado District Court that there had been "a successful permit termination assessment, pursuant to paragraph 14 of the Consent Decree, as well as termination of permits and Agreement Completion." (*Id.* at ¶ 24). Almost all of the formerly permitted Sunnyside Mine Facility acreage which was subject to SGC's MLR Permit has been released from the MLR Permit. (*Id.* at ¶ 25). SGC's only continuing obligation under the MLR Permit is to perform water quality monitoring at Animas River sites up and downstream of the Mayflower Tailings Impoundments, which monitoring, to date, has never raised any violations or deficiencies in SGC's long-completed remedial action. (*Id.*)

In 2015, more than two decades after SGC's remedial action at the Sunnyside Mine Facility was initiated, and more than one decade after the remedial action was substantially completed, EPA and its contractors caused the Blowout at the Gold King Mine.  (*Id.* at ¶ 27).  In 2019, the Federal Defendants belatedly filed a CERCLA cost recovery claim against SGC.  (*Id.* at ¶ 28).  The Federal Defendants' cost recovery claim against SGC is focused on the Sunnyside Mine Facility and the remedial action implemented there decades previously.  (*Id.*)  The Federal Defendants' complaint against SGC acknowledges the desire to avoid perpetual treatment and to install bulkheads to "create a vast pool of impounded water."  (*Id.*)  The Federal Defendants next allege that installation of the bulkheads caused Gold King Mine discharges to increase.  (*Id.*)  Finally, they discuss the August 5, 2015 Blowout.  (*Id.*)  EPA's complaint with SGC is tied to the bulkheads that SGC implemented as part of the final remedial action called for by the Consent Decree.  (*Id.*)

Regardless of when the Blowout occurred, or when EPA made the decision to list the area on the NPL, because an initial CERCLA cost recovery action was not filed by the Federal Defendants within six years of initiation of SGC's remedial action at the Sunnyside Mine Facility, the Federal Defendants' CERCLA cost recovery claim is now time-barred.  42 U.S.C. § 9613(g)(2)(B).  Requiring SGC to fund the cleanup of the EPA-caused Blowout years after SGC's long-completed remedial action at the Sunnyside Mine Facility is statutorily precluded and would be both fundamentally unfair and unjust.  *See id.*

An element of every CERCLA cost recovery claim is establishing that the site is a "facility" as defined in 42 U.S.C. § 9601(9).  *FMC Corp. v. Aero Industries, Inc.*, 998 F.2d 842, 845 (10th Cir. 1993) (citing *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 668 (5th Cir.1989)).  CERCLA defines a "facility" to include "any site or area where a hazardous substance has been

deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9). Although there is significant overlap in the definitions, a "site" can include multiple "facilities" for purposes of the CERCLA cost recovery statute of limitations.

Given the over 100,000 acres and separate and distinct mines, sources, and geography encompassed in the region, the BPMD includes more than one facility. *See, e.g., Union Carbide Corp. v. Thiokol Corp.*, 890 F. Supp. 1035, 1043 (S.D. Ga. 1994). The Federal Defendants admitted, and have argued in their pleadings, that the Sunnyside Mine is its own CERCLA facility, as have Plaintiffs in these matters. (SUMF at ¶ 29). The nature and scope of SGC's remedial action directed at that separate facility, as reflected in the Consent Decree, was tailored to address any Sunnyside Mine Facility contamination and where any such contamination might come to be located. (*Id.*) Because the Federal Defendants failed to bring an initial action against SGC within the first six years after initiation of the on-site construction of the remedial action at the Sunnyside Mine Facility, they are barred from doing so now. 42 U.S.C. § 9613(g)(2)(B).

## II.    The fact that SGC's remedial action was not conducted under CERCLA is immaterial to the statute of limitations analysis.

