IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

IN RE: GOLD KING MINE RELEASE
IN SAN JUAN COUNTY, COLORADO,                            No. 1:18-md-02824-WJ
ON AUGUST 5, 2015

*This Document Relates to All Cases*

## MEMORANDUM OPINION AND ORDER
## DENYING THE MOTION FOR PARTIAL SUMMARY JUDGMENT ON
## WESTON SOLUTIONS, INC. AND ENVIRONMENTAL RESTORATION LLC'S
## GOVERNMENT CONTRACTOR DEFENSE

Environmental Restoration ("ER") and Weston Solutions, Inc. ("Weston"), both of which were EPA contractors at the Gold King Mine, previously filed motions to dismiss the tort claims against them based on the government contractor defense. *See* Doc. 1114, filed February 19, 2021; Doc. 1220, filed May 28, 2021.

To establish the government contractor defense, a contractor must show: (i) the case involves "uniquely federal interests;" (ii) a "significant conflict exists between an identifiable federal policy or interest and the operation of state law;" and (iii) the contractor's actions fall within the "scope of displacement." *Boyle v. United Technologies Corp.*, 487 U.S. 500, 504, 507, 512 (1988).  A contractor's actions fall within the scope of displacement if: (i) "the United States approved reasonably precise specifications;" (ii) the contractor "conformed to those specifications;" and (iii) the contractor "warned the United States about the dangers" known to the contractor but not to the United States." *Boyle v. United Technologies Corp.*, 487 U.S. at 512.

The Court denied ER and Weston's motions to dismiss:

> because there is a dispute as to whether their actions fall within the "scope of displacement" which requires that "the United States approved reasonably precise specifications" and ER and Weston "conformed to those specifications" ... It appears that there were two sets of specifications for work at the Gold King Mine. The first set of specifications ... included tasks that were developed and approved prior to August 4, 2015, when Mr. Way was the OSC [On-Scene Coordinator] Site

> for Gold King Mine. The second set of specifications includes instructions that OSC Hays Griswold provided to ER and Weston on August 4-5, 2015, during work at the Gold King Mine.
> ....
>
> There is a dispute as to whether ER and Weston conformed to EPA's first set of specifications [because OSC Griswold testified that ... he "devised a plan that was completely separate from anything in a work plan ..."saw the work plan ... threw it out ... and from there ... directed [ER] and [Weston] on what to do."
>
> Regarding the second set of specifications, there is a dispute as to whether "the United States approved reasonably precise specifications." The second set of specifications are the instructions OSC Griswold gave to ER and Weston when he directed their work at the Gold King Mine on August 4-5, 2015, and do not appear to be reasonably precise specifications approved by the United States.

Doc. 1437 at 3-4, filed January 31, 2022.

Plaintiffs the Navajo Nation, State of New Mexico, the *Allen* Plaintiffs and the McDaniel Plaintiffs now move for summary judgment contending that "[t]he undisputed facts establish that the Contractors will be unable to prove several required elements of their [government contractor defense]." Navajo Nation, State of New Mexico, and *Allen* Plaintiffs' Motion for Partial Summary Judgment on Weston Solutions, Inc. and Environmental Restoration LLC's Government Contractor Defense, Doc. 1499, filed March 7, 2022 ("Motion"); *McDaniel* Plaintiffs' Notice of Joinder; Doc. 1507, filed March 10, 2022 (collectively "Plaintiffs"). Plaintiffs argue that ER and Weston cannot show that: (i) there is a significant conflict between federal and state law in holding them liable for their negligence; (ii) they were working from reasonably precise specifications approved by EPA; and (iii) they warned OSC Griswold of dangers known to them but not to him. The Court denies the Motion because ER and Weston have shown that there are genuine disputes of material fact regarding the existence of a significant conflict between federal and state law, whether ER and Weston were working from reasonably precise EPA-approved specifications and whether ER and Weston were aware of dangers not known to EPA and OSC Griswold.

**Significant Conflict**

Plaintiffs assert that ER and Weston cannot rely on the application of the discretionary function exception to show a significant conflict exists between federal and state law.

