IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

IN RE: GOLD KING MINE RELEASE
IN SAN JUAN COUNTY, COLORADO,                              No. 1:18-md-02824-WJ
ON AUGUST 5, 2015

*This Document Relates to All Cases*

### MEMORANDUM OPINION AND ORDER GRANTING IN PART PLAINTIFFS' MOTION TO EXCLUDE CERTAIN OPINIONS OF JOHN S.L. MORGAN

John S.L. Morgan "is a mining consultant with extensive experience in both surface and underground mining," "has a degree in Mining Engineering from the Royal School of Mines at the University of London," and "has been the project manager on a number of mine technical reviews, mining operation appraisals, subsidence investigations, and reviews of the environmental compliance and liability analyses for both operational and abandoned mines worldwide, including all regions of the United States." United States' Response at 5, Doc. 1716, filed July 15, 2022.

The United States, Environmental Restoration ("ER") and Weston Solutions, Inc. ("Weston") (collectively "Defendants") retained Mr. Morgan "to review information and provide expert witness services related to the facts of this case within the areas of Mr. Morgan's expertise, including mining reclamation practices." Response at 5-6.

> Mr. Morgan expressed the following opinions in his initial report, dated July 2021, regarding the claims brought against the United States, ER, and Weston:
>
> EPA and its contractors were not unreasonable in their approach to the site preparation activities conducted in late July and early August 2015.
>
> The EPA personnel and contractors on site were experienced with abandoned mine evaluation and reclamation and had specific experience in the region and the type of mine.
>
> Drilling into the Gold King mine Level 7 adit[1] to test for water elevation would have been hazardous, technically difficult, and would have created environmental impacts from any construction of access roads, due to the steep and unstable slopes above the Level 7 portal.

---

[1] "An 'adit' is a horizontal passage into a mine." *Allen* Plaintiffs' Second Amended Complaint at 103, ¶ 322, Doc. 445, filed January 21, 2020.

> The blockage on the Gold King Level 7 east portal existed before any Colorado DRMS activity in 2008/2009. The DRMS activity consisted of the placement of unconsolidated backfill and the installation of two pipes. This work was not intended to create a bulkhead. If the elevation of the water in the Gold King Mine continued to increase over time, then it is probable that the initial Level 7 blockage would have failed irrespective of any DRMS or EPA site activity.
>
> The Gold King landowner had knowledge of the condition of the Level 7 East Portal and had proposed to reopen this portal in 2007. His failure to complete the proposed work resulted in the conditions continuing through to 2015.

Response at 6. Mr. Morgan also issued a rebuttal report responding to the opinions of Plaintiffs' experts Adrian Brown and David Lipson that "were critical of the work of EPA and its contractors at the Gold King Mine." Response at 7.

The State of New Mexico, the Navajo Nation and the *Allen* Plaintiffs (collectively "Plaintiffs") seek to exclude certain opinions of Mr. Morgan because:

(i) Mr. Morgan is not qualified to:

(a) opine regarding On Scene Coordinators' ["OSC"] authority;

(b) rebut Dr. Lipson's groundwater flow model; and

(c) offer opinions regarding the video animation submitted with his report.

(ii) Mr. Morgan's dichotomy between "not unreasonable" and "reasonable" is unreliable and impermissibly attempts to instruct the fact finder regarding the appropriate legal standard.

(iii) Mr. Morgan's opinion that EPA and its contractors "had no intent to reopen" the Gold King Mine is impermissible.

(iv) Mr. Morgan's opinion that EPA and its contractors had "no reason to believe" that water exceeded the height of the top of the portal is contradicted by the record.

(v) Mr. Morgan's opinion that a "void" existed between what EPA and its contractors removed and the "original blockage" is speculative.

2

*See* The Navajo Nation, State of New Mexico, and *Allen* Plaintiffs' Motion to Exclude Certain Opinions of Defendants' Expert John S.L. Morgan at 2, Doc. 1678, filed June 17, 2022.

None of the Parties requested that the Court set a *Daubert* hearing prior to ruling on this Motion.

