IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

IN RE: GOLD KING MINE RELEASE
IN SAN JUAN COUNTY, COLORADO,                     No. 1:18-md-02824-WJ
ON AUGUST 5, 2015

*This Document Relates to:*   No. 16-cv-465-WJ-LF
　　　　　　　　　　　　　　　No. 16-cv-931-WJ-LF

## MEMORANDUM OPINION AND ORDER
## GRANTING WESTON SOLUTIONS, INC.'S MOTION FOR PARTIAL SUMMARY
## JUDGMENT TO DISMISS CERCLA CLAIMS

CERCLA states that owners or operators of a facility, arrangers of waste disposal or treatment, and persons who accept waste for transport to disposal or treatment facilities:

shall be liable for—

**(A)** all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

**(B)** any other necessary costs of response incurred by any other person consistent with the national contingency plan;

**(C)** damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

**(D)** the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

42 U.S.C. § 9607(a).

Defendant Weston Solutions, Inc. ("Weston") seeks dismissal of claims for CERCLA liability asserted by the State of New Mexico and the Navajo Nation ("Sovereign Plaintiffs") stating:

Weston is a technical assistance contractor that was responsible for documenting work, taking measurements, and performing environmental sampling at the Gold King Mine ("GKM") in the summer of 2015. Weston would have been responsible for treating mine water from the GKM in a settling pond with neutralizing chemical,

but the water management system had not yet been completed when the sudden release of impounded water occurred. Accordingly, Weston had no responsibility to treat or dispose of hazardous substances on the date of the GKM release and had no control over the acid mine drainage ("AMD"). On these undisputed facts, Weston was not a "transporter," "operator," or "arranger" for the purposes of CERCLA liability.

Weston's Motion for Partial Summary Judgment to Dismiss CERCLA Claims at 3, Doc. 1489, filed March 7, 2022 ("Motion").

**Summary Judgment**

> "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "There is a genuine issue of material fact if a rational jury could find in favor of the nonmoving party on the evidence presented." *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 882 (10th Cir. 2018) (quotations omitted).
>
> "The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact ...." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The movant may carry this burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505.
>
> When applying this standard, courts "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

*In re Rumsey Land Co., LLC*, 944 F.3d 1259, 1270-71 (10th Cir. 2019); *Valdez v. United Food & Commercial Workers Union Local 7*, 122 Fed.Appx. 443, 445 (10th Cir. 2005) ("The mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to a dispute of fact that is genuine; an issue of material fact is genuine only if the nonmovant presents facts such that a reasonable jury could find in favor of the nonmovant").

2

**Transporter Liability**

Transporter liability arises when "any person accepts … any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance."  42 U.S.C. § 9607(a)(4).  The term "transport" "means the movement of a hazardous substance by any mode."  42 U.S.C. § 9601(26).  "[T]ransporter liability is predicated on site selection by the transporter."  *U.S. v. Hardage*, 985 F.2d 1427, 1435 (10th Cir. 1993).  Weston contends that it is not liable as a transporter because it never accepted the impounded water released from the Gold King Mine and did not select a disposal or treatment location for the impounded water.  *See* Motion at 10-14.

Weston notes that that there are few decisions that focus on the "acceptance" requirement and states:

> Courts interpreting CERCLA "begin with the language of the statute." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 609–10 (2009). The plain meaning of the term "accept" means "to be able or designed to take or hold (something applied or added)." Accept, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/accept (last accessed Feb. 10, 2022).

Motion at 11.  The Sovereign Plaintiffs do not offer any authority disputing Weston's characterization of "accepted" as meaning "took" or "held."

Weston cites to portions of the record indicating that Weston was tasked with assisting with the development and operation of a water management system to treat water from the Gold King Mine, Weston was not responsible for installation of any portion of the water management system, the water management system was not completed on the day of the release from the Gold King Mine, and there was no mechanism to remove the water from within the mine to the treatment system.  *See* Motion at 4, ¶¶ 2, 3; at 7, ¶¶ 13, 14 (citing deposition testimony that the "piping/hose

... to allow flow to be directed to the [Red and Bonita] pond" was not in place and "the steel stinger pipe 4-inch threaded well casing pipe" was not available).