"Waste sites subject to CERCLA include virtually any place where hazardous substances are located." *Wason Ranch Corp. v. Hecla Mining Co.*, 2008 WL 906110, at *3 (D. Colo. 2008). Because CERCLA represents "a floor, not a ceiling," CERCLA "preserves the right of a state or other party to proceed under applicable state law to conduct a cleanup of a site affected by hazardous substances." *New Mexico v. Gen. Elec. Co.*, 467 F.3d 1223, 1246 (10th Cir. 2006). The "overwhelming evidence is that Congress intended CERCLA to be cumulative" and for CERCLA not to be "limited in its application to formally designated Superfund sites." *Id.* (internal quotations omitted). As a result, a federally authorized cleanup program is not a prerequisite to bringing an action under CERCLA and remedial actions undertaken pursuant to

state and federal laws other than CERCLA can still trigger CERCLA's statutes of limitations. *See Calmat Co. v. San Gabriel Valley Gun Club*, 809 F. Supp. 2d 1218, 1222 (C.D. Cal. 2011) ("The court acknowledges a governmentally authorized cleanup program is not a prerequisite to a private action under Section 107(a) of CERCLA.").

SGC's remedial action at the Sunnyside Mine Facility was undertaken in accordance with its MLR Permit, NPDES Permits,  Reclamation Plan, and the Consent Decree.  (SUMF at ¶¶ 5-22).  While the Consent Decree and some of SGC's permits were state sanctioned, the NPDES permit was issued pursuant to delegated federal authority.  Moreover, Colorado and its regulatory agencies provided for and received extensive comments on the remedial action from various federal agencies.  (*Id.* at ¶¶ 7, 9, 12-19).  EPA praised the remedial action, including the bulkheading of the Sunnyside Mine, commending "both the State of Colorado and [SGC] in [their] innovative approach to problems encountered in final closure of the Sunnyside Gold Mine."  (*Id.* at ¶ 15).  Furthermore, while the MLR Permit and Reclamation Plan were administered by Colorado's mining and reclamation agencies, subject to regulation by WQCD for water discharges, including Consent Decree discharges, federal agencies were also involved. (*Id.* at ¶¶ 5-8).  For activities undertaken by SGC on BLM-owned lands, the MLR Permit served as BLM's required plan of operations, BLM's regulations applied to SGC's operations, and BLM had to affirmatively approve SGC's activities.  (*Id.* at ¶ 2).  SGC remediated the Sunnyside Mine Facility pursuant to both state and federal regulation and oversight, and SGC's remedial action is sufficient to trigger CERCLA's statutes of limitations.  (*See id.* at ¶¶ 5-22).

Despite their familiarity and involvement with SGC's remedial action at the Sunnyside Mine Facility, the Federal Defendants did not file an initial CERCLA cost recovery action within six years of initiation of the remedial action as required by 42 U.S.C. § 9613(g)(2)(B).  (*Id.* at ¶

28).  The Federal Defendants' CERCLA cost recovery claim against SGC is, therefore, now time-barred, and SGC should be granted summary judgment dismissing this claim.  42 U.S.C. § 9613(g)(2)(B).

## **CONCLUSION**

SGC's remedial action at the Sunnyside Mine Facility was authorized under applicable state and federal law and approved by the Colorado District Court and various Colorado environmental and mining regulatory boards and agencies, following extensive review, consideration, and comment by EPA and BLM.  Physical on-site construction of the remedial action was initiated in 1991 and substantially completed by 2003.  The Federal Defendants' CERCLA cost recovery claim against SGC was not filed until 2019.  Based on the six-year statute of limitations set forth in 42 U.S.C. § 9613(g)(2)(B), the Federal Defendants' CERCLA cost recovery claim against SGC is time-barred.  The Court should therefore enter partial summary judgment in favor of SGC and dismiss the Federal Defendants' cost recovery claim.


Dated this 28th day of May, 2021.