The United States Supreme Court discussed the discretionary function exception and whether there was a significant conflict between the operation of federal law and state tort law in a wrongful death action brought against an independent contractor who supplied military helicopters to the United States:

> There is, however, a statutory provision that demonstrates the potential for, and suggests the outlines of, "significant conflict" between federal interests and state law in the context of Government procurement. In the FTCA, Congress authorized damages to be recovered against the United States for harm caused by the negligent or wrongful conduct of Government employees, to the extent that a private person would be liable under the law of the place where the conduct occurred. 28 U.S.C. § 1346(b). It excepted from this consent to suit, however,
>
>> "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). ["discretionary function exception"].
>
> We think that the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function within the meaning of this provision. It often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness. And we are further of the view that permitting "second-guessing" of these judgments, see *United States v. Varig Airlines,* 467 U.S. 797, 814, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1984), through state tort suits against contractors would produce the same effect sought to be avoided by the FTCA exemption. The financial burden of judgments against the contractors would ultimately be passed through, substantially if not totally, to the United States itself, since defense contractors will predictably raise their prices to cover, or to insure against, contingent liability for the Government-ordered designs. To put the point differently: It makes little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production. In sum, we are of the view that state law which holds Government contractors liable for design defects in military equipment does in some

circumstances present a "significant conflict" with federal policy and must be displaced.

Boyle, 487 U.S. at 511-12.

To determine whether conduct falls within the discretionary function exception, the Court applies the two-part test set forth by the Supreme Court in *Berkovitz v. United States,* 486 U.S. 531, 536 (1988).

> First, we ascertain the precise governmental conduct at issue and consider whether that conduct was "discretionary," meaning whether it was "a matter of judgment or choice for the acting employee." *Berkovitz,* 486 U.S. at 536, 108 S.Ct. 1954. Conduct is not discretionary if "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive." *Id.*
>
> If the first element of the *Berkovitz* test is satisfied, we then consider the second element—whether the decision in question is one requiring the exercise of judgment based on considerations of public policy. *Id.* at 536–37, 108 S.Ct. 1954. In so doing, we do not consider the employee's "subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *United States v. Gaubert,* 499 U.S. 315, 325, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991).
>
> If both the first and second elements of the *Berkovitz* test are met, the discretionary function exception to the waiver of sovereign immunity applies. Stated another way, if a plaintiff can establish that either element is not met, the plaintiff may proceed because the exception does not apply. *Sydnes v. United States,* 523 F.3d 1179, 1183 (10th Cir.2008).

*Garcia v. U.S. Air Force*, 533 F.3d 1170, 1176 (10th Cir. 2008). "[A] government agent's discretionary actions are [presumed to be] grounded in policy, and it is up to the challenger to allege facts showing that the actions were actually not policy-oriented." *Hardscrabble Ranch, L.L.C. v. United States*, 840 F.3d 1216, 1222 (10th Cir. 2016) (citing *United States v. Gaubert*, 499 U.S. 315 (1991).

The discretionary function exception generally applies when the United States determines how:

4

> to go about containing the spread of contamination before further damage could occur while still protecting public health[, which] touche[s] on policy choices, not the least of which involved the "translation" of CERCLA's general health and safety provisions into "concrete plans." *Allen,* 816 F.2d at 1427 (McKay, J., concurring). This type of "translation involve[s] the very essence of social, economic, and political decisionmaking—the precise policy choices protected by the discretionary function exception." *Id.* The administrator must balance overall priorities—in this case the need for a prompt cleanup and the mandate of safety—with the realities of finite resources and funding considerations. *Id.* (citing *Varig Airlines,* 467 U.S. at 820, 104 S.Ct. at 2767). *See also The Law of Hazardous Waste* § 12.03[4][a] (discussing general principles underlying CERCLA, including prompt cleanup of waste sites, protection of human health and the environment). We are not permitted to "second-guess" that policy determination.
> ....
>
> When government agents are authorized to exercise discretion in carrying out established government policy, such as the policies underlying CERCLA response actions, the exercise of that discretion is presumed to be grounded in policy. *See Gaubert,* 499 U.S. at ––––, 111 S.Ct. at 1274. To overcome this presumption, a plaintiff "must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." *Id.* 499 U.S. at ––––, 111 S.Ct. at 1274–75.

*Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1541-42 (10th Cir. 1992); *see also Johnson v. U.S. Dep't of Interior*, 949 F.2d 332, 340 (1991) ("a decision that is a component of an overall policy decision protected by the discretionary function exception also is protected by this exception").

Plaintiffs argue that ER and Weston cannot rely on the discretionary function exception to establish that there is a significant conflict between federal and state law in holding them liable for their negligence because the discretionary function exception does not apply to EPA's conduct at the Gold King Mine. *See* Motion at 22.

> ER and Weston's contracts with EPA required their work be done pursuant only to certain approved documents, and OSC Griswold's directions to ER and Weston on August 4 and 5, 2015—which ultimately caused the Blowout—were not issued pursuant to any documents, much less those required by EPA's contracts. Thus, the DFE cannot apply.
>
> The ERRS [Emergency and Rapid Response Services] contract provides that ER's "[p]erformance of the response services in this contract shall be made only as authorized by Task Orders," that EPA OSCs "do not have authority to modify" the

5

contract or tasks orders, and "[a]ny request for deviation" from the contract or tasks orders must be submitted to EPA's Contracting Officer for approval. (UMF 2.) Similarly, Weston's START [Superfund Technical Assessment and Response Team] contract provides that work will be conducted pursuant to tasks orders, and "[s]ite specific work" will then be assigned via TDDs [technical direction document] issued by EPA OSCs. (UMF 12.) TDDs "must be within the scope" of the task order and approved by EPA's Contracting Officer. (Id.) ER's Task Order provided, among other things, that all work had to be performed "under the conditions as described in an approved Work Plan." (UMF 6.) Similarly, Weston's Task Order reflects the START contract's mandate that EPA must issue orders pursuant to TDDs. (UMFs 12 & 15.) The ERRS and START contracts allow for the issuance of verbal task orders or TDDs, respectively, only in emergencies, and it is undisputed that there was no emergency at the Gold King Mine prior to the Blowout. (UMFs 3 & 13.) Both contracts also prohibit the OSC from issuing technical direction to the Contractors that "institutes additional work outside the scope" the contracts, task orders, or TDDs, or that changes any of the terms and conditions of such documents. (UMFs 4 & 14.) Technical direction must be in writing or confirmed in writing. (Id.)

Flouting these requirements, OSC Griswold verbally directed ER and Weston to conduct work on August 4 and 5, 2015 from a "new plan" that existed only "in [his] head." (UMFs 24– 27.) OSC Griswold's new plan was "completely separate from anything in a work plan or anything in an e-mail from Steve Way." (UMF 24 (emphasis added); see also UMF 26 (Mr. Petri testifying that OSC Griswold's plan was not "memorialized" in any "site plan document").) Indeed, OSC Griswold agreed that he "threw [] out" the Work Plan that ER prepared with input from Weston. (UMFs 19 & 24.) OSC Griswold made the rash decision to throw out the Work Plan "within minutes" of arriving, even though he had not done "any research" into the conditions at the Gold King Mine, had not "participated in planning the investigation in any form," and had not reviewed "any plans about the work." (UMFs 23 & 24.) OSC Griswold did not think he needed to direct work from any "written plan" because—though both Weston and ER's task orders were for removal action support—he "was not doing the removal action," but rather an investigation which, according to him, did "not require a written plan approved by anybody." (UMFs 1, 11, 25.)