**Admission of Expert Testimony Under Rule 702**

Rule 702, which governs testimony by expert witnesses, provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

**(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

**(b)** the testimony is based on sufficient facts or data;

**(c)** the testimony is the product of reliable principles and methods; and

**(d)** the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Federal Rule of Evidence 702 requires the district court to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597, 113 S.Ct. 2786. Under Rule 702, the court must first decide whether the proffered expert is qualified "by knowledge, skill, experience, training, or education" to render an opinion. *See* Fed. R. Evid. 702. Then "the court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology, as set forth in *Daubert*." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc).

*Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 770 (10th Cir. 2019).

**Expert Qualifications**

To perform its gatekeeping function, the Court generally takes two steps. First, it determines whether the expert is qualified by "knowledge, skill, experience, training, or education" to render an opinion. *See* Fed. R. Evid. 702. The second step is to decide whether the expert's opinions are sufficiently reliable and will be helpful to the trier of fact. *See* Fed. R. Evid. 702.

Plaintiffs challenge Mr. Morgan's qualifications to opine regarding OSCs' authority, to rebut Dr. Lipson's groundwater flow model, and to opine regarding the video animation submitted with his report.

OSCs' Authority

Plaintiffs assert that Mr. Morgan intends to offer opinions at trial regarding the authority of EPA's OSCs such as: (i) "EPA and EPA subcontractors, with EPA's agreement, had *the authority to modify* the plan as site conditions were further understood during field activities;" (ii) "I believe Mr. Griswold, as the OSC, had the responsibility – the *authority and responsibility* to prepare the site for the August 14 [review];" and (iii) "My answer is *Mr. Griswold had the authority* as the OSC to make decisions, based on the site conditions." Motion at 10 (emphasis in original).

Plaintiffs argue that Mr. Morgan's opinions regarding the OSCs' authority should be excluded because Mr. Morgan testified in his deposition that he "has no expertise about the scope of an OSC's authority." Doc. 1678-3 at 2, filed June 17, 2022; *see also* Doc. 1678-2 at 6, filed June 17, 2022 (Mr. Morgan states he is "offering an opinion on [OSC Griswold's] authority based on what's stated in other depositions without any expertise on the limits of an OSC's authority"). Plaintiffs also argue that Mr. Morgan's opinions regarding the scope of Mr. Griswold's authority should be excluded because they are nothing but legal conclusions. *See* Motion at 11.

Defendants argue that "Mr. Morgan can testify regarding his understanding of Mr. Griswold's authority because it informs a factual basis for his opinion on the reasonableness of the activities of the EPA and its contractors." Response at 12. Defendants state:

> Mr. Morgan is not offering an expert opinion on the legal extent of Mr. Griswold's authority ... Mr. Morgan states as one of the bases of this opinion:
>
>> EPA and EPA subcontractors, with EPA's agreement, had the authority to modify the plan as site conditions were further understood during field activities. Indeed, these types of situations, present unknown conditions where perfect advance knowledge is impossible to obtain. It is common in the industry, and expected, that experienced mining professionals will make decisions on

4

> appropriate actions to take based on conditions encountered during the work. It would be unreasonable [to] rely entirely on a specific plan or checklist for such work, given the variety of conditions that could be encountered, including changing site conditions.
>
> ....
> Thus, Mr. Morgan is not expressing a legal opinion regarding Mr. Griswold's authority but rather is expressing a factual basis for his opinion on the reasonableness of the actions of the EPA and its contractors.

Response at 12-14.

Mr. Morgan may not testify regarding the OSC's authority, as he did during his deposition when he testified that he "believes Mr. Griswold, as the OSC, has the ... authority and responsibility to prepare the site," and "Mr. Griswold had the authority as the OSC to make decisions, based on the site conditions." Motion at 10 (quoting from Mr. Morgan's deposition transcript that Mr. Morgan agreed he is "offering an opinion on [Mr. Griswold's] authority based on what's stated in other depositions without any expertise on the limits of an OSC's authority"). Mr. Morgan testified in his deposition that he "has no expertise about the scope of an OSC's authority." Doc. 1678-3 at 2. Mr. Morgan may testify that he formed his opinions on the assumption that the OSC had authority to modify the plan and state the bases for the assumption.