  The Sovereign Plaintiffs dispute "Weston's claim that it was not involved in construction or installation of the water management system" and cite EPA's On Scene Coordinator ("OSC") Way's testimony that OSC Way expected Weston's input on topics "related to the water management system and any construction associated with that" and requested Weston's input with respect to "contributing to the engineering considerations of a water conveyance system." Response at 26, Doc. 1535, filed April 4, 2022.  The Sovereign Plaintiffs note that "the Weston-authored 'Field Schedule' for work to be completed in 2015 assigned 'Water Treatment Setup for Gold King' to Weston."  Response at 26-27.  The Sovereign Plaintiffs also dispute Weston's statement that that the water management system was not completed on August 5, 2015, "to the extent Weston suggest that portions of the water management system were not in place prior to the Blowout."  Response at 13 (citing deposition testimony that "large pipes were installed as part of the sump in front of the blocked adit[1] before August 5, then washed away by the Blowout").

  The Sovereign Plaintiffs have not established a genuine issue of material fact regarding whether Weston accepted the water from the Gold King Mine.  OSC Way's expectation and request for Weston's input related to setting up the water treatment system, and the Sovereign Plaintiffs' assertion that a portion of the water treatment was present, do not suggest that Weston accepted, took or held water from the Gold King Mine.

  Weston also argues that it is not subject to transporter liability because "Weston did not have discretion to select the treatment site for the water from the Gold King Mine."  Motion at 13.

---

[1] "An 'adit' is a horizontal passage into a mine." *Allen* Plaintiffs' Second Amended Complaint at 103, ¶ 322, Doc. 445, filed January 21, 2020.

4

Weston cites to portions of the record indicating that "EPA's OSC had final decision-making authority for all aspects of work at the [Gold King Mine], including excavation and the design of the water management system."  *See* Motion at 5, ¶ 4 (citing OSC Way's testimony that he expected Weston to have input but "the OSC was the individual responsible for making the final decisions" and OSC Griswold's testimony that he "had the final say" on what activities would occur on August 4th and 5th, 2015 at the Gold King Mine").

The Sovereign Plaintiffs contend that "Weston played a critical role in selecting the disposal site" and cites OSC Way's testimony that OSC Way "expected Weston to provide engineering support on the project ... and specifically tasked Weston with performing calculations to determine the additional capacity required to capture anticipated wastewater discharge from the Gold King Mine in expanded, manmade settling ponds."  Response at 27.  While Weston may have provided input to the OSC regarding the water management system, the Sovereign Plaintiffs have not cited to any portions of the record to show that Weston, and not the EPA, selected the disposal and treatment location.

The Court grants summary judgment in favor of Weston as to transporter liability under CERCLA because there is no genuine issue of material fact as to whether Weston accepted water from the Gold King Mine or selected a disposal location for the water from the Gold King Mine.

**Operator Liability**

The Supreme Court of the United States noted the "uselessness of CERCLA's definition of a facility's 'operator' as 'any person … operating' the facility," and gave the term "operator" its "ordinary or natural meaning:"

> [U]nder CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility.  To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is,

5

> operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.
> ....
> In our enquiry into the meaning Congress presumably had in mind when it used the verb "to operate," we recognized that the statute obviously meant something more than mere mechanical activation of pumps and valves, and must be read to contemplate "operation" as including the exercise of direction over the facility's activities.

*United States v. Bestfoods*, 524 U.S. 51, 66-67, 71 (1998); *Raytheon Constructors, Inc. v. Asarco Inc.*, 368 F.3d 1214, 1217 (10th Cir. 2003) (noting that in *Bestfoods*, the Supreme Court sharpened the definition of "operator" for purposes of CERCLA's concern with environmental contamination and quoting the definition in *Bestfoods*).