Respectfully submitted,

CROWLEY FLECK PLLP

By /s/ *Neil G. Westesen*

Neil G. Westesen (*admitted pro hac vice*)
1915 South 19th Street
PO Box 10969
Bozeman, MT 59719-0969
Telephone: (406) 556-1430
Facsimile: (406) 556-1433
*nwestesen@crowleyfleck.com*

Jeffery J. Oven (*admitted pro hac vice*)
Pamela C. Garman (*admitted pro hac vice*)
490 North 31st Street, Suite 500

PO Box 2529
Billings, MT 59103-2529
Telephone: (406) 252-3441
Facsimile: (406) 252-5292
*joven@crowleyfleck.com*
*pgarman@crowleyfleck.com*

**Attorneys for Defendant Sunnyside Gold
Corporation**

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of May, 2021, the foregoing was filed via the U.S. District Court of New Mexico's CM/ECF electronic filing system and a copy thereof was served via the CM/ECF upon all counsel of record.

/s/ *Neil G. Westesen*
Neil G. Westesen

## EXHIBIT INDEX

1. Press Release from CDPHE, *Health Department and Sunnyside Gold Agreement Designed to Protect Water Quality in Animas River Basin Near Silverton* (Feb. 16, 1996) *(SGCDOC155290-94)*

2. Public notices regarding SGC's TR-14 bulkheading submittal

    a. *Public Notice*, SILVERTON STANDARD, at p. 11 (Sept. 23, 1993) *(USA_001016108)*

    b. Letters from SGC to BLM and the San Juan County Commissioners (Sept. 21, 1993) *(USA_001016117-122)*

3. Regional news articles regarding the proposed Consent Decree *(SGCDOC226429-226445)*

    a. Associated Press, *Mine owners, state reach agreement – firm will plug mines, help clean Animas River,* ROCKY MOUNTAIN NEWS, at p. 18a (Feb. 17, 1996)

    b. *Animas River pact reached,* DENVER POST, at p. 6B (Feb. 17, 1996)

    c. Jeanie Stokes for Bloomberg Business News*, Echo Bay strikes deal on mine cleanup*, DENVER POST, at p. 6B (Feb. 17, 1996)

    d. Electa Draper, *Upper Animas plan first of its kind – Mining co., state reach cleanup compromise*, DURANGO HERALD, at pp. 1 and 12A (Feb. 18, 1996)

4. *Notice of Lodging of Proposed Consent Decree and Order in re: Sunnyside Gold Corp. v. Colorado WQCD-CDPHE* (Case No. 94 CV 5459) (Feb. 29, 1996) *(SGCDOC246396-97)*

5. ARSG*, Draft Summary of Animas Stakeholders Group Meeting,* at p. 1 (Mar. 14, 1996) ("Public Meeting – Sunnyside Gold/WQCD Agreement") *(SGCDOC117538-40)*

    a. Accepted by ARSG at its 4/25/96 meeting  *(USA_000273183)*

6. Fax Transmittal from Rob Robinson, BLM Mineral Resources, to Greg Parson, CDPHE-WQCD (Mar. 12, 1996) *(SGCDOC155294-95)*

7. EPA, Internal Memorandum re: Sunnyside Gold Corporation – Animas Basin *(Exhibit 953 Mahmud, USA_000282548-50)*

8. Letter from Calvin N. Joyner, BLM Area Manager, to Larry Perino, SGC, re: Permission to access public lands under BLM jurisdiction for proposed remediation (May 29, 1996) *(SGCDOC097610)*

9.  Email from Kirstin Brown, Colorado DRMS, to Dan Wall, EPA, re: Upper Animas SLERA (Feb. 21, 2013) *(Exhibit 745, USA_000963904-05)*

10. EPA, *Emergency Response to August 2015 Release from Gold King Mine* (available at: https://www.epa.gov/goldkingmine, last visited May 11, 2021)

11. Email from Nitin Natarajan, EPA, to Mathy Stanislaus, EPA, Barry Breen, EPA, and Reggie Cheatham, EPA (Aug. 8, 2015) *(Exhibit 944 Mahmud, ER_EPA00329795-96)*