OSC Griswold's testimony was not mere rhetoric—his direction of ER and Weston's work on August 4 and 5, 2015 deviated from their approved plans and tasking. For example, OSC Griswold's decision to throw out the Work Plan directly violated ER's Task Order, which required work to be conducted only pursuant to an approved work plan. (UMF 6.) OSC Griswold was not directing work pursuant to the Work Plan but instead was executing his "new plan" to "remove the material in front of the blockage" and "remove the material from the bedrock above the blockage." (UMF 27.) Specifically, OSC Griswold directed ER to complete work that the Work Plan contemplated would only occur after HW's arrival, and without any of the precautions—such as gradually dewatering the blockage and hanging

6

> wire mesh—called for by the Work Plan and mandated by ER's Task Order. (UMFs 18 & 27.) Despite OSC Griswold's divergence from ER's Task Order and Work Plan, ER's personnel pledged absolute fealty to OSC Griswold and followed his every order on August 4, and 5, 2015. (UMF 26.) Similarly, there is also no evidence that OSC Griswold was familiar with—much less directing Weston from—an EPA-approved TDD or SAP, yet Weston also followed his every order.4 (UMFs 23–26.)
>
> Accordingly, given the undisputed evidence that OSC Griswold's directions to ER and Weston were untethered to any written document, and contrary to ER's Task Order, the DFE cannot apply to shield EPA from OSC Griswold's reckless behavior.

Motion at 24-26.

ER cites to portions of the record which indicate that the discretionary function exception may apply to EPA regarding OSC Griswold's instructions to ER.  OSC Griswold testified that the goal of the work on August 4-5, 2015, at the Gold King Mine was not to remove the blockage and dewater the mine, the goal was:

> to remove the loose dirt, expose the blockage and the bedrock above in order for the people coming on the 14th [of August] ... to assess the situation and come up with ideas of how to approach the mine opening ... to assess ... the approach to opening the mine ... remove the material in front of—the loose material in front of the blockage and the material over the blockage back to bedrock to be inspected ... [OSC Griswold's plan was based on his belief that] the adit[1] was full and it required a very careful approach to expose both the blockage and the bedrock above.

Doc. 1113-9 at 2-5. OSC Griswold also testified that such "[i]nvestigations do not require a written plan approved by anybody." Doc. 1499-4 at 13. OSC Griswold directed ER to remove dirt and debris from various spots, which ER did. *See* ER Response at 15. ER's contract with EPA allows for technical direction if it is "within the contract and the delivery order, work assignment or technical direction document [TDD] statement of work" and "assists the Contactor in accomplishing the Statement of Work." Doc. 1499-2 at 2. "[O]nce the TDD has been issued the

---

[1] "An 'adit' is a horizontal passage into a mine." *Allen* Plaintiffs' Second Amended Complaint at 103, ¶ 322, Doc. 445, filed January 21, 2020.

7

OSC can ... use verbal technical direction to clarify any ambiguity in the TDD ... ER's contract also authorized the OSCs to direct and coordinate the execution of [Task Orders]." Doc. 1534-3 at 4. Removing the material from in front of the blockage was consistent with ER's Work Plan which states "site preparations will occur," and ER "will support [Harrison Western] by providing earth moving equipment, operators and laborers as necessary for outside operations" and "excavate to the sill and into the competent rock face at the portal." Doc. 1149-8 at 2-3.

Weston cites the declaration of Elliott Petri, who was the only Weston employee present at the Gold King Mine site on August 4-5, 2015, which indicates that the discretionary function exception may apply to EPA regarding OSC Griswold's instructions to Weston. Mr. Petri's declaration, portions of which are quoted below, states that his actions were consistent with Weston's prior-approved tasking documents and that OSC Griswold's instructions were not inconsistent with and did not expand the scope of work in Weston's prior-approved tasking documents. *See* Weston Response at 15-16, ¶¶ F, G, N.

**Reasonably Precise Specification Approved by EPA**

> Plaintiffs assert:
>
> the Contractors cannot show that they were working from reasonably precise specifications approved by EPA. It is undisputed that EPA's contracts with ER and Weston required OSCs to direct work pursuant only to certain documents approved by EPA officials, and it is undisputed that OSC Griswold was directing work untethered to any documents, much less those documents required by EPA's contracts with ER and Weston.
> ....
>
> There is no dispute that OSC Griswold ditched the first set of specifications, devised a new plan, and directed ER and Weston pursuant to that new plan ...Nor is there any dispute that OSC Griswold's direction of ER and Weston deviated from the first set of specifications.

Motion at 6-7, 28-29.