Input to Dr. Lipson's Groundwater Flow Model

Plaintiffs argue that Mr. Morgan is not qualified to rebut Dr. David Lipson's groundwater flow model because "Mr. Morgan admitted in deposition that he has never designed a groundwater flow model, does not have the expertise to create one, and no court has ever found him qualified as an expert witness to testify on ground water modeling." Motion at 12.

Defendants contend that "Mr. Morgan is not offering any opinions on the appropriateness of Dr. Lipson's chosen model or how it operates ... Mr. Morgan is offering opinions on the inputs in Dr. Lipson's model based on his broad experience in considering hydrogeological and topographic features of the area as a result of his development of a 3D model of Gold King Mine and adjacent mines in the region" which included consideration of historical information,

5

topographic maps, mine maps reflecting tunnel workings, mining permits, and hydrogeologic reports.  Response at 14.

The Court denies Plaintiffs' Motion to exclude Mr. Morgan's opinions rebutting Dr. Lipson's opinions.  Mr. Morgan is expressing opinions regarding the input to Dr. Lipson's model, not Dr. Lipson's model.  Mr. Morgan is qualified, based on his experience and the materials he has reviewed, to testify about the inputs to Dr. Lipson's model as compared to the physical conditions of the site.

<u>Video Animation</u>

"Mr. Morgan contracted with Courtroom Animation to create animations to portray and explain the conditions at the Gold King Mine at the various stages of site activities at various relevant times."  Response at 15.

Plaintiffs argue the Mr. Morgan is not qualified to offer opinions regarding the video animation which was submitted with his report.  *See* Motion at 12.  Plaintiffs assert that Mr. Morgan did not create the videos and admitted that he does not have expertise in creating, planning, designing or verifying such animations, but opines that the animation is "thorough," "highly accurate" and that the third party that created the animation "was able to recreate the 3D scenes of the activities to a high level of confidence."  Motion at 12 (emphasis in original).

Defendants argue that Mr. Morgan can testify "regarding whether the animation ... is a fair and accurate representation of conditions and activities at the Gold King Mine" because "Mr. Morgan directed the work of the experienced technical animation team based on his extensive mining experience, as well as his knowledge of the record of the Gold King Mine activities as captured by photographs, videos, and drone imagery."  Response at 15.  Mr. Morgan also "participat[ed] in interviews with eyewitnesses to ensure accuracy."  Response at 17. Defendants state:

> The animation is not intended as a simulation model to produce real evidence. Rather, Mr. Morgan will use the animation as a fair and accurate illustration of activities occurring at the site based on existing information, such as photographs, historical records, and eyewitness input. As demonstrative evidence, the animation can be used with Mr. Morgan's testimony. Unlike a simulation, intended to produce a computer-generated result as real evidence, Mr. Morgan's animation visually depicts site conditions and activities based on existing information; it is retrospective in nature and will be used to illustrate Mr. Morgan's opinions at trial. As such, Mr. Morgan can testify about the process used to create the animation as a fair and accurate depiction of site activities and conditions and can use the animation to illustrate his testimony.

Response at 16 (citations omitted).

The Court denies Plaintiffs' Motion to exclude Mr. Morgan's opinions regarding the video animation submitted with his report. The Court of Appeals for the Tenth Circuit "ha[s] recognized the value of exhibits that summarize data contained in other exhibits and that present the evidence in a 'simpler form.'" *Dahlberg v. MCT Transp., LLC*, 571 Fed.Appx. 641, 647 (10th Cir. 2014) (stating "Demonstrative aids may be effective in illustrating relevant information to a jury, assuming a proper foundation is laid. In assessing foundation in this context, courts consider (among other things) whether the proffered demonstrative exhibit "fairly and accurately summarize[s] previously admitted competent evidence."). Plaintiffs do not explain how Mr. Morgan's lack of expertise in creating animations prevents him from testifying that the animations fairly and accurately depict the site conditions and activities based on his review of existing information, such as photographs, historical records, and eyewitness input.