Weston states that "the requisite degree of control remains undefined in this [C]ircuit," Motion at 18, citing a Tenth Circuit case decided before *Bestfoods* which states:

> Section 9607(a)(1) defines a responsible party as any owner or operator of a facility. An owner or operator is defined as a person who participates in the management of a facility and who is not merely a stockholder. 42 U.S.C. § 9601(20)(A). In determining whether a person is an operator, some courts do not require the defendant to have exercised actual control in order to qualify as operators under section 9607(a) as long as the authority to control was present. *See United States v. Carolina Transformer Co.,* 978 F.2d 832, 837 (4th Cir.1992); *Nurad, Inc. v. William E. Hooper & Sons Co.,* 966 F.2d 837, 842 (4th Cir.), *cert. denied,* 506 U.S. 940, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992). In *United States v. Kayser–Roth Corp.,* 910 F.2d 24, 27 (1st Cir.1990), *cert. denied,* 498 U.S. 1804, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991), however, the court said:
>
>> To be an operator requires more than merely complete ownership and the concomitant general authority or ability to control that comes with ownership. At a minimum it requires active involvement in the activities of the subsidiary.
>
> *See also Redland Soccer Club, Inc. v. Dep't of the Army of the United States,* 801 F.Supp. 1432, 1437 (M.D.Pa.1992); *Bowen Eng'g v. Estate of Reeve,* 799 F.Supp. 467, 474 (D.N.J.1992). On the other hand, actual control and personal participation in the wrongful conduct clearly makes one an operator under CERCLA. *See United States v. Northeastern Pharmaceutical & Chem. Co.,* 810 F.2d 726, 743 (8th Cir.1986), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *Riverside Mkt. Dev. Corp. v. International Bldg. Prods., Inc.,* 931 F.2d 327, 330 (5th Cir.), *cert. denied,* 502 U.S. 1004, 112 S.Ct. 636, 116 L.Ed.2d 654 (1991).

> We need not decide which approach is best because it is undisputed on the record that Mr. Terry exercised actual control and personally participated in any conduct that violated CERCLA.

*FMC Corp. v. Aero Industries, Inc.*, 998 F.2d 842, 846 (10th Cir. 1993).

In cases decided after *Bestfoods*, the Second, Third, Fifth, Sixth, Eighth and Ninth Circuits have stated that operator liability requires authority to control the activities causing the contamination. *See AMW Materials Testing, Inc. v. Town of Babylon*, 584 F.3d 436, 444 (2d Cir. 2009) (operator liability requires "a level of control *over the hazardous substances at issue*") (emphasis in original). *PPG Industries Inc. v. United States*, 957 F.3d 395, 403 (3d Cir. 2020) ("operator liability requires something more than general control over an industry or facility—it requires some indicia of control over the facility's polluting activities"). *Geraghty and Miller, Inc. v. Conoco Inc.*, 234 F.3d 917, 928 (5th Cir. 2000) (stating that "G&M as merely an environmental contractor employed to investigate and assist in constructing a facility for remedying contamination already in the soils ... is not an operator or an arranger;" "operator liability ... only attaches if the defendant had authority to control the cause of the contamination at the time the hazardous substances were released into the environment"); *American Premier Underwriters, Inc. v. General Electric Co.*, 14 F.4th 560, 577 (6th Cir. 2021) ("To be an operator, GE must have had "actual control" over and "perform[ed] affirmative acts," *Brighton*, 153 F.3d at 314, at a facility where "hazardous substances were disposed of" "at the time of disposal," 42 U.S.C. § 9607(a)(2)"). *K.C.1986 Ltd. P'ship v. Reade Mfg.*, 472 F.3d 1009, 1020 (8th Cir. 2007) ("When considering an individual's liability as an operator, " '[i]t is the authority to control the handling and disposal of hazardous substances that is critical under the statutory scheme.' ... We have held that an individual may be liable as an operator if he "(1) had authority to determine whether hazardous wastes would be disposed of and to determine the method of disposal and (2) actually exercised that authority,

7

either by personally performing the tasks necessary to dispose of the hazardous wastes or by directing others to perform those tasks."). *City of Los Angeles v. San Pedro Boat Works*, 635 F.3d 440, 451 n.9 (9th Cir. 2011) ("CERCLA 'operator' liability has been expansively interpreted by this court to extend to any party with the 'authority to control the cause of the contamination at the time the hazardous substances were released into the environment.'" *Id.* at 1341. The Fourth Circuit adopted the same "authority to control" standard in *Nurad, Inc. v. William E. Hooper & Sons Co.,* 966 F.2d 837 (4th Cir.1992)").