As discussed in the preceding section, ER has cited to portions of the record which indicate that OSC Griswold's instructions to remove loose material from in front of the blockage was consistent with the Work Plan and that the contract permitted OSC Griswold to issue technical directions that are within the contract and the delivery order, work assignment, or technical direction document statement of work.

Weston cites the declaration of Elliott Petri who "was the only employee of Weston Solutions, Inc., present at the Gold King Mine site on August 4-5, 2015." Weston Response at 15-16, ¶¶ F, G, N. Mr. Petri made the following declarations regarding whether Weston was working from reasonably precise specification approved by EPA:

> 8.  After Mr. Griswold mobilized to the site on August 4, 2015, he did not communicate to me any directions or instructions that I understood to be new technical direction altering supplementing, or expanding the tasking and scope of work Weston had at the site...
> ....
>
> 10. I do not recall that Mr. Griswold gave me any specific instructions on August 4-5, 2015, concerning the water management system. I understood that the plan with respect to water management was unchanged...
> ....
>
> 15. I do not recall that Mr. Griswold gave me any instructions or directions on August 4-5, 2015, that were inconsistent with the Technical Direction Document No. 0001/1408-01 and the Sampling and Analysis Plan dated July 10, 2015. All of my activities during that period were consistent with my understanding of Weston's prior-approved tasking documents.

Response Ex. 2.

**Warning the United States about Dangers**

> Plaintiffs assert:
>
> the Contractors cannot prove that they warned OSC Griswold of dangers known to them but not to him. Despite OSC Griswold's complete lack of knowledge of the 2014 work, site conditions and plans, the Contractors made no effort to evaluate his knowledge or adequately inform him of site-specific risks before the jointly triggered the Blowout. Instead, the Contractors executed every word of OSC

9

> Griswold's "new plan," contradicting the lessons of the 2014 work, including that they needed to dig higher than they did the year before and ensure that water management systems were in place before excavating.
> ....
>
> Incredibly, there is no evidence that either of the Contractors made *any* effort to educate OSC Griswold. For example, though the Contractors were each on site in 2014, ER and Weston's personnel did not inform OSC Griswold that work was stopped after excavation in the adit face resulted in more water draining from the mine than the team could safely handle. Nor did the Contractors inform OSC Griswold of the unanimous conclusions reached by everyone, including the Contractors, after the 2014 work: they had to dig higher in 2015, and water management systems—including the ability to pump water from behind the blockage—had to be in place before excavation into the adit face occurred. Instead, the Contractors recklessly followed OSC Griswold without question ...[and] went along even when OSC Griswold contradicted the lessons from 2014 and disregarded dangers known to the Contractors: namely, the danger that excavating too low before pumping water from behind the blockage could cause a blowout.

Motion at 7, 30-31 (emphasis in original).

ER and Weston have cited to portions of OSC Griswold's deposition testimony indicating OSC Griswold knew about the danger of excavating too low before pumping water from behind the blockage. OSC Griswold testified that: (i) he "assume[d] that the adit was full" of water; (ii) he assumed the water "was under pressure;" and (iii) he "decided it was possible to remove the loose dirt and expose the bedrock because the dirt was loose, unconsolidated, and could be removed without impacting the blockage of the adit." ER Response at 15 (citing Ex. A); Weston Response at 16, 26 (citing Ex. 6 and Ex. 7).

**Conclusion**

ER and Weston have shown that there are genuine disputes of material fact regarding the existence of a significant conflict between federal and state law, whether ER and Weston were working from reasonably precise EPA-approved specifications and whether ER and Weston were aware of dangers not known to EPA and OSC Griswold. Accordingly, the Navajo Nation, State of New Mexico, and *Allen* Plaintiffs' Motion for Partial Summary Judgment on Weston Solutions,

10

Inc. and Environmental Restoration LLC's Government Contractor Defense, Doc. 1499, filed March 7, 2022, is **DENIED.**

    **IT IS SO ORDERED.**

*/s/ William P. Johnson*
**WILLIAM P. JOHNSON**
**CHIEF UNITED STATES DISTRICT JUDGE**