**Opinion Reliability and Helpfulness**

Plaintiffs challenge the reliability and helpfulness of Mr. Morgan's: (i) use of "reasonable" and "not unreasonable;" (ii) opinion regarding intent to reopen the Gold King Mine; (iii) opinion regarding the OSCs' belief regarding the height of water at the portal; and (iv) opinion regarding the existence of a void between what EPA and its Contractors removed and the original blockage of the Gold King Mine.

Use of "Not Unreasonable" and "Reasonable"

7

Plaintiffs assert that Mr. Morgan intends to use "reasonable" and "not unreasonable" when testifying about his opinions regarding the conduct of EPA and its contractors. Plaintiffs argue that Mr. Morgan's use of "not unreasonable" should be excluded for the following reasons:

(i)  It is speculative and unreliable because Mr. Morgan opines as to the intent of EPA and its contractors, noting that Mr. Morgan testified that "not unreasonable" "means that the preponderance of the evidence meant that [EPA and its Contractors] felt it was the appropriate action[] to take."

(ii)  It is unhelpful to the trier of fact because Mr. Morgan's opinions that EPA and its Contractors "felt they had sufficient information to proceed" will not assist the jury in understanding the evidence or determining a fact at issue.

(iii)  It will confuse and mislead the jury regarding the operative legal standard.

Motion at 13-18. Plaintiffs submitted the following excerpt from Mr. Morgan's deposition to illustrate their concerns:

> **Q:** "Do you believe [EPA and its Contractors'] underestimation of the water level, based on their non-tested assumption, was *reasonable*?"
> [Objection to form]
> **A:** "*I don't think* based on the information, which was available, prior to the site activity on August the 4th and 5th, that it was *unreasonable* to believe that the water level was not higher than the top of the mine adit."
> **Q:** "But you are not actually willing to offer the opinion that it was reasonable, correct?"
> **A:** "*I just offered the opinion that it was not unreasonable*."
> **Q:** "Which means you are not offering the opinion it was reasonable, correct?"
> **A:** "That's not. We discussed this two days ago*, reasonable and not unreasonable, to me, mean different things*."
> **Q:** "Okay. And I would like to understand that. How does reasonable – *what's the difference between reasonable and not unreasonable to you*?
> **A:** "*Not unreasonable means* that based on all of the information which they had available to them, *they felt they had the best knowledge* . . . not unreasonable means that *the preponderance of the evidence means that they felt it was the appropriate actions to take*."
> **Q:** "And reasonable - - "
> **A:** "And I think *reasonableness gives a different level of evaluation than not unreasonable*. And I'm happy to say that it was not unreasonable."
> [Court reporting issues]
> **Q:** "In your estimation, reasonable is a higher standard than not unreasonable, correct?"

> [Objection to form]
> **A:** "I answered that *I think reasonable is a higher standard than not unreasonable*."
>
> (Dkt. 1678-5 at 143:8–145:5 (emphasis added).)

Plaintiffs' Reply at 11.

Defendants argue that Mr. Morgan did not create unhelpful legal standards of reasonableness when he used "not unreasonable" and "reasonable" because he "used these terms deliberately in his report and described in detail what he meant in outlining the extensive bases for his opinions in his report." Response at 18. Defendants also argue that "Mr. Morgan did not use exclusively legal terms or phrases like 'negligence' or 'the reasonable man standard.' Instead, he used terms in common parlance to describe the level of care that EPA and its contractors exercised at the site." Response at 18.