The Sovereign Plaintiffs state that the Supreme Court discussed the "actual authority" and "authority to control" tests regarding operator liability in *Bestfoods*, "but adopted neither" and "[t]o hold Weston liable as an operator, the Sovereign Plaintiffs need only show that Weston 'manage[d], direct[ed], or conduct[ed] operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.'"  Response at 17-18 (quoting *Bestfoods*).

Based on the language in *Bestfoods*, the Tenth Circuit's acknowledgement in *Raytheon* of the *Bestfoods* standard, and the absence of any Tenth Circuit case law indicating otherwise, the Court concludes that "actual authority" or "authority to control" is not a necessary element for operator liability.  However, the language in *Bestfoods* also indicates that mere participation in some activities at a facility is not sufficient to establish operator liability:

> In our enquiry into the meaning Congress presumably had in mind when it used the verb "to operate," we recognized that the statute obviously meant something more than mere mechanical activation of pumps and valves, and must be read to contemplate "operation" as including the exercise of direction over the facility's activities.

*Bestfoods*, 524 U.S. at 71; at 66 (stating "in the organizational sense more obviously intended by CERCLA, the word [to "operate"] ordinarily means '[t]o conduct the affairs of; manage: *operate a business*.'") (emphasis in original).

Weston contends that it is not liable as an operator because it did not participate in and had no authority to control the excavation at the Gold King Mine immediately before the release. *See* Motion at 14-24. Weston cites EPA OSC Way's testimony that Weston "did not have the authority to direct" the work of the other contractors performing the excavation, "Weston was not in a supervisory capacity ... they were providing technical expertise and support for the operations on site," and OSC Way did not expect Weston's employee "to be personally responsible for the control and direction of any excavation work at the Gold King Mine site," *See* Motion at 21-22. Weston also cites EPA OSC Griswold's testimony that he "directed those at the Gold King Mine on August 4th and 5th what to do ... [and] what not to do," was "the sole decision-maker" at the Gold King Mine, and "had the final say." Motion at 22. EPA contractor Environmental Restoration's Response Manager testified that Weston did not do any excavation work at the Gold King Mine in 2015. *See* Motion at 7, ¶ 15.

The Sovereign Plaintiffs contend that:

(i)   Weston was "involved in 'conduct[ing]' the entirety of the 'operations' insofar as it was highly involved in all aspects of project planning beginning in 2014 and carrying into 2015."

(ii)  "[I]n 2015 Weston was tasked with 'Water Treatment Setup for Gold King.'"

(iii) "OSC Way tasked Weston engineer Bryniarski with performing calculations in 2014 to determine the capacity of the manmade settling ponds that would be required to capture the hazardous substances then trapped and building up in the mine [which] was an essential

9

step in locating the disposal site ... Accurately calculating the volume, which Weston failed to do, was critical to designing a capable water treatment system and preventing a blowout."

(iv)  "OSC Way testified that 'there was an expectation of [Weston] having direct input into what the nature of the excavation--excavation or construction-related activities may be.'"

(v)  "OSC Griswold testified that Weston engineer Petri was actively involved with excavation work, '[taking] a close look' and '[i]nspect[ing] for any signs that [they] were approaching the blockage, any hints, any clues.'"

(vi)  "OSC Way testified that it was incumbent on all project team members, including Weston, to alert the team of any dangerous condition they saw at any time."

(vii)  "Weston's own project documents state its employees' right and responsibility to stop 'any work that presents an imminent hazard to people or the environment' ... [Weston] was empowered and required to speak up if it saw something dangerous.  A sharp deviation from the plan to excavate only after the water management system was in place qualified as something that Weston could have and should have intervened to control or at least question."

Response at 19-21.

The Court grants summary judgment in favor of Weston as to operator liability.  Weston cited to portions of the record showing that Weston did not have the authority to direct or control the work of the other contractors performing the excavation, that Weston provided technical support and support for the operations but was not in a supervisory capacity, that EPA OSC Griswold was the sole decision-maker at the Gold King Mine, directed those at the Gold King Mine on what to do, and had the final say, and that Weston did not do any excavation work at the

Gold King Mine in 2015.  The portions of the record cited by the Sovereign Plaintiffs indicate Weston was involved with planning operations at the Gold King Mine, performed a calculation of the volume of water in the Gold King Mine to design an appropriate water treatment system, was tasked with observing the excavation to look for signs that the excavation was approaching the blockage, and was expected to alert the team of any dangerous conditions Weston observed.  Those portions of the record do not show there is a genuine issue as to whether Weston managed, directed, or conducted operations at the Gold King Mine such that it would be an "operator" under the *Bestfoods* standard which "includ[es] the exercise of direction over the facility's activities."