The Court grants Plaintiffs' Motion to exclude Mr. Morgan's use of "not unreasonable." Mr. Morgan's use of "not unreasonable" will not help the trier of fact because Mr. Morgan testified it means that EPA and the Contractors "felt it was the appropriate action to take." Under Colorado law,[2] "in ordinary negligence cases, an actor is required to conform his or her conduct to a standard of objective behavior measured by what a reasonable person or ordinary prudence would or would not do under the same or similar circumstances." *Bedee v. American Medical Response of Colorado*, 361 P.3d 1083, 1087 (Colo. App. 2015); *see also* Colo. Jury Instr., Civil 9:8 ("Reasonable care is that degree of care which a reasonably careful person would use under the same or similar circumstances"). Opinions regarding what the EPA OSC and the Contractors felt was the appropriate action to take are not relevant to the objectively reasonable standard under Colorado law. Furthermore, the use of "not unreasonable" may confuse the jury.

<u>Intent to Reopen the Gold King Mine</u>

Plaintiffs state:

---

[2] "Colorado law governs Plaintiffs' tort claims." Mem. Op. and Order at 18, Doc. 166, filed March 20, 2019.

9

> In his report, Mr. Morgan opines that "EPA had no intent to reopen the [Gold King Mine] Level 7 East Portal on August 4 or 5" and that, instead, the "objective" was to prepare for an August 14, 2015 site visit. (**Ex. 1** [Morgan Opening Report] at 2; *see also id.* at 42 ("[R]eopening was not the intent of EPA activities in early August 2015."); **Ex. 4** [Morgan Rebuttal Report] at 10 ("[T]here was no intent to open the mine August 4 or 5.").) He reiterated this opinion in deposition. (*See*, *e.g.*, **Ex. 2** [Morgan Day 1 Tr.] at 173:10–13 ("My opinion, as I state in my expert report, is that I do not believe, based on the information I have reviewed, there was any intent to open the mine on August the 4th and 5th."); *id.* at 180:12–18 ("Mr. Griswold did not intend to open the mine.").)

Motion at 18-19.  Plaintiffs assert that Mr. Morgan's opinions that EPA and its contractors did not intend to reopen the Gold King Mine on August 4 and 5, 2015, should be excluded.

> Defendants argue:
>
> Mr. Morgan is not speculating on intent or motivation as part of an opinion as in the cases Plaintiffs cite. Instead, he is considering the evidence in the record on the work objectives of the EPA and its crew, based on witness statements and other record evidence in assessing the reasonableness of the work at the site in early August 2015. In his first opinion on the reasonableness of the conduct of EPA and EPA contractors, Mr. Morgan states as some of the factual bases for the opinion:
>
>> / EPA had no intent to reopen the GKM Level 7 East Portal on August 4 or 5; in fact, the whole objective of the August 4 and August 5 work was to prepare the site for a scheduled meeting with Mike Gobla, a representative of the U.S. Department of the Interior (DOI) Bureau of Reclamation (BOR), on August 14. [citing in a footnote: Deposition of Matt Francis; Deposition of Steve Way; USA_000115551].
>>
>> / Further confirmation that EPA and its contractors did not intend to reopen the mine on August 4 and 5 is the fact that EPA did not have all of the equipment required to reopen the mine on site on August 5; specifically, the stinger pipe and pump that were required, for the approach to reopen the mine, were not on site….
>>
>> / The mining subcontractor to ER was Harrison Western Construction Corporation (HW). HW was not on site on August 5 and had communicated with ER to mobilize on site on August 25. In addition, HW had agreed to participate in the scheduled August 14 meeting at GKM. These actions further confirm that EPA was not intending to open the mine on August 5.
>
> Ex. 2 at 2-3.

Response at 21.

10

The Court grants Plaintiffs' Motion to exclude Mr. Morgan's opinions that EPA and its contractors did not intend to reopen the Gold King Mine on August 4 and 5, 2015. Mr. Morgan may testify that he formed his opinions regarding EPA and the Contractors' actions on the assumption that the EPA and the Contractors did not intend to reopen the Gold King Mine and may state the bases for the assumption. *See* Reply at 13-14 (Plaintiffs state: "while it may be permissible for Mr. Morgan to testify that Defendants' professed lack of intent to reopen the mine has a 'basis in fact,' his opinion goes much further ... it may be proper for Mr. Morgan to opine that certain equipment not being on site demonstrates a lack of intent to open the Gold King mine ... he cannot opine that Defendants acted with 'no intent to reopen the [Gold King Mine]'").