**Arranger Liability**

"Because CERCLA does not specifically define what it means to 'arrang[e] for' disposal of a hazardous substance," the Supreme Court of the United States "give[s] the phrase its ordinary meaning:" "under the plain language of the statute, an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance."  *Burlington Northern v. Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 611 (2009).  The Tenth Circuit has more recently stated:

> to be held liable under CERCLA as an arranger, we require a party to satisfy three conditions: (1) the party must be a "person" as defined in CERCLA; (2) the party must "own" or "possess" the hazardous substance prior to the disposal; and (3) the party must, "by contract, agreement or otherwise," arrange for the transport or disposal of such hazardous substances.

*Chevron Mining Inc. v. United States*, 863 F.3d 1261, 1279 (10th Cir. 2017).  The Tenth Circuit noted that the Sixth and Eighth Circuits recognized that "control" over the hazardous substance may establish constructive ownership or possession sufficient to trigger arranger liability but did not decide whether constructive ownership or possession is sufficient to trigger arranger liability in the Tenth Circuit.  *Chevron Mining*, 863 F.3d at 1283.

11

Weston contends that it is not liable as an arranger because it never possessed, owned, or controlled the water impounded in the Gold King Mine. *See* Motion at 24-27.

> The release occurred before waste entered the system that Weston assisted EPA to design (UMF [Undisputed Material Fact] 14), so whatever control Weston wielded with respect to that system is irrelevant to arranger liability. ERRS, not Weston, was responsible for setting the system up. UMFs 6, 12. The testimony makes clear that Weston did not control ERRS's excavation work (UMF 12), so Weston cannot be said to have "arranged" for any excavation to access or treat the AMD. At most, Weston provided technical support related to excavation activities, such as taking measurements of the dimensions of the portal, measuring flow of water, or sampling water for concentrations of metals. UMFs 2-3. The excavation was the purview of other contractors and subcontractors. UMFs 6, 9, and 11.

Motion at 25-26.

> The Sovereign Plaintiffs cite to portions of the record showing that:
>
> (a) EPA tasked Weston with "water management system operations assistance" (Weston UMF 2); (b) EPA instructed Weston to "[d]evelop, help operate, and monitor a water treatment system" (Weston UMF 3); (c) EPA required "[w]ater management systems will be set up and operational before any construction work begins" (Weston UMF 6); and (d) Weston was "responsible for overseeing the water treatment operations" (*id.*). But there are significant disputes concerning the precise roles, responsibilities, and degree of discretion Weston had with respect to designing, controlling, and operating the water management system. (DMFs 1-9.

Response at 25.  The Sovereign Plaintiffs also state:

> there are disputed material facts concerning whether Weston's level of control of the hazardous substances to be disposed of via the water management system could amount to constructive possession thereof. Moreover, portions of the water management system were installed prior to the Blowout, and the force of the Blowout stripped these large pieces of pipe from the site, washing them downstream. (DMF 14.) Accordingly, the hazardous substances released from the Gold King Mine *did pass through* the installed components of the water management system that Weston was tasked and involved with designing, installing, and operating, in fact carrying those components away. This further demonstrates that Weston took constructive possession of those hazardous substances when they passed through the water management system that Weston had almost complete responsibility for and control over.

Response at 25 (emphasis in original).

The Court grants summary judgment in favor of Weston as to arranger liability under CERCLA because the Sovereign Plaintiffs have not established a genuine issue of material fact

regarding whether Weston possessed, owned, or controlled the water impounded in the Gold King Mine. The portions of the record cited by the Sovereign Plaintiffs suggest that Weston had control over the water *management system* but do not suggest Weston may have had control over the water released from the Gold King Mine.

**IT IS ORDERED** that Weston Solutions, Inc.'s Motion for Partial Summary Judgment to Dismiss CERCLA Claims, Doc. 1489, filed March 7, 2022, is **GRANTED.**

_____
**WILLIAM P. JOHNSON
CHIEF UNITED STATES DISTRICT JUDGE**