No Reason to Believe that Water Exceeded the Height of the Top of the Portal

> Plaintiffs state:
>
> Mr. Morgan opines that "EPA had no knowledge of or reason to believe that impounded water in the GKM Level 7 workings exceeded the height of the top of the portal." (**Ex. 1** [Morgan Opening Report] at 4.) This is a key opinion of Mr. Morgan's. He testified that if EPA and its Contractors *had* the knowledge or belief that the water exceeded the height of the top of the portal on August 4 and 5, 2015, they should have acted differently.
> ....
> Mr. Morgan conveniently assumed that when Mr. Griswold stated he approached the adit as though it were full, Mr. Griswold meant the water was *exactly* 10 feet high, i.e. the height of the portal ... even though Mr. Griswold admitted he had "*no idea* how high the portal was.
> ....
> Mr. Morgan's assumption is in fact *contradicted* by the record. On August 16, 2015, Mr. Griswold emailed his supervisors ... [and] explained his claimed approach: "Keeping in mind that the mine should be assumed to be *full of water* – that is backed up to the *top of the plug or higher* – we did not want to get anywhere close to the top of the plug."

Motion at 19-21 (emphasis in original). Plaintiffs contend that Mr. Morgan's opinion that EPA and its Contractors "had no knowledge or of reason to believe that impounded water in the [Gold King Mine] exceeded the height of the top of the portal" is unreliable and should be excluded because "Mr. Morgan admitted that his assumption is unsupported by Mr. Griswold's testimony, and record evidence flatly contradicts it." Motion at 22.

11

Defendants state:

Mr. Morgan's statement that EPA had no knowledge or reason to believe that impounded water in the GKM Level 7 workings exceeded the height of the top of the portal is based on facts that he articulated in his report. Ex. 2 at 4. First, Mr. Morgan noted "[o]ngoing flow from the two drainage pipes that were installed in 2014, to the flume," and the lack of any "increased discharges from the adjacent GKM West Portal." *Id.* Mr. Morgan also noted that "[s]ite photographs show[ed] that [acid mine drainage] was continuing to drain at a consistent low flow from the elevation of the bottom pipe during July and early August 2015, and the soil above the portal did not show signs of moisture." *Id.* In a separate section of his report, Mr. Morgan pointed out additional factual support for this point: "[t]he hill above the adit was inspected for seeps which would have indicated outward flow from mine water that had a pressure head above the top of the adit. It was reported that there were no seeps." *Id.* at 27.

Response at 24.

The Court denies Plaintiffs' Motion to exclude Mr. Morgan's testimony that EPA had no reason to believe that the impounded water exceeded the height of the top of the portal. Mr. Morgan based his opinion on the observation of flow from drainage pipes and the lack of seeps above the portal, observations which were made before the release and are consistent with the height of water not exceeding the height of the top of the portal. While Mr. Griswold's approach may have been based on his assumption that the water was backed up to the top of the plug or higher, an assumption that was stated more than a week after the release, the assumption does not negate Mr. Morgan's opinion that the observations at the site, made immediately before the release, did not indicate that the water exceeded the height of the portal.

Existence of a Void Between what EPA and its Contractors Removed and Original Blockage

Plaintiffs state:

Mr. Morgan opines that a "void" (or "gap") existed between the material EPA and its Contractors removed in 2014 and 2015 and the "original blockage" within the Gold King Mine Level 7 Adit. In Mr. Morgan's view, the presence of this void meant that the removals directed by Mr. Griswold on August 4 and 5, 2015 did not weaken the "original blockage," because EPA and its Contractors were removing material "not providing *any* confining pressure on the original blockage." (**Ex. 4** [Morgan Rebuttal] at 9 (emphasis added).) While convenient for Defendants, Mr. Morgan admitted in deposition that no one working at the Gold King Mine in 2014 and 2015—at the time or after the fact—acknowledged or realized the existence of

12

> such a void. Instead, Mr. Morgan bases his opinion on one ambiguous photograph taken in July 2015. Mr. Morgan's opinion is mere speculation, lacks a reliable foundation, and should be excluded.
> ....
> Mr. Morgan also acknowledged that the photograph was taken after preliminary excavation had already commenced, meaning that any "void" depicted in the photograph could have been the product of such removals, rather than a dormant feature leftover from the [the work undertaken by the State of Colorado's Division of Reclamation, Mining, and Safety ("DRMS") at the Gold King Mine in 2009].

Motion at 23, 26.

Defendants quote from Mr. Morgan's Rebuttal Report which discusses DRMS's 2009 project at the Gold King Mine portal, and states: (i) the "project description was clear that there was a complete blockage of the portal at a distance of approximately 30 ft inby[3] of the portal;" (ii) after installing drain and monitoring pipes, DMRS placed backfill in the portal and left "a distance of 3 to 5 ft" between the original blockage and the DRMS backfill; and (iii) "The DRMS back fill and associated pipes were not a backfill plug and were not intended to provide any additional stability to the original blockage." Response at 27.

Plaintiffs state that their "Motion does not challenge that DRMS may have left, or at least intended to leave, a void between the backfill material and the blockage in the mine: it is focused on Mr. Morgan's speculation that this void *continued to exist* in 2014 and 2015." Reply at 16 (emphasis in original). Plaintiffs ask the Court to exclude Mr. Morgan's opinion that a void existed between the material EPA and its contractors removed and the original blockage because Mr. Morgan's opinion is based on one ambiguous photograph.

The Court will not exclude Mr. Morgan's opinion that a void existed in 2014 and 2015 at the Gold King Mine. Mr. Morgan's opinion is not based solely on the one photograph taken in July 2015; it is also based on his review of DRMS's work at the Gold King Mine in 2009. While the photograph may be the only evidence from 2015 regarding the void that Mr. Morgan considered, and while

---

[3] The word "inby" means "in an inward direction : INSIDE, WITHIN; *specif* : toward the workings of a mine." Webster's Third New International Dictionary 1140 (1993).

Plaintiffs characterize the photograph as "ambiguous," it is one of the several facts on which Mr. Morgan based his opinion. *See In re Urethane Antitrust Litigation*, 768 F.3d 1245, 1263 (10th Cir. 2014) ("a district court must admit expert testimony as long as it is based on a reliable methodology. It is then for the jury to evaluate the reliability of the underlying data, assumptions, and conclusions").

**IT IS ORDERED** that The Navajo Nation, State of New Mexico, and *Allen* Plaintiffs' Motion to Exclude Certain Opinions of Defendants' Expert John S.L. Morgan, Doc. 1678, filed June 17, 2022, is **GRANTED in part** as follows:

(i) The Court grants Plaintiffs' Motion to exclude Mr. Morgan's opinions regarding the scope of the OSC's authority.

(ii) The Court denies Plaintiffs' Motion to exclude Mr. Morgan's opinions rebutting input to Dr. Lipson's model.

(iii) The Court denies Plaintiffs' Motion to exclude Mr. Morgan's opinions regarding the video animation submitted with his report.

(iv) The Court grants Plaintiffs' Motion to exclude Mr. Morgan's use of "not unreasonable."

(v) The Court grants Plaintiffs' Motion to exclude Mr. Morgan's opinions that EPA and its contractors did not intend to reopen the Gold King Mine on August 4 and 5, 2015.

(vi) The Court denies Plaintiffs' Motion to exclude Mr. Morgan's testimony that EPA had no reason to believe that the impounded water exceeded the height of the top of the portal.

(vii) The Court denies Plaintiffs' Motion to exclude Mr. Morgan's opinion that a void existed in 2014 and 2015 at the Gold King Mine.

_____
**WILLIAM P. JOHNSON
CHIEF UNITED STATES DISTRICT JUDGE**